GEORGE AZADIAN (SBN 253342)
Email: george@ctmesq.com
**THE MATHEWS LAW GROUP**
2596 Mission Street, Suite 204
San Marino, CA  91108
Voice: (626) 683-8291

DANIEL GREENBERG (*pro hac vice* pending)
Email: dngrnbrg@gmail.com
**CENTER FOR CLASS ACTION FAIRNESS LLC**
**GREENBERG LEGAL SERVICES**
55 Fontenay Circle
Little Rock, AR  72223
Voice: (501) 588-4245

(additional counsel on signature page)

*Attorneys for Class Members Nicholas John Stehle*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

LODGED

JUL 22 PM 2:58
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

| | |
|---|---|
| MICHELLE WEEKS, *et al.*,<br>        *Plaintiffs,*<br><br>v.<br><br>KELLOGG COMPANY, *et al.*,<br>        *Defendants.*<br><br>_____<br><br>Nicholas John Stehle,<br>        *Objector.* | Case No. CV-09-08102 (MMM) (RZx)<br><br>**OBJECTION TO PROPOSED<br>SETTLEMENT**<br><br>Judge:    Hon. Margaret M. Morrow<br>Date:     August 29, 2011<br>Time:     10:00 a.m.<br>Courtroom: 780<br><br>**CLASS ACTION** |

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................... i

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ...............................................................................................1

I.    The Objector Is a Member of the Class. .......................................................1

II.   Under Rule 23, Preventing an Unfair Settlement Is This Court's Duty. ........2

    A.    Courts Should Adopt *ALI Principles* § 3.05 for Reviewing Settlements. ...........................................................................................3

    B.    The Court Should Discount Attempts by the Settling Parties to Infer Class Approval from a Low Number of Objections....................4

    C.    Class Counsel's Recommendation Is Superfluous...............................6

    D.    The Court Can Apply Section 3.05 of the ALI Principles Consistently With Ninth Circuit Precedent. .........................................7

III.  The *Cy Pres* Provisions Betray The Class. .....................................................7

    A.    Class Counsel's Primary Duty Must Be to the Class, Not to Charities..............................................................................................8

    B.    The Cy Pres Portion of This Settlement Fails to Target the Class. ...................................................................................................9

    C.    The Settlement's Language Permits Donation of Junk Food. ............11

    D.    Class Counsel Overcounts the Value of the *Cy Pres* Remainder. ......12

    E.    The Parties Have Failed to Demonstrate a Lack of Conflict of Interest with the *Cy Pres* Recipients...................................................13

IV.   This Settlement's Motion Schedule Provides Inadequate Notice to Class Members. ..............................................................................................14

V.    Class Counsel's Self-Interested Accounting Has Created Fees That Are Both Excessive and Concealed...........................................................15

    A.    The Value of Notice and Claim Administration Primarily Benefits Defendants, Not the Class...................................................15

B.   Class Counsel Has Improperly Valued Charitable Donations of Goods at Their Retail Price. ................................................................18

C.   Residual *Cy Pres* Should Not Be Valued the Same as Class Benefits. .......................................................................................19

D.   In Short, Class Counsel Is Really Asking For One-Third or One-Half the Settlement. ..................................................................20

VI.   The Settlement Places Impermissible and Unjustifiable Burdens upon Both Objectors and Their Counsel. ...........................................21

VII.   Stehle's *Pro Bono* Attorneys Bring This Objection in Good Faith. ............23

CONCLUSION ......................................................................................24

1

# TABLE OF AUTHORITIES

2

**<u>Cases</u>**

3

*Amalgamated Meat Cutters & Butcher Workmen v. Safeway Stores, Inc.*, 52
F.R.D. 373 (D. Kan. 1971)....................................................................................6

4

5

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) .......................................2

6

*Antoninetti v. Chipotle Mexican Grill*, 614 F.3d 971 (9th Cir. 2010)...............22

7

*Besinga v. United States*, 923 F.2d 133 (9th Cir. 1991)....................................16

8

*Coppolino v. Total Call Intern., Inc.*, 588 F. Supp. 2d 594 (D. N.J. 2008) .......16

9

*Crawford v. Equifax Payment Services, Inc.*, 201 F.3d 877 (7th Cir. 2000)......20

10

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006)................................3

11

*Ellis v. Edward D. Jones & Co.*, 527 F. Supp. 2d 439 (W.D. Pa. 2007). ...........5

12

*Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434 (S.D. Iowa 2001) ..........4

13

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998).................................3

14

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 2005 U.S.
Dist. LEXIS 16468 (D. Me. Aug. 9, 2005)......................................................11

15

*In re Diet Drugs Prods. Liability Litig.*, 385 F.3d 386 (3rd Cir. 2004) ............16

16

*In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106
(7th Cir. 1979) ...................................................................................................6

17

18

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55
F. 3d 768 (3d. Cir. 1995)......................................................................2, 4, 5, 6

19

*In re HP Inkjet Printer Litig.*, No. 5:05-cv-3580 JF, 2011 WL 1158635 (N.D.
Cal. Mar. 29, 2011)..........................................................................................18

20

*In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010)...........14, 24

21

*In re Prudential Ins. Co. America Sales Practices Litig.*, 148 F.3d 283 (3rd
Cir. 1998)..........................................................................................................18

22

23

*In re Relafen Antitrust Litigation*, 360 F.Supp.2d 166 (D. Mass. 2005)............2

24

*In re Wells Fargo Securities Litig.*, 991 F. Supp 1193 (N.D. Ca. 1998) ...........11

25

*Kealoha v. Castle*, 210 U.S. 149 (1908) ...........................................................16

26

*Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d
677, 680-681 (7th Cir. 1987)..............................................................................5

27

28

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004) ........................20

*Murray v. GMAC Mortgage Corp.*, 434 F.3d 948 (7th Cir. 2006) ..............20, 21

1    *Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292 (M.D. Pa. 1995) ..................5

2    *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277 (7th Cir. 2002) ......................................2

3    *Riker v. Gibbons,* 2010 WL 4366012 (D. Nev. Oct. 28, 2010) ..........................................2

4    *Schwartz v. Dallas Cowboys Football Club, Ltd.,* 157 F.Supp.2d 561 (E.D.
     Pa. 2001)..........................................................................................................11, 18

5

   *Silber v. Mabon,* 957 F.2d 697 (9th Cir. 1992) ................................................................2

6

   *Six Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301 (9th Cir.
7     1990) ...................................................................................................................*passim*

8    *Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003)..................................................3, 17

9    *Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370 (9th Cir. 1993)......................................15

10   *True v. Am. Honda Motor Co.,* 749 F.Supp.2d 1052 (C.D. Cal. 2010). ...........................15

11   *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043 (9th Cir. 2002).............................................3

12   *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ..........................17

13   **Statutes and Regulations**

14   26 U.S.C. § 170(e)(3)(B) ...............................................................................................18

15   28 U.S.C. § 1713..................................................................................................16, 17

16   Fed. R. Civ. P. 23 ......................................................................................................*passim*

17   Rev. Rul. 85-8, 1985-1 C.B. 59 .....................................................................................18

