Shaun J. Mathers
10 Mountain Oaks Park
La Crescenta, CA. 91214
(818) 599-2707
shaunjm@hotmail.com



2011 JUL 25  PM 2:59

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
LOS ANGELES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF: ) | NO. CV 09-08102 (MMM) (RZx) |
| ) | |
| MICHELLE WEEKS and MARIA ) | **OBJECTIONS AND COMMENTS** |
| SANDOVAL each individually ) | **TO THE STIPULATED** |
| and on behalf of others ) | **SETTLEMENT AND FEE** |
| similarly situated, ) | **APPLICATION** |
| ) | |
| PLANTIFF, ) | Hearing Date: August 29, 2011 |
| ) | Hearing Time: 10:00 AM |
| v. ) | Courtroom:     780 |
| ) | Judge:       Hon. M. Morrow |
| KELLOG COMPANY, a Delaware ) | |
| corporation; KELLOG USA INC., ) | |
| a Michigan corporation;  KELLOG ) | |
| SALES COMPANY, a  Delaware ) | |
| corporation and DOES 1-100 ) | |
| ) | |

## SUMMARY

As a Settlement Class Member, I object to the proposed settlement and argue the cy pres funding is inappropriate in that it fails to meet the purpose of establishing such funds, that the appointment and compensation of Class Representative Michelle Weeks is inappropriate and finally that the attorney fee application is excessive when one considers the level of success achieved, the benefit to the class members, the basis for calculation of the fee and the evidence utilized in developing the lodestar.

In short, this action would now appear to be less about compensating the purchasers of deceptively labeled puffed rice and more about ensuring attorney compensation based on deceptively characterized levels of success and puffed fee claims.

## BACKGROUND

I am a member of the settlement class[1] and have provided my full name, address and telephone number. This document reflects the grounds and legal support for my objections. It is my intent to appear at the settlement hearing. Proof of class membership and my signature are submitted and contained in my Declaration ( Shaun J. Mathers, attached). I have not objected to any class action settlement, in any court within the past five years.

On November 4, 2009, Kellog Company issued a press release stating its intent to discontinue its "immunity" claims on the packaging of Rice Krispies cereal. The Plaintiff's recitals contained within the settlement agreement and submitted to the Court report that this action was taken subsequent to Kellog Company receiving a Civil Investigative Demand letter from the State of Oregon's Attorney General challenging the immunity claims made on Rice Krispies cereal boxes.

---

[1] Objecting Class Member purchased a box of Rice Krispies cereal in January of 2010. The Court's order approving the Class defines same as purchasers of this product between "June 1, 2009 and March 1, 2009." In reviewing the record I assume and believe the end date, "March 1, 2009" is erroneous and should actually reflect "March 1, 2010." I proceed on that assumption.

1    On November 5, 2009, the first of several lawsuits was filed against Kellog

2 Company. Said lawsuits over time have been consolidated and now make up this action

3 currently before the Court.

4    On December 17, 2009, the State of Oregon's Attorney General announced a

5 settlement of Kellog Company's "questionable product marketing allegations." The

6 settlement reportedly required Kellog Company to donate 480,000 boxes of cereal, with a

7 wholesale value of $1,478,000 to Oregon food banks (Exhibit A).

8    On June 3, 2010, Kellog Company agreed to new advertising restrictions to settle

9 claims made by the Federal Trade Commission (FTC) regarding the immunity and health

10 benefits provided by Rice Krispies. The FTC action *In the Matter of Kellog Company*,

11 Docket No. C-4262 resulted in a concurring statement being issued by FTC

12 Commissioner Julie Brill and Chairman John Leibowitz (Exhibit B). The commissioners

13 publicly expressed their concerns that Kellog Company had pursued its Rice Krispies

14 immunity boosting marketing campaign at the exact same time they were settling

15 deceptive cognitive enhancement claims made about their Frosted Mini-Wheat product.

16    On September 10, 2010, a stipulated settlement was agreed to in the matter of

17 Dennis and Koz v. Kellog CV 09-CV-01786 (IEG) WMG. The matter was submitted to

18 and approved by Judge Irma E. Gonzalez, Chief Judge of the United States District Court

19 – Southern District. This case was similar to the instant case in that it involved

20 allegations of deceptive advertising as to the cognitive benefits associated with the

21 consumption of another Kellog Company product, Frosted Mini-Wheat. The terms of

22 this settlement were also similar to the instant case in that class members could receive

23 up to $5 for each box of cereal, with a maximum $15, paid from a common fund. It also

24 includes donation of cereal to a cy pres fund. The settlements differ considerably in

25 regards to the amounts. The Frosted Mini-Wheat settlement fund is $2.75 million. The

26 fee application submitted by class counsel is paid by Kellog Company and is not drawn

27 from the common fund. The cy pres distribution is valued at $5.5 million; though it is

28 not clear whether this is a retail or wholesale value. On April 4 2011 Judge Gonzalez

1  awarded $2.4 million in fees and costs which represented approximately 19% of the
2  settlement value.

3      Settlement was reached in this case, Weeks v. Kellog, on January 10, 2010.  The
4  settlement provides for a common fund of $2.5 million.  Class members can submit for
5  reimbursement of up to $5 for each box of cereal purchased with a maximum distribution
6  of $15 per household.  Claim amounts may be proportionately reduced dependent upon
7  the amount in the fund and the number of claims against it.  The award of attorney fees
8  and payments to class representatives are treated as priority claims in that they are paid
9  from the common fund prior to any reimbursement calculation or payment to the
10 remaining class members.  A cy pres food distribution, with a retail value of $2.5 million
11 is established.  This distribution is divided between two recipients, Westside Food Bank
12 and Feeding America.   There are several non economic conditions related to future
13 advertising activities conducted by Kellog Company.  The settlement contains a number
14 of "free sailing" agreements between the parties. The parties have presented this
15 stipulated settlement to the court for final approval.

16     The Federal Judicial Center's publication, (Managing Class Action Lawsuits: A
17 Pocket Guide for Judges; 3rd Edition, Rothstein and Willging 2010) summarizes the
18 purpose of such hearings.  They describe the settlement approval process as the "most
19 important and challenging assignments judges face in the class action arena." They
20 indicate this is the result of several factors including the unambiguous placement of the
21 judge in the role of protecting the class member's interests. They further describe this
22 activity as follows:

23     "The judge's assigned task of approving or disapproving a class settlement
24     presents exceptional challenges. Some courts "have gone so far as to term
25     the district judge in the settlement phase of a class action suit a fiduciary of
26     the class" and to impose "the high duty of care that the law requires of
27     fiduciaries." Reynolds v. Beneficial National Bank, 288 F.3d 277, 280 (7th
28     Cir. 2002)."