18   **Other Authorities**

19   American Law Institute, Principles of the Law of Aggregate Litig. §3.05
     (2010)...................................................................................................................*passim*

20

   American Law Institute, Principles of the Law of Aggregate Litig. §3.07
21   (2010)..................................................................................................................11, 13

22   John Beisner, *et al., Cy Pres: A Not So Charitable Contribution to Class
     Action Practice* (2010) .....................................................................................................9

23

   Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objectors
24     in Class Action Litigation: Theoretical and Empirical Issues*, 57 Vand. L.
     Rev. 1529 (2004)..........................................................................................................6

25

   Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev.
26   1623 (2009) ................................................................................................................23

27   Editorial, *When Judges Get Generous; A better way to donate surpluses from
     class-action award*s, Wash. Post (Dec. 17, 2007)..........................................................9

28

Robert Feenstra and Matthew Shapiro (eds.), SCANNER DATA AND PRICE
INDEXES: STUDIES IN INCOME AND WEALTH, vol. 64 (2003) ......................................10

Allison Frankel, "Legal Activist Ted Frank Cries Conflict of Interest, Forces
O'Melveny and Grant & Eisenhofer to Modify Apple Securities Class
Action Deal," AMERICAN LAWYER LIT. DAILY (Nov. 30, 2010). ...............................23

Christopher R. Leslie, *The Significance of Silence: Collective Action
Problems and Class Action Settlements*, 59 FLA. L. REV. 71 (2007)............................5

Adam Liptak, *Doling Out Other People's Money*, N.Y. Times (Nov. 26,
2007) ................................................................................................................................9

Herbert Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS § 13:20 (4th
ed. 2002). .........................................................................................................................2

Notes of Advisory Committee on 2003 Amendments, Fed. R. Civ. P. 23 .......................14

Martin H. Redish, *et al.*, *Cy Pres Relief and the Pathologies of the Modern
Class Action: A Normative and Empirical Analysis*, 62 FLA. L. REV. 617
(2010) ...........................................................................................................................8, 9

Sam Yospe, *Cy Pres Distributions in Class Action Settlements*, 2009
COLUMBIA BUS. L. REV. 1014 ....................................................................................9, 11

Rachel M. Zahorsky, "Unsettling Advocate," ABA J. (Apr. 2010) .................................23

**INTRODUCTION**

The settling parties ask this Court to approve a settlement in which class counsel takes the majority of the cash for itself, while directing a majority of the remainder of the settlement's value to charities. As a result, the settlement cannot be approved: class counsel has breached its duty to the class by directing settlement funds to third parties instead of their clients.

Moreover, the settlement cannot be approved because its procedures violate Rule 23. Class counsel gave insufficient notice to the class of its $1.3 million fee request, and the preliminary approval order places improper restrictions upon objections designed to deter class members from exercising their rights.

If the Court does approve the settlement, it cannot approve a $1.3 million award to the attorneys: class counsel has exaggerated the benefits of the settlement to inflate their fee award, and improperly scheduled the fairness hearing to hide the lack of benefit to the class. The Court should wait until the number of claims is known before awarding fees, and then award fees based on the actual benefit to the class.

**I.      The Objector Is a Member of the Class.**

Objector Nicholas John Stehle purchased Kellogg's Rice Krispies and Cocoa Krispies cereal between June 1, 2009 and March 1, 2010. Stehle qualifies for membership in the class; he therefore has standing to object to the settlement. Through his counsel, Daniel Greenberg of the Center for Class Action Fairness, Stehle intends to appear at the final approval hearing on August 29, 2011. Greenberg's *pro hac vice* motion is pending; he represents Stehle *pro bono*. Greenberg has filed a separate motion with this court requesting the opportunity to be heard at the final fairness on June 20, 2011; in that brief, he requested the opportunity to cross-examine any witnesses who testify at the hearing in support of settlement approval.

Stehle's mailing address is 2201 Cherry Crossing, Benton, AR 72015; his phone number is (501) 539-0275. Stehle has never objected to any other class action settlement.

## II.   Under Rule 23, Preventing an Unfair Settlement Is This Court's Duty.

"Both the United States Supreme Court and the Courts of Appeals have repeatedly emphasized the important duties and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to final adjudication and settlement of a class action suit." *In re Relafen Antitrust Litigation*, 360 F.Supp.2d 166, 192-94 (D. Mass. 2005), citing *inter alia Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617, 623, 117 S. Ct. 2231, 138 L. Ed. 2d 68 (1997) ("Rule 23(e) protects unnamed class members from 'unjust or unfair settlements' agreed to by 'fainthearted' or self-interested class 'representatives.'"); *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279-80 (7th Cir. 2002) ("district judges [are] to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions" prior to settlement).

"Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members.... [T]he court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F. 3d 768, 785 (3d. Cir. 1995) (quoting *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir. 1975)). *See also Riker v. Gibbons,* 2010 WL 4366012, at *2 (D. Nev. Oct. 28, 2010). "A trial court has a continuing duty in a class action case to scrutinize the class attorney to see that he or she is adequately protecting the interests of the class." Herbert Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS § 13:20 (4th ed. 2002). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon,* 957 F.2d 697 (9th Cir. 1992), at 701. *Accord Diaz v. Trust Territory of Pacific Islands,* 876 F.2d 1401, 1408 (9th Cir. 1989).

There should be no presumption in favor of settlement approval: "[t]he proponents of a settlement bear the burden of proving its fairness." *True v. American Honda Co.,* 749 F. Supp. 1052, 1080 (C.D. Cal. 2010) (*citing* 4 NEWBERG ON CLASS ACTIONS § 11:42 (4th Ed.2009)). *Accord* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(c) (2010) ("*ALI Principles*").

It is insufficient that the settlement happened to be at "arm's length" without express collusion between the settling parties; because of the danger of conflicts of interest, third parties must monitor the reasonableness of the settlement as well. There is a need for "special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998). *Accord Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003) ("If fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have obtained."). "Because in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage, courts have stressed that when awarding attorneys' fees from a common fund, the district court must assume the role of fiduciary for the class plaintiffs." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002) (quoting *In Re Washington Public Power Supply Syst. Lit.*, 19 F.3d 1291 (9th Cir. 1994)). "Accordingly, fee applications must be closely scrutinized." *Vizcaino*, 290 F. 3d at 1052.

### A.   Courts Should Adopt *ALI Principles* § 3.05 for Reviewing Settlements.

Standards for reviewing settlements differ from circuit to circuit: the "current case law on the criteria for evaluating settlements is in disarray." *ALI Principles* § 3.05 comment a at 205. The Ninth Circuit has asked courts to follow an eight-factor test. *E.g.*, *Churchill Village v. General Elec.*, 361 F.3d 566, 575-76 (9th Cir. 2004). But the Ninth Circuit has also reversed settlement approvals without reference to the eight-factor test. *Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) (reversing settlement approval without reference to eight-factor test).