1    ,    The judge in these matters is further burdened by the fact that while it is generally

2    agreed that the adversarial process encourages the parties to report the facts favorable to

3    their respective position, the nature of a class action settlement often removes that

4    incentive, requiring the judge to look beyond what is presented and make an independent

5    assessment as to the fairness and appropriateness of the settlement.  The manual also

6    describes "hot button indicators" that may signal potential difficulties in valuing the

7    settlement.  The proposed settlement includes at least three factors that fall within the

8    confines of that list, namely the cy pres fund, the non-economic relief and the possibility

9    of collusion.

10   **OBJECTIONS**

11   *Cy Pres Fund as Presented is Inappropriate.*

12        The cy pres fund suffers from two distinct material flaws, adequacy of distribution

13   and undisclosed relationships.

14        This case is a nationwide class action.  Class members are residents located

15   through the 50 states.  Westside Food Bank, who receives half of the cy pres distribution,

16   is a localized charitable organization.  A review of the Westside Food Bank website

17   (Exhibit C) reveals that this institution's mission is "to distribute as much food as

18   possible to local agencies" and that the organization "supplies food to the food assistance

19   programs of social service agencies in Santa Monica, Venice, Culver City, West Los

20   Angeles, West Hollywood, Inglewood, and the LAX area."  This very narrow distribution

21   chain, affecting and benefiting only a small geographic area of a single county within this

22   vast nation cannot credibly be argued to be of benefit to the entire settlement class.   The

23   Westside Food Bank distribution is in direct contradiction to the concepts espoused in *Six*

24   *Mexican Workers v. Arizona Citrus Growers* which invalidated a cy pres distribution

25   because the "proposal benefits a group far too remote from the plaintiff class"

26        Both cy pres recipients, Feed America and Westside Food Bank, also suffer an

27   additional infirmity, undisclosed relationships with parties and counsel.  Feed America

28   has an existing relationship with Kellog Company.  Kellog Company is listed as a

1 "Leadership Partner" on the Feed America website (Exhibit D). Westside Food Bank

2 maintains an existing relationship with the law firm Milstein Adelman and both parties

3 reflect their relationship on their respective websites. In fact the Milstein Adelman

4 website relates "Every year, all of the attorneys volunteer at the Westside Food Bank and

5 sort food for the hungry." While I find such philanthropy praiseworthy, the benefits

6 received by counsel and parties (signage, good will, etc.), the failure to disclose these

7 existing relationships and the failure to provide any language in the settlement proposal

8 prohibiting the supplanting of existing efforts casts serious dispersions on both these

9 beneficiaries. Considering the wide variety of national charitable efforts that must exist

10 without such ties to counsel or parties, this selection is nothing less than questionable.

11 *Appointment and Compensation of Class Representative Michelle Weeks is*

12 *Inappropriate.*

13 While some clients maintain an attorney on retainer, this would appear to be an

14 instance where an attorney maintains a client on retainer. Excluding Weeks lending of

15 her name to this matter and her attendance at a single deposition, there exists no evidence

16 of her involvement other than vague assertions and conclusions as to her involvement and

17 benefit to the class. A review of Class Counsel Avila's declaration would suggest that

18 Ms. Avila and Mr. Rubenstein had identified the deceptive advertising of Rice Krispies

19 as a potential legal issue in October 2009. Counsel originally filed suit on behalf of

20 Sabena Kammula in December 2009. In May 2010 counsel moved to replace Kammula

21 with Weeks. Class Representative Weeks maintains an existing and apparently beneficial

22 relationship with Mr. Rubenstein. Mr. Rubenstein (as well as Ms. Edith Kallas of

23 Whately Drake) represented Ms. Weeks in Michelle Weeks v. Mead Johnson Nutrition

24 Company 2:2009 CV 5835 which was filed in August 2009. Mr. Rubenstein also

25 represents Weeks as a named plaintiff in Katie Francis v. Nestle Healthcare Nutrition Inc.

26 2:2010 CV 09544.

27 A class representative has an absolute fiduciary responsibility to the class members

28 they represent. They should ensure the legal efforts, the payment for which is ultimately

1   the responsibility of the class, are reasonable, necessary and efficient.  They have the

2   ability to negotiate the legal fee in advance of the matter and should continue to monitor

3   and direct the efforts of counsel throughout the course of litigation.  While the judge

4   eventually assumes this same role in the Fairness Hearing, they do so post settlement and

5   as a result operate more as an after the fact monitor than as a client.  There is absolutely

6   no evidence in the record that Ms. Weeks performed these crucial functions.  The nature

7   of her multiple representative relationships with counsel in this matter actually call into

8   question her ability to perform her vital functions without conflict.

9   ATTORNEY FEES CLAIM

10       I believe the fee request as presented to be excessive and I specifically attack

11   counsels' methodology in awarding fees, their valuation of this settlement, their

12   characterization of success, their lodestar calculations and their proposed multiplier.

13   *Methodology*

14       Counsel's fee motion essentially argues an entitlement to 25% of the value of the

15   settlement and they support their proposition by comparing this amount to their lodestar

16   calculations.  They cite *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) to

17   establish the precedent that either the lodestar or percentage of recovery may be

18   applicable.  While they are correct in that application they omit the fact that *Hanlon*

19   applied the lodestar method and the award of fees represented 4.5% of the valuation.

20   Also cited is *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir.

21   1990) in an apparent effort to establish the 25% award as the standard and ignoring the

22   language that states "*The benchmark percentage should be adjusted, or replaced by a*

23   *lodestar calculation, when special circumstances indicate that the percentage recovery*

24   *would be either too small or too large in light of the hours devoted to the case or other*

25   *relevant factors.*"  In other words, contrary to the artfully implied assertions of counsel,

26   there stands no bright line rule governing the fee recovery.  The award of fees is soundly

27   within the discretion of the trial court, is based on a wide variety of factors and nuances,

1  may swing up or down considerably and its appropriateness is measured against case law,

2  the market and public policy concerns.

3  The Supreme Court recently delved into many of the issues regarding fee claims

4  in their ruling *Perdue v Kenny A.* (U.S. Sup Ct, Apr. 21, 2010, No. 08-970) 2010.  While

5  this case dealt primarily with loadstar calculations resulting from a statutory fee award,

6  the discussion is illustrative of the Court's consideration of fee awards in general.  It

7  establishes a reasonable fee as one that is "sufficient to induce a capable attorney to

8  undertake the representation," but does not provide "a form of economic relief to improve

9  the financial lot of attorneys."

10  While the applicants argue for a percentage that is cross checked against their

11  lodestar, their arguments fall short on a number of accounts.

12  *Valuation of Settlement*

13  Counsel argues the value of this settlement exceeds $5.4 million.  This calculation

14  is based on $2.5 million of common fund added to the cy pres fund which counsel values

15  at $2.5 million plus some $400 thousand related to administrative costs.  Counsel further

16  argues significant benefit resulting from injunctive relief.

17  I take issue with the valuation of the cy pres fund and any benefit attributed to the

18  injunctive relief.