Some of the *Churchill Village* factors are not helpful to evaluating a settlement, not least because the cases give no guidance to how to weight the various factors. Instead, courts should follow § 3.05 of the American Law Institute's *Principles of the Law of*

*Aggregate Litigation*, which, rather than an indeterminate balancing test of factors, asks courts to submit settlements to several tests that demonstrate unfairness. Under § 3.05(a), there is first an initial four-part test that all settlements must meet: the court must consider whether

    (1)    the class representatives and class counsel have been and currently are adequately representing the class;

    (2)    the relief offered to the class… is fair and reasonable given the costs, risks, probability of success, and delays of trial and appeal;

    (3)    class members are treated equitably (relative to each other) based on their facts and circumstances and are not disadvantaged by the settlement considered as a whole; and

    (4)    the settlement was negotiated at arm's length and was not the product of collusion.

In addition to these four mandatory requirements, a "settlement may also be found to be unfair for any other significant reason that may arise from the facts and circumstances of the particular case." *Id.* § 3.05(b).

**B.**    **The Court Should Discount Attempts by the Settling Parties to Infer Class Approval from a Low Number of Objections.**

Any given class action settlement, no matter how much it betrays the interests of the class, will produce only a small percentage of objectors. The predominating response will always be apathy, because objectors—unless they can obtain *pro bono* counsel—must expend significant resources on an enterprise that will create little direct benefit for themselves. Another common response from non-lawyers will be the affirmative avoidance, whenever possible, of anything involving a courtroom. Class counsel may argue that this understandable tendency to ignore notices or free-ride on the work of other objectors is best understood as acquiescence in or evidence of support for the settlement. This is wrong. Silence is simply *not* consent. *Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 447 (S.D. Iowa 2001) (*citing In re GMC Pick-Up Truck Fuel Tank Prods.*

1   *Liab. Litig.*, 55 F.3d, at 789.). "Silence may be a function of ignorance about the
2   settlement terms or may reflect an insufficient amount of time to object. But most likely,
3   silence is a rational response to any proposed settlement even if that settlement is
4   inadequate. For individual class members, objecting does not appear to be cost-beneficial.
5   Objecting entails costs, and the stakes for individual class members are often low."
6   Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class*
7   *Action Settlements*, 59 FLA. L. REV. 71, 73 (2007).

8          There is usually little hope that opt-outs can recover for their claims—the entire
9   purpose of class actions is to aggregate claims that would be uneconomical to bring
10  individually. "Almost by definition, most class members have too little at stake to warrant
11  opting out of the class litigation and filing an individual lawsuit. Thus, opting out is
12  probably not a viable option even though a proposed settlement is unfair or inadequate."
13  *Id.* at 109. Without *pro bono* counsel to look out for the interests of the class, filing an
14  objection is economically irrational for any individual. "[A] combination of observations
15  about the practical realities of class actions has led a number of courts to be considerably
16  more cautious about inferring support from a small number of objectors to a sophisticated
17  settlement." *In re GMC Pick-Up Litig.*, 55 F.3d at 812 (*citing In re Corrugated Container*
18  *Antitrust Litig.*, 643 F.2d 195, 217-18 (5th Cir. 1981)); *cf. Petruzzi's, Inc. v. Darling-*
19  *Delaware Co.*, 880 F. Supp. 292, 297 (M.D. Pa. 1995) ("'[T]he silence of the
20  overwhelming majority does not necessarily indicate that the class as a whole supports the
21  proposed settlement . . . .'"). "[A] low number of objectors is almost guaranteed by an
22  opt-out regime, especially one in which the putative class members receive notice of the
23  action and notice of the settlement offer simultaneously." *Ellis v. Edward D. Jones & Co.*,
24  527 F. Supp. 2d 439, 446 (W.D. Pa. 2007). "[W]here notice of the class action is, again as
25  in this case, sent simultaneously with the notice of the settlement itself, the class members
26  are presented with what looks like a *fait accompli*." *Mars Steel Corp. v. Continental*
27  *Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677, 680-681 (7th Cir. 1987). "Acquiescence to
28  a bad deal is something quite different than affirmative support." *In re General Motors*

1  *Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1137 (7th Cir. 1979) (reversing

2  approval of settlement).

3       When class members have little at stake, as in an action such as this where the

4  maximum recovery is fifteen dollars, the rate of response will be predictably low. This is

5  especially true here, where as discussed below, the notice failed to inform the class that

6  class counsel wished to receive over half of the cash available in the settlement, and the

7  Court placed impermissibly high burdens on objecting. As such, it cannot be seen as

8  something akin to an election or a public opinion poll. *See In re GMC Pick-Up Litig.*, 55

9  F.3d at 813 (finding that "class reaction factor" does not weigh in favor of approval, even

10  when low number of objectors in large class, when "those who did object did so quite

11  vociferously"); Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and*

12  *Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 VAND. L. REV.

13  1529, 1532 (2004). It is typically not worth the average citizen's time or money to object:

14  the slight likelihood that one additional objection will be decisive, when multiplied by the

15  slight increase in an individual class member's payout that such an objection would

16  produce, makes individually-funded objections a losing proposition.

17       The judge must act as a guardian for *all* class members—whether or not they have

18  formally entered the case by registering an objection. "[T]he absence or silence of class

19  parties does not relieve the judge of his duty and, in fact, adds to his responsibility."

20  *Amalgamated Meat Cutters & Butcher Workmen v. Safeway Stores, Inc.*, 52 F.R.D. 373,

21  375 (D. Kan. 1971). The Court should draw no inference in favor of the settlement from

22  the number of objections, especially given the vociferousness of the objectors. *GM Pick-*

23  *Up Trucks*, 55 F.3d at 812-13; *ALI Principles* § 3.05 comment *a* at 206.

24       **C.    Class Counsel's Recommendation Is Superfluous.**

25       Class counsel argues that the opinion of experienced counsel who agreed to the

26  settlement is evidence in favor of settlement approval. Dkt. No. 138-1 at 16. But this

27  makes no sense: counsel negotiated the settlement, and are never going to go to the Court

28  and ask them to disregard what they negotiated, regardless of the underlying fairness of

the settlement. "[T]he lawyers who negotiated the settlement will rarely offer anything less than a strong favorable endorsement." *Principles* § 3.05, comment *a*. The fact that class counsel approves of the settlement can hardly be evidence that the settlement fairly treats the class relative to the benefits received by class counsel.

### D. The Court Can Apply Section 3.05 of the ALI Principles Consistently With Ninth Circuit Precedent.

One can use the Section 3.05 standards as a consistent complement to the *Churchill Village* eight-factor test, which also asks courts to examine the risks of the case and the reasonableness of the settlement fund in relation to those risks, and *Molski v. Gleich*, which applied more general grounds of fairness. Stehle recognizes that this court is bound by Ninth Circuit precedent on the question, but asks the Court to adopt ALI's *Principles* § 3.05 in evaluating the settlement, and downplay the importance of *Churchill Village* factors that do nothing to distinguish between good settlements and bad ones. That said, the settlement fails to meet two separate and independent Ninth Circuit precedents.