19  The $2.5 million attributed to the cy pres fund is expressed as a "retail" value.

20  This method of valuation substantially fails for at least two reasons.  The retail value of

21  any product expresses the cost of manufacturing, the profit to the manufacturer, the cost

22  and profit enhancement of the wholesaler, the cost to the retailer as well as the retailer's

23  overhead expenses related to stocking, handling, advertising, sale and profit.  The mark-

24  ups associated with every step in this chain are substantial and inappropriate to use in this

25  valuation.  Kellog has no claim to any part of the aforementioned consumer chain after

26  their product is sent to the wholesaler.  It is also easy to believe that if $2.5 million in

27  cash were provided to the cy pres recipients to purchase these same products that

1  negotiations and market forces would allow them to obtain substantially more product
2  than is provided here.

3       Allowing the use of the retail value substantially increases the appearance of value
4  but disgorges far less from Kellog than is at first apparent.  This also has the effect of
5  substantially increasing the attorney fee claim.

6       The Objecting Class Member believes the cy pres relief should be valued on a
7  "cost of manufacturing" basis and asserts there is sufficient information in the record to
8  effectively estimate the same.  A cost of manufacturing basis represents the wholesale
9  cost, less wholesaler mark-up and profit to the manufacturer.  The Oregon Attorney
10 General's Press Release announcing his office's settlement with Kellog reported that
11 Kellog would provide 480,000 boxes of cereal to Oregon food banks.  The Eugene
12 Oregon Register Guard newspaper reported (Exhibit E) the wholesale value of this
13 donation at $1.15 million, or $2.40 per box of cereal.  The Kellog Fact Sheet (Exhibit F)
14 states 2009 earnings at $12.6 billion and reflects operating profits of $2 billion.  Thus
15 profits represent about 16% of revenue.  Reducing the wholesale price of $2.40 per box
16 by this 16% profit margin values each box at about $2.02 and if the cy pres donation
17 represents 500,000 boxes of cereal, the effective cash value of this portion of the
18 settlement is in reality $1.01 million in benefit to the class.

19      The injunctive relief adds no real value to this settlement.  The language within the
20 settlement is effectively a restatement of agreements previously made by Kellog to the
21 Oregon Attorney General's Office and the Federal Trade Commission.   It provides no
22 additional benefit to the class and should not be utilized to establish any level of success
23 or be the basis for any enhancement of fees.

24      I respectfully request the Court adopt these calculations which gives the settlement
25 an effective total value of $3.9 million.

26 *Characterization of Success*

27      While counsel contends they have achieved a significant if not remarkable level of
28 success in this matter, the Objecting Class Member views the matter quite differently.

1 Success should be defined relative to the range of expected recovery. While that is often
2 difficult to assess, the record in this matter presents significant clues useful in evaluating
3 that range.

4      The first starting point is revenue and profit. Kellog reports in its fact sheet that
5 North American retail cereal sales represent approximately one quarter, or $3.1 billion, of
6 net sales. Profits related to this segment are approximately $500 million annually.
7 Kellog's Rice Krispies, one of their oldest and best known brands undoubtedly represents
8 a significant share of those sales and profits.

9      More telling though is Kellog's actions related to the Oregon Attorney General's
10 letter. Kellog immediately settled the claims, discontinued the marketing program and
11 donated half a million dollars of cereal to Oregon food banks. The 2010 census reflects
12 the Oregon population at 3.8 million, representing about 1.2% of the 308 million
13 residents of the United States. The Oregon settlement if it were provided on a nationwide
14 basis would have a value exceeding $40 million, or roughly 10 times the value of this
15 settlement, a fact that could not have gone unnoticed by the executives and counsel of
16 Kellog Company.

17      The Frosted Mini-Wheat Settlement is also an excellent benchmark by which to
18 measure this settlement. It presented similar legal claims regarding the deceptive
19 marketing of a cereal product. This lawsuit settled on very similar terms for class
20 members ($5 per box of cereal purchased with a maximum recovery of $15 per
21 consumer). Very different were the size of the common fund, the cy pres fund and the
22 total valuation of the settlement. The Mini-Wheat settlement was valued by the court at
23 some $12 million dollars, or three times the value of this settlement.

24      This case contained no novel questions of law. It was simply a question of
25 whether the immunity claims were deceitful and were supported by fact. When faced
26 with the same or similar question in every other forum (Oregon, Federal Trade
27 Commission, Mini-Wheat suit), the Kellog Company folded its hand.

.1     The relatively low costs as well as the length and degree of depositions are

2 illuminative. Less than $25 thousand was expended in costs, with about one third of that

3 amount attributed to travel as well as a considerable sum for mediation. The record

4 would appear to reflect less than four days worth of depositions. This case would appear

5 to have been more an exercise in negotiations than litigation.

6     Counsel utilizes the fact that at the time they submitted their motion and fee claim

7 no class member had objected and few had opted out to establish that the settlement and

8 fee is reasonable. This representation was premature in that now at least one objection

9 has been lodged. Counsel, if they are in fact familiar and experienced with class actions,

10 should recognize that few class members object or opt out of these types of cases,

11 particularly when their anticipated recovery is of very small value, as is the case here.

12     As was previously discussed, the injunctive value, being an essential restatement of

13 previous settlements by Kellog Company can hardly be characterized as a major

14 achievement.

15     The proposed settlement in this case is modest by comparison to the benchmark

16 representing one third to one tenth of the recovery made in the other matters.

17 Considering the substantial nature of Kellog Company, it is even less remarkable

18 representing a minute fraction of profits and revenue. It fails to even disgorge the

19 substantial profits the corporation reaped when it embarked on this deceitful marketing

20 plan. While perhaps falling into the low end of the range of an acceptable settlement, it is

21 nothing to write home about.

22 *Lodestar Calculations*

23     The objecting class member specifically attacks the adequacy of evidence related

24 to time and hourly rate, the stated hourly rates, the reasonableness of the time and the

25 multiplier.

26     Counsel has submitted no detailed evidence of billing making it impossible to

27 assess the reasonableness and appropriateness of their respective fee claims. Their

28 compilations are so void of detail they can hardly even be described as "block billing," a

1  practice which may subject the submitter to an immediate percentage reduction *In re*

2  *Samuel R. Pierce, Jr.,* 190 F.3d 586, 593-594 (D.C.Cir. 1999), (the D.C. Circuit

3  confirmed that its general practice was to reduce vaguely entered hours of plaintiffs'

4  attorneys by 10%). *H.J. Inc. v. Flygt Corp,,* 925 F.2d 257, 260 (8th Cir. 1991) (upheld a

5  district court's reduction of hours billed by the prevailing plaintiff's attorney by 20% for

6  vague billing entries) *Gratz v. Bollinger,* 353 F.Supp.2d 929, 939 (E.D. Mich. 2005),

7  (reduced requested fees 10% due to block billing and vague entries).

8       The fee applicants also fail in their burden to establish comparable market rates in

9  that other than their personal declarations of rates, they provide no outside evidence of

10  what similar legal vendors might charge for similar work.