### III.   The *Cy Pres* Provisions Betray The Class.

There are five respects in which the *cy pres* provisions are problematic. First, there is a significant possibility that *cy pres* beneficiaries will inappropriately intrude upon and take priority over direct class compensation. Second, the charitable donations' apparently arbitrary area of coverage fails to adequately target the plaintiff class. Third, the language of the settlement permits Kellogg to meet its obligations by donating junk food. Fourth, that arbitrary area of coverage gives rise to legitimate concern that there may be some personal or financial connection between the parties and the *cy pres* beneficiaries. Fifth, especially in the case of public interest litigation *cy pres* beneficiaries, it is impermissible and offensive for class counsel to receive any compensation for directing funds to other members of the bar. Because of the many peculiarities of the *cy pres* portion of this proposed settlement, Stehle asks the parties to take reasonable measures to demonstrate that the *cy pres* portions of this settlement are fair.

**A.     Class Counsel's Primary Duty Must Be to the Class, Not to Charities.**

Class counsel has propounded a settlement that gives designated third-party beneficiaries a higher priority than their own clients. Class counsel represents the agreement as delivering $2.5 million of cash and $2.5 million of food "to the Settlement Class" (Plaintiffs' Memorandum of Law, at 1), but this is incorrect. In fact, if the fee request is granted, more than half the cash will go to class counsel; meanwhile, the food donation will go to third parties, not the class. This leaves less than a quarter of the supposed $5 million for the class. What if there are insufficient funds remaining to compensate the class for the claims made? This question is answered in the original stipulated settlement: any taxes owed will be paid in full, class counsel will be paid in full, class representatives will be paid in full – but class members will have their compensation proportionately reduced. Stipulation of Settlement (Dkt. No. 121) at 17-18.

There is no defensible reason to have *any cy pres* distribution in this settlement until the class members are completely compensated. Class counsel's acceptance of the consequences of this settlement – that discrete third parties may receive millions of dollars in charitable donations at the expense of a few dollars to thousands of faceless clients – contradicts its duties to its clients. Perhaps class counsel wants the ability to issue a press release suggesting that their law firms are generous donors to a public-spirited organization, when in fact they are spending their putative clients' money. The food banks are not the class counsel's client; the class members are. And the failure of class counsel and the class representative to put the interests of the class first in negotiating this settlement raises severe Rule 23(a)(4) concerns: how can these parties be said to fairly and adequately represent the class when the proposed settlement pursues the interests of third parties at the class's expense?

This prospect is a typical result of *cy pres* settlements, about which there is an emerging consensus that such settlements, by their very nature, invite conflicts of interest. *See, e.g.*, Martin H. Redish, *et al.*, *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 Fla. L. Rev. 617 (2010) (*cy pres*

"threatens to undermine the due process interests of absent class members by disincentivizing the class attorneys in their efforts to assure [classwide] compensation of victims of the defendant's unlawful behavior"); John Beisner, *et al.*, *Cy Pres: A Not So Charitable Contribution to Class Action Practice* (2010); Sam Yospe, *Cy Pres Distributions in Class Action Settlements*, 2009 Columbia Bus. L. Rev. 1014; Editorial, *When Judges Get Generous; A better way to donate surpluses from class-action award*s, Wash. Post (Dec. 17, 2007) ("Federal judges are permitted to find other uses for excess funds, but giving the money away to favorite charities with little or no relation to the underlying litigation is inappropriate and borders on distasteful. In all but the rarest of circumstances, those funds should be made available to individual plaintiffs and not to outside organizations—no matter how worthy"); Adam Liptak, *Doling Out Other People's Money*, N.Y. Times (Nov. 26, 2007).

**B.      The Cy Pres Portion of This Settlement Fails to Target the Class.**

Years before an army of commentators began to point out the deficiencies in typical *cy pres* settlements, the Ninth Circuit was on the case. In *Six Mexican Workers v. Arizona Citrus Growers,* the district court found that the Arizona Citrus Growers had violated the Farm Labor Contractor Registration Act to the detriment of a class of 1,349 undocumented Mexican workers; it then awarded the workers $1.8 million in damages. *Six Mexican Workers,* 904 F.2d 1301 (9th Cir. 1990), at 1303-04. The court ordered "any unclaimed funds be distributed through a *cy pres* award to the Inter-American Fund for indirect distribution in Mexico." *Id.* at 1304.

On appeal, the Ninth Circuit remanded. "The district court's proposal benefits a group too far remote from the plaintiff class." *Id.* at 1308. *Cy pres* "will be rejected when the proposed distribution fails to provide the 'next best' distribution." *Id.* Any such distribution must "adequately target the plaintiff class." *Id.* at 1309. "The district court's plan permits distribution to areas where the class members may live, but there is no reasonable certainty that any member will be benefited." *Id.* at 1308. The court insisted that the need for *cy pres* to "effectuate … the interests of silent class members" was non-

negotiable: "If the district court is unable to develop an appropriate *cy pres* distribution, or finds *cy pres* no longer appropriate, it should consider escheating the funds pursuant to 28 U.S.C. § 2042." *Id.* at 1309.

*Six Mexican Workers'* requirement that the *cy pres* recovery should be directed at the class is not only good law, but good public policy. Strict insistence that a *cy pres* distribution conform to the *cy pres* standards of trust law, and thus serve as a truly "next best" distribution, has the effect of eliminating or deterring arbitrary distributions that betray the interests of class members.

The proposed agreement before the court today contains a *cy pres* provision that not only fails to meet the *Six Mexican Workers* standard, but makes the Inter-American Fund proposal that the trial court proposed and the appellate court rejected appear to be, in comparison, a model of efficiency and precision. The agreement proposes to distribute "Kellogg branded cereals and other food products having a total retail value of $2.5 million" to two food-bank charities, Feeding America and the Westside Food Bank. Order Granting Preliminary Approval, at § IV (b) (2). It is unclear why these two charities were chosen, or what percentages of the distribution each food bank will receive; Feeding America appears to distribute food nationally, but the Westside Food Bank apparently distributes food only within Westside – that is, one portion of Los Angeles County.[1] If each food bank is to receive $1.25 million in "cereals and other food products," then the class members in Westside will be radically overcompensated as compared to the rest of the class. If, on the other hand, the Westside Food Bank will receive a relatively small share of "cereals and other food products" for their distribution, it is unclear why Feeding America is capable of distributing food to the rest of the nation, but not to Westside. (Indeed, Feeding America's Form 990 of 2009 shows that it donated roughly $3.35

---

[1] An Internet search reveals that there are other Westside Food Banks, but presumably this settlement involves the Westside Food Bank in Los Angeles County.

1   million to the nonprofit Los Angeles Regional Foodbank in food and truck services.[2]) In
2   either case, there is a legitimate concern that this settlement appears to dictate a
3   maldistribution that will betray the interest of class members. The Westside Food Bank's
4   mission has no connection to the nationwide class that has allegedly been harmed; in this
5   respect, the required geographic correspondence between the *cy pres* and the class is
6   wholly absent. *Cf.* Yospe, *supra*.

7        More and more appellate and district courts are rejecting settlements because they
8   recognize that the *cy pres* cannot be biased toward the home-court territory: *see, e.g., In re*
9   *Wells Fargo Securities Litig.*, 991 F. Supp 1193, 1197 (N.D. Ca. 1998) (rejecting local *cy*
10  *pres* distribution); *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 362 F. Supp. 2d. 574,
11  577 (E.D. Pa. 2005) (rejecting local *cy pres* distribution); *In re Compact Disc Minimum*
12  *Advertised Price Antitrust Litig.*, 2005 U.S. Dist. LEXIS 16468 (D. Me. Aug. 9, 2005)
13  (rejecting *cy pres* distribution to New York City charities as lacking "national scope").
14  The American Law Institute's recently-released *Principles of the Law of Aggregate*
15  *Litigation* makes the same argument: *cy pres* awards "should require the parties to identify
16  a recipient whose interests reasonably approximate those being pursued by the class."
17  § 3.07(c) at 217 (2010).