11      The hourly rates requested by the applicants are no less than extraordinary.  A

12  review of the various submissions in support of the fee motion reveals that more than 20

13  attorneys billed against the matter with some rates, even prior to the application of the

14  proposed multiplier, exceeding $800 per hour.  The Supreme Court in *Perdue v Kenny A.*

15  remarking on a similar rate with some incredulity indicated the "attorneys would earn as

16  much as some of the richest law firms in the country."

17      As previously stated the lack of detail related to the billing makes it difficult to

18  assess but some specific concerns even stand out based on the submissions.

19      The submission of Mr. Rubenstein's round figure of 250 hours of labor seems

20  merely coincidental, until one reviews his expended costs, which reflect exactly $200 for

21  photocopies, $60 for postage and $40 telephone/facsimile.  The fact that each of these

22  figures falls on a round number is nothing less than a coincidence of supreme magnitude.

23      A review of Ms. Avila's declaration is not as revealing until one compares it to her

24  firms submission related to fees in *Thompson v. Biotab Nutraceuticals, Inc.* (Los Angeles

25  Superior Court Case No. BC414808).  In this matter Ms. Avila's firm represented the

26  plaintiff and argued that the defendant's claims regarding their product's ability to

27  enhance penis size were deceitful to the consumer.  They managed to settle with the

28  defendant for some $12 million dollars and Ms. Gillian Wade subsequently filed a

1   declaration with the court which included a billing statement (Exhibit G) labeled as

2   "Exhibit #1" in this December 9, 2010, submission . In comparing this billing statement

3   to Ms. Avila's declaration it appears that rates within the firm have changed.

4          The billing statement references an attorney "GW" who is presumably Ms. Wade.

5   Her rates appear to have risen substantially, going from $500 per hour to $550 per hour in

6   the most recent submission, a significant increase during a time of economic downturn.

7   Perhaps more puzzling is the rate change for "IM" who is presumably Mr. Issac Miller.

8   His rate has fallen from $300 per hour to $275 per hour. While both Ms. Avila's and Ms.

9   Wade's declarations assert these rates are those normally "charged by these time keepers

10  in non-contingency litigation matters" these variations can only cause one to speculate

11  that the fee schedule is somewhat less fixed than presented.

12  *Multiplier*

13         Applicants request a lodestar multiplier of 1.2 to their fee claim arguing it is

14  "justified in light of the contingent nature of this action." *Perdue v Kenny A*. discussed

15  the application of a multiplier indicating "the lodestar figure includes most, if not all, of

16  the relevant factors constituting a 'reasonable' attorney's fee." The fifth factor described

17  in *Hensley v Eckerhart* is the nature of the fee, whether it is "fixed or contingent."

18  Though the applicants allude to "future work" they provide a thin description and no

19  estimate of time or expense related to the same. The lodestar should contain all relevant

20  adjustments for risk, performance and contingency making this multiplier inappropriate.

21         If the multiplier is simply viewed as vehicle to adjust the fee based on

22  performance, success, adequacy of fee, complexity of the case or other factors not

23  contained or inadequately addressed within the lodestar, there exists in this case a strong

24  argument for an inverse multiplier. The block billing would argue for an immediate .1

25  reduction from the base.  The fact that comparable case(s) have settled for two to three

26  times more than the value of this matter would support a .3 reduction. The novelty,

27  complexity and risk being low would additionally support a reduction of .02 which would

1  equate to a .58 multiplier and a rate that this Objecting Class Member could support.  The

2  fee request when subjected to this multiplier results in an award of $665,674

3  **CONCLUSION**

4         A jaded observer might opine that the applicants believe they are simply entitled to

5  25% of this recovery, that they have inflated the stated value of this claim, and they now

6  submit bloated fees increased by a multiplier designed to support this alleged entitlement.

7  In any event, this settlement represents beer and peanuts that is presented and billed as

8  champagne and caviar.

9         The Objecting Class Member respectfully requests the Court:

10      1) Reject the portions of the settlement related to cy pres recipients until

11             nationwide non-affiliated charities are identified and substituted.

12      2) Remove Ms. Weeks as Class Representative, amend her status to that of Class

13             Member and allow her only that compensation commensurate with Class

14             Member status.

15      3) Adopt the calculations contained in this document in relation to the valuation of

16             the settlement and establish the total value at $3.9 million.

17      4) Award attorney fees in the amount of $663,000 which represents 17% of $3.9

18             million fund value.

19      Finally, while I have attempted to comply with all court rules and established legal

20  niceties, I fully recognize that my lack of legal education and training have left me

21  wanting in that regard.  As such I thank the Court in advance for its patience and

22  consideration of this submission.

23

24                                              Respectfully Submitted

25

26

27                                              Shaun J. Mathers

# EXHIBIT A

Case 2:09-cv-08102-MMM -RZ   Document 144   Filed 07/25/11   Page 16 of 38   Page ID
#:2629

## Oregon Department of Justice
## Attorney General John Kroger

Oregon DOJ Home  |  Media  |  Current Releases  |  2009  |  December 17, 2009 Media Release

# KELLOGG SETTLEMENT WILL PROVIDE NEARLY 500,000 BOXES OF CEREAL TO THE HUNGRY

**December 17, 2009**

**Settlement over questionable health claims will provide Oregon Food Bank with 108,000 boxes of cereal, Feeding America will receive 372,000**

Attorney General John Kroger today announced that Kellogg Company has agreed to donate nearly 500,000 boxes of cereal to organizations that feed the hungry as part of a settlement over questionable product marketing allegations.

"Kellogg should be credited with addressing the allegations quickly and constructively," said Attorney General Kroger. "This settlement will directly benefit Oregonians who are hungry."

The case focused on cereal box marketing claims that Rice Krispies "helps support your child's immunity." The claim was part of a promotional campaign for Rice Krispies, Cocoa Krispies, Frosted Krispies and MultiGrain Jumbo Krispies.

Today's settlement requires Kellogg to stop shipping cereal boxes with the immunity language by January 15, destroy more than 2 million units of packaging with the immunity claim, and cease making such health claim unless it provides the Oregon Department of Justice with advance notice and competent reliable scientific evidence.

Kellogg also will contribute 108,000 boxes of cereal to Oregon Food Bank ($332,000 wholesale value) and 372,000 boxes to Feeding America ($1,146,000 wholesale value). The donated cereal boxes contain 5,760,000 servings.

"We thank Attorney General Kroger's office for its work to ensure the integrity of our food and to help fight hunger," said Mike Moran, OFB's food resource manager. "This donation will fill breakfast bowls for hungry children throughout Oregon."

The timing of this settlement is especially important because hunger has reached record levels. Distribution of emergency food and the number of people served throughout the Oregon Food Bank Network escalated to historic highs during the past fiscal year and remains at alarmingly high levels.

Every month, more than 86,000 children eat meals from emergency food boxes. The U.S. Department of Agriculture reported that Oregon has one of the highest hunger rates in the country. Hunger affects a child's development, health, ability to learn and potential for a fulfilling and productive life.