18       Despite the fact that *Six Mexican Workers* is controlling authority for adjudicating
19  the fairness of a *cy pres* award, it is not cited by class counsel in its brief. Little wonder:
20  the settlement cannot meet that standard. In the words of *Six Mexican Workers*, the *cy*
21  *pres* fails to "adequately target the plaintiff class." Approval of the Westside Food Bank
22  portion of this settlement would be reversible error.

23       **C.     The Settlement's Language Permits Donation of Junk Food.**

24       Furthermore, given the central underlying concern of the settlement – that class
25  members deserve compensation for receiving nutritionally inadequate foodstuffs – it

---

26
27  [2] That form is available at
28  http://dynamodata.fdncenter.org/990_pdf_archive/363/363673599/363673599_201006_9
    90.pdf .

hardly seems appropriate for any portion of the "cereals and other food products" to include such products as Keebler Rainbow Chips Deluxe Cookies or Kellogg's Pop-Tarts Ice Cream Shoppe Hot Fudge Sundae toaster pastries. The cereals and other food products that Kellogg's distributes as a consequence of this settlement should contain more than empty calories. The proposed settlement contains no such limitation.

### D.   Class Counsel Overcounts the Value of the *Cy Pres* Remainder.

The other *cy pres* portion of this settlement, which will take effect in the event that all class members are fully paid and there is a surplus remaining, itself underscores several *cy pres* problems. In the event of a remainder, those funds will be equally distributed to three charitable and educational institutions: the Westside Food Bank, the food safety program at the University of Georgia, and the Food Safety, Health, and Nutrition Project of Public Justice. Stipulation of Settlement, pp. 17-18.

If this distribution takes place, it will further exacerbate the failure of the *cy pres* to target the class adequately (why wasn't a national food bank named?). Furthermore, it is unclear why a donation to Public Justice's new program is the best use of settlement monies, especially because (according to a recent news release) "the goals of the Food Project have not yet been fully defined."[3] Public Justice is not an appropriate recipient under *Six Mexican Workers.*

The justification for making *cy pres* beneficiaries out of nonprofit law firms appears increasingly distant, and raises problems of self-rewarding behavior as well. This award appears to benefit trial lawyers twice – first by providing *cy pres* recovery to an organization that supports the agenda or causes of trial lawyers generally and that provide litigation support for the trial bar, and second by basing attorneys' fees on the first amount. In effect, this segment of the agreement gives class counsel commissions on commissions.

---

[3] The release is available at
http://www.publicjustice.net/Repository/Files/FoodSafetyAttorneyJobAnnouncement.pdf
.

1    These *cy pres* awards, which seem increasingly distant from their appropriate
2    target, raise the questions of what the damages really are to the class, whether the
3    relatively huge (as a part of the settlement) *cy pres* awards are the best possible way to
4    benefit the class, and if there is any ceiling on the commissions that class counsel might
5    claim for its work on behalf of the class. But because it is in the interest of both class
6    counsel and defendants to grease the skids on the settlement, these questions will likely
7    never be answered. These problems demonstrate why it is inappropriate to award
8    attorneys' fees based on the amounts received by third parties: if class counsel gets paid
9    the same whether a dollar goes to the class or goes to charity, class counsel has no
10   incentive to put the interests of their clients first.

### E.    The Parties Have Failed to Demonstrate a Lack of Conflict of Interest with the *Cy Pres* Recipients.

The advocates of a proposed settlement bear the burden of proving its fairness. *See, e.g., True v. Am. Honda Motor Co.,* 749 F. Supp. 2d 1052, 1080 (C.D. Cal. 2010). But there has been no evidence produced by the parties that they have no relationship with the *cy pres* recipients. The American Law Institute's *Principles* dictate that a "*cy pres* remedy should not be ordered if the court or any party has any significant prior affiliation with the intended recipient that would raise substantial questions about whether the selection of the recipient was made on the merits." *Principles* § 3.07 cmt. b at 219.   All of the parties involved in producing the proposed settlement agreement – the named class members, class counsel, defendants, and defendants' counsel – should be required to produce a plain and concise statement for the record attesting that they have no significant affiliation with any of the four projected *cy pres* recipients or those organizations' principals (or, in the alternative, a statement that describes any such affiliation), to be submitted into the docket reasonably in advance of the fairness hearing.[4] In the absence of affirmative disclosures

---

[4] This requirement seems far more relevant and less burdensome than, say, a requirement that any objector must list all the class action objections that he or she, and his or her counsel, has been involved in for the last five years. *See* Section VI below.

1    evidencing a lack of a conflict of interest, Stehle objects on this independent ground to the

2    *cy pres*.

3    **IV.    This Settlement's Motion Schedule Provides Inadequate Notice to Class**
        **Members.**

4

5          The class notice fails to disclose to the class the size of the attorney-fee request.

6    Moreover, the settling parties have induced this Court to set the calendar of this action so

7    as to foreclose sufficient opportunity for substantive notice. Both are violations of

8    Rule 23(h). *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010), is

9    directly on point. *Mercury Interactive* dictates that a Court must set the objection deadline

10   after the date for filing the fee motion and supporting documents; and that deadline must

11   give class members an "adequate opportunity" to exercise their Rule 23(h) objection

12   powers. *Id.* at 993-94. Rule 23(h) "requires that any class member be allowed an

13   opportunity to object to the fee 'motion' itself, not merely to the preliminary notice that

14   such a motion will be filed." *Id.* When the district court in *Mercury Interactive* set the

15   objection deadline before the deadline for motions for attorneys' fees, and approved a

16   classwide notice that gave no notice of the magnitude of the fee request, it abused its

17   discretion and erred as a matter of law. *Id. at* 993.

18         Both the class notice and the schedule flunk *In re Mercury*. At the request of the

19   settling parties, the Court set the deadline for objections only one week after motions for

20   attorneys' fees are due—but because objections must be *received* by July 25, and because

21   the Central District of California does not permit objectors to engage in ECF filing, it

22   means that class members must submit their objections by July 22 (and engage an

23   expensive delivery service to do so). Order Granting Preliminary Approval, at ¶¶ 11, 12.

24   "When the district court sets a schedule that denies the class an adequate opportunity to

25   review and prepare objections to class counsel's completed fee motion, it fails to fulfill its

26   fiduciary responsibilities to the class." *In re Mercury*, 618 F.3d at 994-95. *See also* Notes

27   of Advisory Committee on 2003 Amendments, Fed. R. Civ. P. 23 ("For motions by class

28   counsel in cases subject to court review of a proposed settlement under Rule 23(e), it

1   would be important to require the filing of at least the initial motion in time for inclusion

2   of information about the motion in the notice to the class about the proposed settlement

3   that is required by Rule 23(e).").