Here's how you can help:

- Fill a bag with food and take it to any Jiffy Lube or U.S. Bank. Watch for other businesses in your neighborhood that are collecting food for the OFB Network.
- Donate cash online at www.oregonfoodbank.org.
- Visit www.oregonfoodbank.org to learn about many other ways to help.

Oregon Department of Justice - 2009 Media Release                    Page 2 of 2
Case 2:09-cv-08102-MMM -RZ   Document 144   Filed 07/25/11   Page 17 of 38   Page ID
                                    #:2630

David Hart, Assistant Attorney in Charge of the Financial Fraud/Consumer Protection Unit, handled the case for the Oregon Department of Justice.

Attorney General John Kroger leads the Oregon Department of Justice. The Department's mission is to fight crime and fraud, protect the environment, improve child welfare, and defend the rights of all Oregonians.

**Contact:**

Tony Green, (503) 378-6002 tony.green@doj.state.or.us

# EXHIBIT B

***In the Matter of Kellogg Company***, FTC Docket No. C-4262

Concurring Statement of Commissioner Julie Brill
and Chairman Jon Leibowitz

June 3, 2010

Today the Commission announced that it has modified the order
previously entered in this matter to bar the world's leading producer of breakfast
cereals, the Kellogg Company ("Kellogg"), from making unsubstantiated or
misleading claims about the health benefit of any food it produces, markets, or
sells. The Commission's action is in response to dubious health claims made by
Kellogg regarding the ability of its Rice Krispies cereal to boost children's
immunity. We approve of the Commission's action announced today, and we
appreciate the hard work of FTC staff who obtained the order modification.

We write separately, however, because we are concerned that while
Kellogg was developing its questionable Rice Krispies campaign last year, it was
simultaneously negotiating with the FTC to resolve earlier allegations that the
company had deceptively marketed Frosted Mini-Wheats as improving children's
attentiveness.

In April 2009, the Commission made public its concern that Kellogg had
engaged in false advertising by claiming repeatedly — on the Internet, in print
ads, on TV, and on product packaging — that eating a bowl of Frosted Mini-
Wheats cereal was "clinically shown to improve kids' attentiveness by nearly
20%."[1] The Commission alleged that the claims were untrue and therefore
violated Sections 5 and 12 of the FTC Act.[2] Kellogg resolved the Commission's
concern about the Frosted Mini-Wheats campaign by agreeing in February 2009
to a proposed consent order that prohibits Kellogg from making false or
unsubstantiated claims about the benefits, performance, or efficacy of Frosted
Mini-Wheats, or any other morning food or snack food, for cognitive function,
cognitive processes, or cognitive health. After publishing an analysis of the
proposed settlement in the Federal Register, and after the close of a public
comment period, the Commission issued its final Decision and Order on July 27,
2009, incorporating the terms of the negotiated settlement.[3]

What is particularly disconcerting to us is that at the same time that
Kellogg was making promises to the Commission regarding Frosted Mini-

---

[1] *In re Kellogg Co.*, FTC Docket No. C-4262 (Compl. Apr. 20, 2009), *available at*
http://www.ftc.gov/os/caselist/0823145/090420kelloggcmpt.pdf; *id.* (Exs. A-H), *available at*
http://www.ftc.gov/os/caselist/0823145/090420kelloggcomplaintexha-h.pdf.
[2] 15 U.S.C. §§ 45, 52.
[3] *Kellogg*, *supra* note 1 (Decision and Order, July 27, 2009), *available at*
http://www.ftc.gov/os/caselist/0823145/090731kelloggdo.pdf.

Wheats, the company was preparing to make problematic claims about Rice
Krispies.

Around July 2009, Kellogg unveiled a new advertising campaign for Rice
Krispies and other varieties of Krispies cereals (including Cocoa Krispies) that
promoted the purported benefits of the Krispies cereals for children's immunity.
On product packaging, for example, Kellogg claimed that Rice Krispies cereal
"now helps support your child's immunity," with "25 percent Daily Value of
Antioxidants and Nutrients — Vitamins A, B, C, and E."  The back of the cereal
box stated that "Kellogg's Rice Krispies has been improved to include
antioxidants and nutrients that your family needs to help them stay healthy."

Kellogg's dubious claims that Rice Krispies boosts children's immunity
were no doubt months in the making, as they required development by Kellogg's
creative team, designing and printing of new packaging, the production of a new
television commercial, and approval by management, before the new campaign's
public roll-out in the summer of 2009.  In light of the timing of the launch of the
Rice Krispies campaign, it is reasonable to conclude that planning for the new
"immunity" claims was well underway while Kellogg was negotiating and finalizing
its agreement with the FTC to not make unsubstantiated "cognitive ability" claims
about Frosted Mini-Wheats.

In 2009, Kellogg had sales of nearly $13 billion and a marketing and
advertising budget of over $1 billion.[4]  The company clearly has the means and
ability to carefully test its children's food products to determine if the products in
fact provide health benefits for kids.  We are also confident that Kellogg has the
wherewithal to carefully develop truthful and nonmisleading advertising about
such health benefits.  As a trusted, long-established company with a presence in
millions of American homes, Kellogg must not shirk its responsibility to do the
right thing when it advertises the food we feed our children.

We hope that the Commission action announced today communicates to
industry that it has an obligation to be honest with the public, and that the FTC
will act swiftly to challenge questionable health claims about children's food
products.  Our kids and parents deserve no less.

---

[4] See Kellogg Company 2009 Annual Report, at 56 (Note 18), available at
http://annualreport2009.kelloggcompany.com/note18-10K.html.

2

# EXHIBIT C

Westside Food Bank - What Is Westside Food Bank?                    Page 1 of 1

Case 2:09-cv-08102-MMM -RZ   Document 144   Filed 07/25/11   Page 22 of 38   Page ID
#:2635

# What Is Westside Food Bank?                                        | Print |

## About



Westside Food Bank is an independent, non-governmental, 501(c)(3) non-profit corporation founded in 1981, which provides food to social service agencies on the Westside of Los Angeles County. Our food often enables low-income people to stay in their homes, deterring the problem of homelessness, because it saves them from having to make the agonizing choice between paying for rent or food when they can't afford both. Receiving our food also enables our 70 member-agencies to devote more of their own resources to other ways of helping clients achieve self respect and economic independence.

The Food Bank acquires as much food as possible through donations, but we must still purchase approximately half of our food from wholesale merchants at the best volume prices we can obtain. Purchasing food allows us to consistently provide our member agencies with the most nutritious food possible. The Food Bank also receives produce from a statewide "Farm to Family" distribution program. Our Extra Helpings Westside Program, which recovers food that would otherwise be thrown away from bakeries, restaurants, caterers and food suppliers, provides about one third of the food we distribute. Thanks to the economies of scale and our efficient operation, we can acquire five pounds of food for each donated dollar.

Westside Food Bank is proud to be a member of the Westside Shelter & Hunger Coalition which is committed to ending local hunger and homelessness through service coordination, public education, and advocacy.  The Westside Shelter & Hunger Coalition is a program of Community Partners.   The Coalition's new Strategic Plan was made possible by a generous grant from the Jewish Community Foundation of Los Angeles .