4        In short, the absence of any disclosure about the size of the fee request and the

5   flawed motion schedule that the settling parties induced this Court to approve provides an

6   independent ground for the settlement's rejection.

7   **V.    Class Counsel's Self-Interested Accounting Has Created Fees That Are Both Excessive and Concealed.**

8

9        Class counsel's memorandum of law in support of its fee award states that it is

10  requesting 24% of the settlement value in exchange for its efforts. Memorandum of Law

11  in Support of Plaintiffs' Motion, at 4. But this fraction is based on the wrong denominator,

12  and is generated entirely through creative accounting. Attorneys' fees should be based on

13  the benefits to the *class*; class counsel is seeking a 24% commission on a variety of

14  payments (and inflated estimates of value of donations) to third parties. Regrettably, a

15  realistic accounting of the settlement reveals that class counsel is asking for something in

16  the neighborhood of one-third to over one-half of the settlement's entire value.

17  **A.    The Value of Notice and Claim Administration Primarily Benefits Defendants, Not the Class.**

18       Class counsel's first accounting error lies in its contention that it is entitled to count

19  the costs of claim administration and notice to the class as a benefit to the class. This is

20  wrong. First, as a matter of law, post-settlement notice is carried out almost exclusively

21  for the benefit of *defendants*, rather than the class, and thus cannot be double-counted as a

22  class benefit; second, the theory that notice should be counted as a class benefit for

23  purposes of evaluating the settlement would lead to absurd results that contradict the Class

24  Action Fairness Act.

25       The consideration that defendants receive for settling a class action is a waiver of

26  all claims by class members. But if an individual class member "later claims he did not

27  receive adequate notice and therefore should not be bound by the settlement, he can

28  litigate that issue on an individual basis when the settlement is raised as a bar to a lawsuit

1    he has brought." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993).

2    *See also In re Diet Drugs Prods. Liability Litig.*, 385 F.3d 386, 396 (3rd Cir. 2004)

3    (countenancing "a collateral attack on the order approving the Settlement" for claims of

4    inadequate notice); *Kealoha v. Castle,* 210 U.S. 149, 155 (1908) (holding that there can be

5    no *res judicata* without notice). Defendants therefore have every incentive to ensure that

6    classwide notice meets constitutional requirements. This is far from a hypothetical

7    concern: defendants have found themselves on the wrong end of repeat litigation when

8    class members failed to receive constitutionally-adequate notice. *See, e.g., Besinga v.*

9    *United States*, 923 F.2d 133, 137 (9th Cir. 1991) (reversing dismissal of plaintiff's case

10   because no notice was given in prior class action). *Cf. Coppolino v. Total Call Intern.,*

11   *Inc.*, 588 F. Supp. 2d 594 (D. N.J. 2008) (holding that plaintiff's claim was not barred

12   by *res judicata* when class notice in earlier settlement was constitutionally inadequate).

13   Notice benefits defendants when it creates claim preclusion that would not otherwise

14   exist. As such, the expense of class notice cannot simply be entered as a benefit on the

15   class's side of the ledger.

16          Furthermore, if the Court adopted the view that notice benefited the class, the very

17   act of settlement could be considered "consideration"—even if class members got nothing

18   in exchange for waiving their rights—simply because those class members received a

19   letter in the mail notifying them of the settlement. For example, imagine a settlement

20   against a bank that provided only a token $100 *cy pres* award, but in which the defendant

21   was entitled to deduct half the cost of notice from individual customers' accounts to pay

22   for attorneys' fees. Such a settlement would normally be prohibited by 28 U.S.C. § 1713.[5]

23   Because the very act of notice "substantially outweighs the monetary loss," if a court

24   adopted the proposition that notice benefits the class generally, the skimming of all class

25

26   _____

27   [5] "The court may approve a proposed settlement under which any class member is
     obligated to pay sums to class counsel that would result in a net loss to the class member

28   only if the court makes a written finding that nonmonetary benefits to the class member
     substantially outweigh the monetary loss."

1   members' accounts would be permissible. Because such a result would be flatly unjust

2   and impossible to square with the plain import of the statute, this suggests that counting

3   notice as a class benefit generally is insupportable and unfair.[6]

4         The commission that class counsel demands for administrative expenses is similarly

5   indefensible. As part of its share of the settlement, class counsel in effect demands a cut of

6   the court-approved fees and expenses of the claims administrator, as well as a cut of the

7   administrative and maintenance fees associated with the settlement fund. Just as in the

8   case of the notice expenses, the money going to the claims administrator is money going

9   to a third party, rather than the class, and should not be considered part of the common

10  fund for purposes of calculating the fee award. Any other result is the economic

11  equivalent of a kickback where class counsel gets money based on how much the

12  settlement administrator bills.

13        Such an arrangement would create a conflict of interest between the attorney and

14  the class. Under the current structure, every dollar the settlement administrator receives is

15  a dollar the class will not receive. If attorney fees are paid only on what the class receives,

16  class counsel will have appropriate incentive to ensure that settlement administration is

17  efficient and to take steps to prevent overbilling or wasteful expenditures. But if class

18  counsel is given a commission based on the size of administrative expenses, it would have

19  no financial incentive to oversee the efforts of the administrator, creating a perverse

20  system of compensation that discourages assignment of resources to the class. *Cf. Wal-*

21  *Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (attorney fee

22  calculations should use methods which align the interests of attorney and client).

---

23  [6] There is dictum to the contrary in *Staton v. Boeing Co.*, 327 F.3d 938, 975 (9th Cir.

24  2003), but that case cites no authority and provides no reasoning for the proposition. In
    the context of that opinion—which included notice as a class benefit and found the

25  resultant attorneys' fee award impermissibly high—it appears that the Ninth Circuit was

26  assuming that notice costs could be counted as a class benefit only for the sake of the
    argument. Moreover, any argument to the contrary would have to account for the fact that

27  *Staton* appears to have been legislatively superseded by the enactment in 2005 of 28

28  U.S.C. § 1713.

Class counsel may legitimately request a percentage of what the class receives; however, it should not be rewarded for the amounts the defendant pays the post office and the settlement administrator any more than it should be rewarded for the amounts the defendants pay defense counsel. In short, class counsel should only be asking for a share of the money the class *actually* receives. The "key consideration in determining a fee award is reasonableness in light of the benefit *actually conferred*" (emphasis in original). *In re HP Inkjet Printer Litig.*, No. 5:05—cv—3580 JF, 2011 WL 1158635, at *10 (N.D. Cal. Mar. 29, 2011) (quoting *Create-A-Card Inc., v. Intuit, Inc.,* No. C 07-06452 WHA, 2009 WL 3073920, at * 3 (N.D. Cal. Sept. 22, 2009)). "'[N]umerous courts have concluded that the amount of the benefit conferred logically is the appropriate benchmark against which a reasonable common fund fee charge should be assessed.' " *In re Prudential Ins. Co. America Sales Practices Litig.,* 148 F.3d 283, 338 (3rd Cir. 1998) (quoting Conte, 1 *Attorney Fee Awards* § 2.05, at 37). "In determining the appropriate amount of attorneys' fees to be paid to class counsel, the principal consideration is the success achieved by the plaintiffs under the terms of the settlement." *Schwartz v. Dallas Cowboys Football Club, Ltd.,* 157 F.Supp.2d 561, 579 (E.D. Pa. 2001). *See also ALI Principles* § 3.13. In short, class counsel is entitled to request a share of the benefits it brings to the class; its demand for a share of expenditures that benefit other parties in the action is unreasonable.