## Who we serve:

Westside Food Bank supplies food to the food assistance programs of social service agencies in Santa Monica, Venice, Culver City, West Los Angeles, West Hollywood, Inglewood, and the LAX area. Through the services of our member agencies, our food reaches the most vulnerable members of these communities, including:

- Children in preschool, after-school, and day-care programs who don't get enough to eat at home and whose health, academic performance, and general well-being are threatened by hunger.
- Unemployed, under-employed, and working poor people who need help making ends meet.
- Seniors on fixed incomes and the frail elderly.
- Women and children living in domestic violence shelters.
- Homeless individuals who are without the basic necessities.
- The mentally ill, the disabled, and those with chronic illnesses who need assistance.
- Veterans who may face the challenges of readjustment, ill-health, or poverty.

Close Window

Case 2:09-cv-08102-MMM -RZ    Document 144    Filed 07/25/11    Page 23 of 38    Page ID #:2636

# Special Thanks

| Print |

Year after year, businesses and organizations throughout the community help us in so many ways.  We'd like to extend a special thanks to everyone who has helped us over the years! The following is a list, in no particular order, of organizations that have continually offered their support. Without their generosity and kindness, Westside Food Bank would not be where it is today.

**Summit Entertainment** 

**Getty Center** 

**Wells Fargo Bank** 

**Bloomingdales of Santa Monica** 

**Santa Monica Yoga** 

**Hulu** 

**Curves**

**TRUST! Beauty Salon** 

**Olympic Chiropractic** 

**Milstein Adelman Law Firm** 

**Bingham McCutchen**

**California United Bank**

**RAND Corporation** 

**Morgan Stanley** 

**Mindfire Entertainment**

**Hart, Watters & Carter** 

**Education Trust**

Case 2:09-cv-08102-MMM -RZ    Document 144    Filed 07/25/11    Page 24 of 38    Page ID #:2637



PS Arts



Dwyer-Curlett & Co.



UCLA



LMU



Westwood Presbyterian Church

Brentwood Presbyterian Church



Parish of St. Matthew



Unitarian Universalist of Santa Monica

First United Methodist Church of Santa Monica



Beth Shir Shalom





Close Window

Case 2:09-cv-08102-MMM -RZ    Document 144    Filed 07/25/11    Page 25 of 38    Page ID
#:2638

# Welcome to Westside Food Bank!

| Print |

Help Westside Food Bank provide food for local families in need this spring season. Make your spring donation and/or sign up to become a virtual fundraiser and invite your friends and family to support our cause as well. Thanks for giving the gift of nourishment this season.

Westside Food Bank's mission is to distribute as much food as possible to local agencies with food assistance programs and to reduce food waste on the Westside of Los Angeles County. As the food bank warehouse for the Westside since 1981, we annually distribute nearly 4 million pounds of food to the food assistance programs of 65 Westside social service agencies. We do not distribute food directly to individuals, only to agencies.

If you need food assistance, click here for our list of food pantries.

Close Window

# EXHIBIT D

MY COMMUNITY CENTER    JOIN:    Email Address    ▶

**Donate Now**

EN ESPAÑOL

**HOW WE FIGHT HUNGER**

**Mission and Values**

**Programs & Services**

**Advocacy and Public Policy**

**Our Food Bank Network**

**Our Partners**

Leadership Partners
- ConAgra Foods
- Food Lion LLC
- General Mills
- Idol Gives Back
- Kellogg Company
- Kraft Foods and Kraft Foods Foundation
- Kroger
- The Lincy Foundation
- Nestlé
- Pepsico
- Procter & Gamble
- The Starr Foundation
- SUPERVALU
- Walmart and the Walmart Foundation

Mission Partners

Supporting Partners

Promotional Partners

Celebrity Partners

Media Partners

Related Organizations

**Donate Now**

## Leadership Partners



**CONAGRA FOODS**

ConAgra Foods has been a long-time partner in helping feed hungry Americans - particularly with child hunger.

Read more >

    

Search

**FEEDING AMERICA**

JOIN THE FIGHT AGAINST HUNGER:

Join:   Email Address   Stay Connected:

©2011 Feeding America. All rights reserved.
Whenever reading a client's story, the image depicted is of the actual person being referenced.
Other images are models for illustrative representation purposes only.
Feeding America is a 501 (c)(3) non-profit recognized by the IRS.

MY COMMUNITY CENTER   JOIN:   Email Address   ▶

**Donate Now**

EN ESPAÑOL

## HOW WE FIGHT
# HUNGER

**Mission and Values**

**Programs & Services**

**Advocacy and Public Policy**

**Our Food Bank Network**

**Our Partners**
Leadership Partners
ConAgra Foods
Food Lion LLC
General Mills
Idol Gives Back
Kellogg Company
Kraft Foods and Kraft Foods Foundation
Kroger
The Lincy Foundation
Nestlé
Pepsico
Procter & Gamble
The Starr Foundation
SUPERVALU
Walmart and the Walmart Foundation
Mission Partners
Supporting Partners
Promotional Partners
Celebrity Partners
Media Partners
Related Organizations

### DONATE NOW
Support Feeding America, $25 helps to provide meals to feed a family of four for two weeks!

○ $25 = 175 meals
○ $50 = 350 meals
○ $100 = 700 meals
○ Other

**Donate Now**

### JOIN NOW
Want to stay informed about hunger & the solutions to the issue? Join our community.

Enter Email address   GO

**Donate Now**

# Kellogg Company

**KELLOGG COMPANY**

*"Kellogg Company's partnership with Feeding America and its national network of food banks spans three decades. We know that our financial contributions, product donations and committed volunteers are helping hungry children and families.."*



*David Mackay, President and Chief Executive Officer*

Kellogg Company has been a long-standing and committed donor, contributing more than 224 million pounds of food over the last ten years to Feeding America and its network. In fiscal year 2008, Kellogg committed $100,000 toward our disaster preparedness efforts. Most recently, Kellogg's responded to our request for disaster support in a big way, contributing $250,000 to our disaster fund and more than 400,000 pounds of product to help us respond to the disasters we have faced so far this year, including Hurricanes Ike and Gustav, and the flooding in the Midwest.

Search 🔍

JOIN THE FIGHT AGAINST HUNGER:        Join:   Email Address  Stay Connected:

**FEEDING
AMERICA**

| | | | | | | | |

©2011 Feeding America. All rights reserved.
Whenever reading a client's story, the image depicted is of the actual person being referenced.
Other images are models for illustrative representation purposes only.
Feeding America is a 501 (c)(3) non-profit recognized by the IRS.

**EXHIBIT E**

# the company's cereal boxes

By Ilene Aleshire

The Register-Guard

Appeared in print: Thursday, Dec. 24, 2009, page B4

The Kellogg Co. will donate almost 500,000 boxes of cereal to feed hungry people and change some of its marketing material after Oregon Attorney General John Kroger challenged the company's claims that its cereal helps children's immunity.