**B.   Class Counsel Has Improperly Valued Charitable Donations of Goods at Their Retail Price.**

Class counsel's second accounting error lies in its valuation of the cereals and other foods that it intends to distribute to food banks. The agreement at hand requires the defendants to supply cereal and food "having a total retail value of $2.5 million" to charities. But these goods cannot realistically be valued at $2.5 million for purposes of calculating settlement value. If Kellogg made a donation of $2.5 million retail value of food to charities, the IRS would not allow Kellogg to count it as a $2.5 million deduction on its taxes. 26 U.S.C. § 170(e)(3)(B);  Rev. Rul. 85-8, 1985-1 C.B. 59. And Kellogg is

not counting the donation on its books as a $2.5 million loss. Class counsel should not be allowed to give the charitable donation a higher value than Kellogg or the IRS would. The appropriate measure is Kellogg's costs (or, if one were to use the IRS rule, halfway between costs and market value, capped at twice costs). Of course, nationally branded products will always be sold at a substantial markup. *See* Robert Feenstra and Matthew Shapiro (eds.), SCANNER DATA AND PRICE INDEXES: STUDIES IN INCOME AND WEALTH, vol. 64 (2003), at 190. A more realistic estimate is $1.8 million, rather than $2.5 million.

Indeed, because the defendants will be able to make charitable donations of Kellogg brands that haven't sold as well in the marketplace, even the use of wholesale prices for purposes of valuation is a metric that is more favorable for Kellogg (which wants to reduce its exposure) and for class counsel (which wants to maximize its commission) than for the class, whose interests would best be served by valuing Kellogg's food donations at the same amount the IRS would value them.

Because there is so little information about what products Kellogg will actually give to charity, any calculation of how much the $2.5 million retail figure overstates the value of the settlement would be inexact. What is clear is that pretending that this portion brings anything like $2.5 million in value to the class is a material accounting error in multiple respects, and one that exaggerates the value of the settlement in the name of inflating the attorney-fee award.

**C.      Residual *Cy Pres* Should Not Be Valued the Same as Class Benefits.**

Because the parties scheduled the fairness hearing before the claims deadline, we do not know whether the class will make claims that exceed the amount in the settlement fund. But if the class makes claims short of the total amount in the settlement fund, the fee award should be reduced accordingly. If class counsel receives the same 24% award whether money goes to the class or goes to third parties, it will not have the proper incentive of informing class members of the availability of relief. *See* Section V.A, above.

**D.    In Short, Class Counsel Is Really Asking For One-Third or One-Half of the Settlement.**

To sum up: class counsel's fee award is a much bigger share than it claims when these errors are stripped from its analysis. As noted above, because of the settling parties' several failures of transparency, it is difficult to calculate class counsel's likely expectation, but one can make reasonable assumptions. Indisputably, class counsel is demanding nearly 53% of the cash that the settlement will produce, and perhaps a higher percentage of the cash that the class (rather than impermissibly unrelated third parties) will receive. Calculating what portion class counsel will actually receive of the entire settlement value that is outlined in class counsel's fee request is more difficult, but that share is assuredly much higher than 24%.

As noted above, it is inappropriate to count notice and administration costs as a class benefit – one might just as well argue that a substantial part of the value derived from the purchase of a new car comes from the experience of negotiating with the dealership's sales staff. Furthermore, it is a significant overstatement to express the value to the class of food bank donations in retail dollars. If we assume that the $2.5 million in cash is fully paid out so as to benefit class members as much as possible, and that the $2.5 million in food donations actually is worth two-thirds of that to the class, this means that class counsel is actually asking for nearly 32% of the settlement. But given the possibility that the fund may not be able to pay all claimants, in that case even this significantly higher percentage will understate class counsel's share of the settlement. Alternatively, if we assume that the settlement lacks the money to pay the class, each class member's share is therefore reduced *pro rata*. This would mean that the food bank donations would not qualify as class benefits, and therefore that the value of those donations to class members would be minimal. *See, e.g., Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004) ("There is no indirect benefit to the class from the defendant's giving the money to someone else."); *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 952 (7th Cir. 2006); *Crawford v. Equifax Payment Services, Inc.*, 201 F.3d 877, 882 (7th Cir. 2000). This

would also mean that class counsel would, in fact, be demanding nearly 53% of the value of the settlement. One thing is for sure: whether counsel's share of the settlement is in the upscale neighborhood of one-third (which is, of course, the typical plaintiff attorney's fee for an individual action) or in the posh neighborhood of over one-half, class counsel has moved out of the neighborhood of the Ninth Circuit's 25% benchmark entirely. *E.g., Six Mexican Workers*, 904 F.2d at 1311. The appropriate fee award is 25% of the amount claimed by class members.

## VI. The Settlement Places Impermissible and Unjustifiable Burdens upon Both Objectors and Their Counsel.

Under Rule 23(e), "any class member may object" to a proposed settlement. Class members have a right to object; in some sense, it is the only right that an objector has. That right is not merely a privilege that a settlement agreement may regulate or obstruct. Regrettably, the settlement agreement burdens this right in a manner that seems almost designed to make the task of a legitimate objector inordinately difficult.

In particular, the Order that preliminarily approves this settlement requires any objector to "provide a detailed list of any other objections submitted by the objector, or the objector's counsel, to any class actions pending in any court in the United States, state or federal, in the previous five (5) years." Order Granting Preliminary Approval, at ¶ 15. One can conceive of several reasons for this requirement; none of those reasons are good.

If the settlement agreement required the disclosure of past judicial sanctions (for, e.g., vexatious litigation or other abuse of the legal process), requiring such disclosure could be reasonable. But simply requiring objectors to list all the circumstances in which they have been so victimized by flawed settlements that they have chosen to pursue legal remedies seems to serve no legitimate purpose. Rather, this requirement seems unduly burdensome and impermissibly designed to deter legitimate objections.

In a now-vacated federal district court opinion, the judge once noted that the plaintiff in that case has participated in multiple class action lawsuits; according to the judge, this indicated that the plaintiff was "merely seeking the 'quick buck' " and was

1 "not truly interested in vindicating any of the rights of the proposed class members."

2 *Murray v. GMAC Mortgage Corporation,* 434 F.3d 948 (7th Cir. 2006), at 954. But this

3 judgment was vacated: as the appellate court noted, "The district judge did not cite a

4 single decision supporting the proposition that someone whose rights have been violated

5 by 50 different persons may sue only a subset of the offenders." *Id.* Similarly, a class

6 member subjected to several unfair class action settlements is entitled to object multiple

7 times without penalty. *Cf., e.g., Antoninetti v. Chipotle Mexican Grill, Inc.,* 614 F.3d 971,

8 980 (9th Cir. 2010) (reversible error to hold plaintiff's litigation history against him).