Kroger issued a subpoena, demanding that the company supply documents supporting the claims, Kroger's spokesman, Tony Green, said Wednesday. "After that we moved quickly to settlement."

The case focused on cereal box marketing claims that Rice Krispies "helps support your child's immunity," Green said. "The claim was part of a promotional campaign for Rice Krispies, Cocoa Krispies, Frosted Krispies and MultiGrain Jumbo Krispies."

The settlement Kellogg reached with the attorney general's office requires the company to stop shipping cereal boxes anywhere in the country with the immunity language by Jan. 15, destroy more than 2 million units of packaging with the immunity claim, and cease making such health claims unless it provides the state Department of Justice with advance notice "and competent reliable scientific evidence," Green said.

Kellogg also will contribute 108,000 boxes of cereal, with a wholesale value of $332,000, to the Oregon Food Bank and 372,000 boxes, with a wholesale value of almost $1.15 million, to Feeding America, a national organization that fights hunger, Green said.

"Kellogg should be credited with addressing the allegations quickly and constructively," Kroger said in a statement. "This settlement will directly benefit Oregonians who are hungry."

Kellogg issued a statement thanking Kroger's office "for its work to ensure the integrity of our food and to help fight hunger. This donation will fill breakfast bowls for hungry children throughout Oregon."

Kroger's office said the timing of the settlement was especially important because hunger has reached record levels. "Distribution of emergency food and the number of people served throughout the Oregon Food Bank Network escalated to historic highs during the past fiscal year and remains at alarmingly high levels."

Previous: Rise in holiday travel expected as gas prices drop just a little

Next: Guantanamo may have to stay open until 2011

Advertisement

a.m. to 10:30 a.m. on weekends and holidays.
- To place a display advertisement: (541) 485-1234, ext. 2421
- To place a classified advertisement or a paid obituary: (541) 342-1212
- Newsroom fax: (541) 683-7631
- Sports fax: (541) 687-6674
- Main switchboard: (541) 485-1234

E-mail
mailto:feedback%40registerguard.com
News tip hotline
Call 541-338-2727 or e-mail mailto:newstips%40registerguard.com to reach The Register-Guard
newsroom directly with news tips.

Send general news releases to mailto:rgnews%40registerguard.com. To contact individual staff
members, see our online directory.

Copyright © 2011 — The Register-Guard, Eugene, Oregon, USA

- Terms of Use
- Privacy Statement
- Copyright

# EXHIBIT F

  

# *A foundation stock for your portfolio.*



For more than a century, Kellogg Company has been dedicated to producing great-tasting, high-quality, nutritious foods that consumers around the world know and love. With 2009 sales of nearly $13 billion, Kellogg Company is the world's leading producer of cereal, as well as a leading producer of convenience foods, including cookies, crackers, toaster pastries, cereal bars, frozen waffles and vegetarian foods. We market more than 1,500 products in over 180 countries, and our brands include such trusted names as *Kellogg's, Keebler, Special K, Pop-Tarts, Eggo, Cheez-It, Nutri-Grain, Rice Krispies, Mother's, Morningstar Farms, Murray Sugar Free, Townhouse, All-Bran, Frosted Mini-Wheats, Club, Kashi, Bear Naked, Just Right, Guardian, Optivita, Chocos, Trésor, Frosties, Sucrilhos, Vector, Muslix* and *Zucaritas.* We enter 2010 with a rich history of success and a steadfast commitment to continue delivering sustainable and dependable growth in the future.

### The Strength of K

**Our people**   Committed to excellence, passionate about achieving our goals, eagerly embracing new challenges

**Our strategy**   Focused and consistent, delivers sustainable and dependable performance

**Our business model**   Resilient and proven, relevant in all economies, drives long-term health of the company

**Our brands**   Recognized and loved around the world, in strong categories, responsive to advertising and brand building

In 2009, we delivered strong, high-quality results while continuing to build an even stronger Kellogg Company for the future. Kellogg grew internal net sales, operating profit and earnings per share at, or above, our long-term annual targets.

- We posted 3 percent growth in Internal Net Sales, driven by a particularly strong year in cereal and a solid year in snacks.

- We delivered a 10 percent improvement in Internal Operating Profit, reflecting the success of our cost savings and productivity initiatives.

- We generated $3.16 Earnings per Share, a 13 percent increase on a currency-neutral basis.

- We generated record cash flow of nearly $1.3 billion.

- We fulfilled our commitment of returning cash to shareowners by increasing our dividend by 10 percent and returning nearly three-quarters of a billion dollars through dividends and share repurchases.

Throughout 2009, we continued to invest in our strengths— building our brands in our core categories, spending effectively on brand-building advertising and marketing, innovating and renovating our products to meet our consumers' changing needs, and identifying and implementing efficiencies and cost savings throughout our organization. This investment lays the groundwork for continued sustainable and dependable performance now and well into the future.

Our well-known and trusted brands are the strength of Kellogg. As a focused, branded food company, we provide a balanced portfolio of brands that reaches consumers around the world. The key to our success is in the way we strengthen our brands to keep them relevant, resonant and powerful with consumers. Consumers demand variety and convenience, and, now more than ever, value. Through leveraging the power of our brands and our proven ability to execute, we are dedicated to expanding our share in our categories.

As we enter 2010, we anticipate that the operating environment will remain challenging for Kellogg, our retailers and our consumers. We will continue to execute our sustainable growth model and focused business strategy to deliver sustainable and dependable performance.





**2009 NET SALES**
**$12.6 billion**

North America Frozen & Specialty Channels
North America Retail Cereal
North America Retail Snacks
International Snacks
International Cereal

## KELLOGG COMPANY FINANCIAL HIGHLIGHTS

In 2009, we delivered strong, high-quality results while continuing to build an even stronger Kellogg Company for the future.

| (dollars in millions; except per share data) | 2009 | 2008(a) | 2007 | 2006 | 2005 | 2004(a) | 5-YR CAGR(b) |
|---|---|---|---|---|---|---|---|
| Net sales | $12,575 | $12,822 | $11,776 | $10,907 | $10,177 | $9,614 | 6% |
| Gross profit as a % of net sales | 42.9% | 41.9% | 44.0% | 44.2% | 44.9% | 44.9% | |
| Operating profit | $ 2,001 | $ 1,953 | $ 1,868 | $ 1,766 | $ 1,750 | $1,681 | 4% |
| Net income attributable to Kellogg Company | $ 1,212 | $ 1,148 | $ 1,103 | $ 1,004 | $  980 | $  891 | 6% |
|   Basic per share amount | $ 3.17 | $ 3.01 | $ 2.79 | $ 2.53 | $ 2.38 | $ 2.16 | 8% |
|   Diluted per share amount | $ 3.16 | $ 2.99 | $ 2.76 | $ 2.51 | $ 2.36 | $ 2.14 | 8% |
| Cash flow (net cash provided by operating activities, reduced by capital expenditures)(c) | $ 1,266 | $  806 | $ 1,031 | $  957 | $  769 | $  950 | 6% |
| Dividends paid per share | $ 1.43 | $ 1.30 | $ 1.20 | $ 1.14 | $ 1.06 | $ 1.01 | 7% |