9     The justification for the provision that requires Stehle's counsel to disclose any

10 objections they have submitted in pending settlements is equally mysterious. The theory is

11 apparently that when the objector's counsel has experience in class actions, this is grounds

12 for suspicion. The benefits of experience are uncontroversial in any other practice area; if

13 you've just been named in a criminal indictment, you don't hire a patent lawyer. There is

14 no reason to hold against Stehle the Center for Class Action Fairness's success in

15 objecting to previous bad class action settlements. As another court in this District

16 responded to the claim that the arguments of the objectors' attorneys should be

17 downgraded because they have had the temerity to represent other objectors in the past:

18 "Plaintiffs attack many of the Objectors' counsel because they have represented objectors

19 in other actions in the past. This has no greater bearing on the merits of the objections

20 raised than a plaintiffs counsel's experience in filing class action suits speaks to the merits

21 of claims he brings." *True v. Am. Honda Motor Co.,* 749 F. Supp. 2d 1052, 1079 (C.D.

22 Cal. 2010) (citation omitted).

23     Notwithstanding Stehle's contention that the requirement to list any other class

24 action objections that his counsel have been involved in is puzzling, burdensome, and

25 improper, the Center for Class Action Fairness provides the required list in an attached

26 declaration from Theodore Frank, the attorney who runs the Center.

27

28

**VII.   Stehle's *Pro Bono* Attorneys Bring This Objection in Good Faith.**

Daniel Greenberg, Stehle's attorney, is senior counsel for the Center for Class Action Fairness LLC ("the Center"), a non-profit program of the 501(c)(3) DonorsTrust that was founded in 2009. The attorneys engaged by the Center represent consumers *pro bono* by, among other things, representing class members aggrieved by class action attorneys—particularly attorneys who negotiate settlements that benefit themselves at the expense of their putative clients. The Center has won millions of dollars for class members since its founding in 2009. *See, e.g.*, Rachel M. Zahorsky, "Unsettling Advocate," ABA J. (Apr. 2010); Allison Frankel, "Legal Activist Ted Frank Cries Conflict of Interest, Forces O'Melveny and Grant & Eisenhofer to Modify Apple Securities Class Action Deal," AMERICAN LAWYER LIT. DAILY (Nov. 30, 2010).

It is perhaps relevant to distinguish the Center's mission from the agenda of those who are often styled "professional objectors." A number of "professional objectors" are for-profit attorneys who attempt or threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of the attorneys' fees; thus, some courts presume that the objector's legal arguments are not made in good faith. *See* Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009), 1635-36. This is not the business model of the Center for Class Action Fairness, which is funded entirely by charitable donations and court-awarded attorneys' fees. While the Center focuses on bringing objections to unfair class action settlements, it refuses to engage in *quid pro quo* settlements to extort attorneys; the Center has never settled an objection.

Because the Center does not object indiscriminately, it has an excellent track record of success. In 22 cases to date where the Center has objected 23 times, courts have rejected the underlying settlement or materially modified the settlement and fee request ten times; on two other occasions, parties responded to the Center's objection before the fairness hearing by modifying settlements so as to provide millions of dollars more of cash to the class. The Center has lost two objections with finality and has thirteen objections pending in trial or appellate courts (including four where its objection was

1    upheld in part). In short, Stehle brings this objection in good faith to protect the interests

2    of the class. Nonetheless, it is the experience of the Center, based on the conduct of class

3    counsel in other cases, that some attorneys will falsely and unjustifiably accuse the Center

4    of seeking to extort class counsel. If this Court has any doubt whether the Center's

5    objection is brought in good faith, Stehle and the Center are willing to stipulate to an

6    injunction prohibiting them from accepting a cash payment in exchange for the settlement

7    of this objection.

8    **CONCLUSION**

9      Class counsel has breached its duty to the class by creating insufficient notice, by

10   sending the lion's share of the settlement to third parties, by requesting an impermissibly

11   large attorneys' fee, by making extraordinarily self-interested calculations that do not

12   accurately represent the settlement's value, and by creating impermissible obstacles to

13   objections. The proposed settlement and accompanying notice fails to meet the

14   requirements of either *Six Mexican Workers* or *Mercury Interactive*. For these

15   independent reasons, this Court should refuse to approve the settlement.

16      Should the Court nevertheless approve the settlement, it must sharply reduce the

17   fees that class counsel requests, so as to be consistent with the Ninth Circuit 25%

18   benchmark and so as to reward class counsel only for the benefits this settlement brings to

19   the class. As such, it must delay ruling on the fee motion until the number of claims is

20   known.

21   Dated: July 22, 2011

22                Respectfully submitted,

23

24                */s/ Daniel Greenberg*

                  Daniel Greenberg (*pro hac vice* pending)

25               **GREENBERG LEGAL SERVICES**

                  **CENTER FOR CLASS ACTION FAIRNESS LLC**

26               55 Fontenay Circle

27               Little Rock, AR  72223

                  DnGrnbrg@gmail.com

28               (501) 588-4245

1

2          _/s/ George Azadian_
           George Azadian (SBN 253342)
3          **THE MATHEWS LAW GROUP**
           2596 Mission Street, Suite 204
4          San Marino, CA  91108
5          George@ctmesq.com
           (626) 683-8291
6
7          _/s/ Theodore H. Frank_
           Theodore H. Frank (SBN 196332)
8          **CENTER FOR CLASS ACTION FAIRNESS LLC**
9          1718 M Street NW, No. 236
           Washington, DC 20036
10         tedfrank@gmail.com
11         (703) 203-3848

12         Attorneys for Nicholas Stehle

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I, the undersigned, declare that I am over the age of 18 and am not a party to this action. I am employed in the City of San Marino, California my business address is The Mathews Law Group, 2596 Mission Street, Suite 204, San Marino California 91108.

I hereby certify that on this day I filed the foregoing:
**OBJECTION TO PROPOSED SETTLEMENT** with the Clerk of the Court, and served true and correct copies upon class counsel and defendants' counsel via first class mail at the addresses below, per the instruction of the Settlement Notice.

United States District Court
Central District of California
Roybal Federal Building
255 East Temple Street
Los Angeles, CA 90012

Gillian L. Wade
Sara D. Avila
Milstein Adelman & Kreger LLP
2800 Donald Douglas Loop North
Santa Monica, CA 90405
*Attorneys for Plaintiff Michelle Weeks and Katie Dintelman*

Dean N. Panos
Richard P. Steinken
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
*Attorneys for Defendants*

Behram V. Prekh
Heather Marie Peterson
Michael L. Kelly
Kirtland & Packard LLP
2361 Rosecrans Avenue Suite 450
El Segundo, CA 90245
*Attorneys for Plaintiff Maria Sandoval*

Patrick J Sheehan
Joe R. Whatley, Jr.
Whately Drake & Kallas LLC
1540 Broadway 37th Floor
New York, NY 10036
*Attorneys for Plaintiff Michelle Weeks and Katie Dintelman*

**X FEDERAL** - I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is a true and correct. I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

This declaration is executed in San Marino, California, on July 22, 2011.

*Andrea M. Mitchell*

Andrea M. Mitchell

**PROOF OF SERVICE**