*(a) Fiscal year includes a 53rd week.  |  (b) CAGR = compounded annual growth rate.  |  (c) Cash flow is defined as net cash provided by operating activities less capital expenditures. The Company uses this non-GAAP financial measure to focus management and investors on the amount of cash available for debt repayment, dividend distributions, acquisition opportunities and share repurchase. Refer to Management's Discussion and Analysis within the Form 10-K for reconciliation to the most comparable GAAP measure.*

Total shareowner return on Kellogg shares for fiscal 2009 was 22%, ahead of the S&P Packaged Foods & Meats Index total return of 16%. Five-year cumulative annual return of Kellogg shares (35%) significantly outperforms both the Packaged Foods & Meats Index (13%) and the S&P 500 Index (2%).(b)

Advertising investment of nearly $1.1 billion in 2009 continued our consistent and strong investment into building our brands. At approximately 9% of net sales, this investment is significantly above that of our peers in the packaged foods industry.

Cost saving and efficiency programs in 2009 provided substantial progress toward our goal of $1 billion in annual cost savings by the end of 2011. We now expect to exceed $1 billion in savings over this three-year period.

**EARNINGS PER SHARE** ($ diluted)




5-year CAGR(a) 8%

'04  '05  '06  '07  '08  '09

2009 EPS increased 6% over 2008, the 8th consecutive year of growth.

**NET SALES** (millions $)




5-year CAGR(a) 6%

'04  '05  '06  '07  '08  '09

Net sales were strong again in 2009, despite the weak economy's pressure on consumers.

**OPERATING PROFIT** (millions $)




5-year CAGR(a) 4%

'04  '05  '06  '07  '08  '09

Once again, we increased operating profit dollars while continuing to invest in our business and cost-savings programs.

**DIVIDENDS** ($ per share)



5-year CAGR(a) 7%

'04  '05  '06  '07  '08  '09

Dividends per share have increased 42% over the past 5 years.

*Note: Fiscal years 2004 and 2008 include a 53rd week.  |  (a) CAGR = compounded annual growth rate.  |  (b) Assumes all dividends reinvested.*

This fact sheet was designed to provide a brief overview of Kellogg Company. You can obtain a complete description of the Company, its operations and financial condition, including the Company's consolidated financial statements and annual reports by calling (269) 961-2800 or accessing http://investor.kelloggs.com.

This fact sheet may contain forward-looking statements, reflecting management's expectations regarding future events and operating performance and speaks only as of January 2, 2010. These forward-looking statements involve a number of risks and uncertainties. A list of the factors that could cause actual results to differ materially from those expressed in, or underlying, our forward-looking statements are detailed in the Company's annual (10-K) and quarterly (10-Q) reports filed with the Securities and Exchange Commission. This fact sheet should not be construed as an offer to buy or sell securities.

**Direct Stock Purchase Program—Initial investment only $50**

NYSE ticker symbol:  K
World headquarters:  Battle Creek, Michigan
Web site:  kelloggcompany.com

**Data as of January 2, 2010**
Employees:  ≈31,000
Shares outstanding:  382 million
Estimated annual dividend:  $1.50
Market capitalization:  $20 billion
Long-term credit rating:  A3/BBB+

**Investor Relations Contact**
Kathryn C. Koessel, Vice President, Investor Relations
Kellogg Company, One Kellogg Square
Battle Creek, MI 49017
(269) 961-9089 I investor.relations@kellogg.com
http://investor.kelloggs.com

®, ™, © 2010 Kellogg NA Co. I ®, ™, © 2010 Kashi Co.

# EXHIBIT G

# Summary of Billing Sheets

| FIRM | Atty/LC/PL | Rate | Hours | Total |
|---|---|---|---|---|
| **WCCE** | | | | |
| | MMH | $670.00 | 403.00 | $270,010.00 |
| | GS | $500.00 | 605.10 | $302,550.00 |
| | SDS | $395.00 | 30.10 | $11,889.50 |
| | KC | $375.00 | 51.20 | $19,200.00 |
| | JSE - ASSOC | $250.00 | 375.70 | $93,925.00 |
| | JL - ASSOC | $250.00 | 12.00 | $3,000.00 |
| | JSE - LAW CLERK | $180.00 | 129.60 | $23,328.00 |
| | JL - LAW CLERK | $180.00 | 60.60 | $10,908.00 |
| | DSG | $180.00 | 77.50 | $13,950.00 |
| | AJ | $180.00 | 326.20 | $58,716.00 |
| | GMR | $180.00 | 3.20 | $576.00 |
| **Totals for WCCE** | | | **2,074.20** | **$808,052.50** |
| | | | | |
| **MAK** | | | | |
| | WK | $650.00 | 59.75 | $38,837.50 |
| | GW | $500.00 | 896.00 | $448,000.00 |
| | PF | $350.00 | 6.75 | $2,362.50 |
| | SA | $350.00 | 1.25 | $437.50 |
| | IM | $300.00 | 231.25 | $69,375.00 |
| | LAW CLERKS | $125.00 | 53.50 | $6,687.50 |
| **Totals for MAK** | | | **1,248.50** | **$565,700.00** |
| | | | | |
| **NEWPORT TRIAL GROUP** | | | | |
| | SJF | $750.00 | 82.50 | $61,875.00 |
| | REB | $350.00 | 108.35 | $37,922.50 |
| | WJF | $175.00 | 125.00 | $21,875.00 |
| | JP | $175.00 | 150.00 | $26,250.00 |
| **Totals for Newport Trial** | | | **465.85** | **$147,922.50** |
| | | | | |
| **BRUCE WHITMAN** | | | | |
| | BW | $670.00 | 303.60 | $203,412.00 |
| **Totals for Bruce Whitman** | | | **303.60** | **$203,412.00** |
| | | | | |
| **STATMAN, HARRIS** | | | | |
| | AS | $670.00 | 8.40 | $5,628.00 |
| | JH | $670.00 | 334.40 | $224,048.00 |
| | RB | $670.00 | 1.40 | $938.00 |
| | FG | $500.00 | 1.80 | $900.00 |
| | CH | $500.00 | 66.00 | $33,000.00 |
| | WKL | $450.00 | 56.40 | $25,380.00 |
| | MN | $395.00 | 343.20 | $135,564.00 |
| | SA | $395.00 | 64.70 | $25,556.50 |
| | EH | $375.00 | 89.80 | $33,675.00 |
| | PT | $180.00 | 98.80 | $17,784.00 |
| | LS | $180.00 | 53.54 | $9,637.20 |
| **Totals for Statman, Harris** | | | **1,118.44** | **$512,110.70** |
| | | | | |
| | | | | |
| **Totals for all firms** | | | **5,210.59** | **$2,237,197.70** |

Williams et al. v. Biotab Nutraceuticals, Inc. et al.,
BC 414808