1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

E-Filed: 11.23.11

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MICHELLE WEEKS, KATIE
DINTELMAN and MARIA
SANDOVAL, each individually and on
behalf of all others similarly situated,

                    Plaintiffs,

          vs.

KELLOGG COMPANY, a Delaware
corporation; KELLOGG USA, INC., a
Michigan corporation; KELLOGG
SALES COMPANY, a Delaware
corporation, and DOES 1 through 100,
inclusive,

                    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 09-08102 (MMM) (RZx)

ORDER APPROVING FINAL
SETTLEMENT APPROVAL

      On November 5, 2009, plaintiffs[1] filed an action against defendants Kellogg Company,

Kellogg USA, Inc., and Kellogg Sales Company (collectively "Kellogg").[2]  Plaintiffs filed a first

_____

      [1]The original plaintiff in this action, Sabena Lakshmi Kammula, withdrew from the action.
(See Order Granting Plaintiff Leave to File Second Amended Complaint for the Sole Purpose of
Substituting the Named Class Representative, Docket No. 43 (May 6, 2010); Stipulation to
Dismiss Plaintiff Sabena Lakshmi Kammula, Docket No. 47 (May 27, 2010).)

      [2]Complaint, Docket No. 1 (Nov. 5, 2009).  The original complaint alleged claims on behalf
of a class of purchasers of Cocoa Krispies only.

1   amended complaint on December 9, 2009,[3] a second amended complaint on May 6, 2010,[4] a third

2   amended complaint on October 14, 2010,[5] and a fourth amended complaint on May 20, 2011.[6]

3   The fourth amended complaint alleges that defendants have made, and continue to make, false and

4   misleading statements in advertising and packaging Kellogg's Rice Krispies and Cocoa Krispies

5   ("the Krispies cereals").   Specifically, plaintiffs contend that the Krispies cereal labels and

6   Kellogg's website state, without the support of clinical studies, that consuming small amounts of

7   the cereal will improve children's health and immune systems.[7]

8          Plaintiffs' fourth amended complaint pleads three causes of action: (1) unfair business

9   practices in violation of California Business and Professions Code § 17200 *et seq.*, (2) false and

10  misleading advertising in violation of California Business and Professions Code § 17500 *et seq.*,

11  and (3) fraudulent and intentional misrepresentation in violation of California Civil Code § 1750

12  *et seq.*[8]   It seeks injunctive relief, actual damages, restitution, punitive damages, prejudgment

13  ─────────────────

14         [3]First Amended Complaint, Docket No. 14 (Dec. 9, 2009).   The first amended complaint

15  added a Rice Krispies subclass.

16         [4]Second Amended Complaint, Docket No. 44 (May 6, 2010).   The second amended

17  complaint substituted Michelle Weeks as lead plaintiff.

18         [5]Third Amended Complaint, Docket No. 92 (Oct. 14, 2010).  The third amended complaint

19  added Maria Sandoval as a plaintiff following consolidation of this action with a related case,
    *Maria Sandoval v. Kellogg Company et al.*, CV 10-05258 MMM (RZx).  Order Re Consolidation

20  of Cases, Docket No. 65 (Aug. 13, 2010).

21         [6]Fourth Amended Complaint, Docket No. 131 (May 20, 2011).   The fourth amended

22  complaint added Katie Dintelman as a plaintiff, which consolidated this action with a related case
    pending in the Southern District of Illinois, *Dintelman v. Kellogg Company et al.*, CV 09-945

23  GPM (DGW), and also asserted claims on behalf of a nationwide class.  (Declaration of Joe R.
    Whatley, Jr. in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and

24  an Award of Attorneys' Fees, Expenses and Plaintiff Service Awards ("Whatley Decl."), Docket

25  No. 136 (July 18, 2011), ¶¶ 6, 11 ("On May 20, 2011, Plaintiffs filed a Fourth Amended
    Complaint which consolidated the *Dintelman* action with the *Sandoval* and *Weeks* action and

26  asserted claims on behalf of a nationwide class").

27         [7]Fourth Amended Complaint, ¶¶ 3-5.

28         [8]*Id.*, ¶¶ 49-83.

2

interest, attorneys' fees, and costs.

On August 10, 2010, plaintiffs filed a motion for class certification,[9] which defendant opposed.[10]  The court had no opportunity to decide whether a class should be certified because, on November 17, 2010, the parties files a notice of settlement.[11]  On May 9, 2011, the court issued an order preliminarily approving the parties' proposed settlement, and directing that notice of the proposed settlement be given to class members.[12]  On July 18, 2011, the parties filed a motion seeking final approval of the settlement,[13] and a motion seeking an award of attorneys' fees, expenses, and incentive awards.[14]  Two class members objected to the proposed settlement and fee application.[15]

On August 29, 2011, the court conducted a fairness hearing, at which it circulated a tentative order certifying the settlement class and generally approving the terms of the settlement the parties had reached.  The court, however, expressed concerns regarding the parties' proposed distribution of *cy pres* funds, and stated that it was unable finally to approve the settlement with

[9]Motion for Class Certification, Docket No. 64 (Aug. 10, 2010); Reply in Support of Motion for Class Certification, Docket No. 96 (Nov. 1, 2010).

[10]Opposition to Motion for Class Certification, Docket No. 75 (Sept. 16, 2010).

[11]Notice of Settlement of Class Action, Docket No. 110 (Nov. 17, 2011).  See also Order Vacating Plaintiff's Motion to Certify Class, Docket No. 111 (Nov. 18, 2011); Joint Stipulation of Settlement ("Original Stipulation"), Docket No. 121 (Jan. 10, 2011).

[12]Order Granting Preliminary Approval of Class Action Settlement ("Prelim. Order"), Docket No. 126 (May 9, 2011).

[13]Memorandum in Support of Motion for Final Approval of Class Action Settlement ("Settlement Approval Motion"), Docket No. 136 (July 18, 2011).

[14]Memorandum in Support of Motion for an Award of Attorneys' Fees, Expenses, and Plaintiff Service Awards ("Attorneys' Fees Motion"), Docket No. 135 (July 18, 2011).

[15]Objection and Comments to the Stipulated Settlement and Fee Application by Shaun J. Mathers ("Mathers Objection"), Docket No. 144 (July 25, 2011); Objection to Proposed Settlement filed by Nicholas John Stehle ("Stehle Objection"), Docket No. 141 (July 26, 2011).

these provisions included.[16]  The court's tentative order also set forth its reasoning for reducing the proposed attorney's fees award to $879,237, and the award of costs to $19,418.64.  After meeting and conferring, the parties agreed to amend the settlement to address the court's concerns.

On September 12, 2011, the parties filed an amended stipulation of settlement.[17]  One of the objectors filed a response to the amended stipulation on September 19, 2011,[18] to which plaintiffs responded on September 26, 2011.[19]

## I.  FACTUAL BACKGROUND

### A.    The Parties and Complaint

Defendants are leading manufacturers of breakfast cereals, which include Rice Krispies, a toasted rice cereal, and Cocoa Krispies, a chocolate-flavored, sweetened rice cereal.[20]  Plaintiffs contend that, from approximately June 1, 2009, through March 1, 2010, Kellogg labeled the Krispies cereals as follows: "Now helps support your child's immunity;" "25% Daily Value of Antioxidants & Nutrients Vitamins A, B, C & E;"[21] "Helping to support your family's immunity;" "Kellogg's Cocoa Krispies has been improved to include antioxidants and nutrients that your

---

[16]Minutes of Plaintiff's Motion for Final Approval of Class Action Settlement, Docket No. 150 (Aug. 29, 2011).

[17]Amended Stipulation of Settlement ("Amended Stipulation"), Docket No. 152 (Sept. 19, 2011).

[18]Response by Objector Nicholas John Stehle ("Stehle Response"), Docket No. 154 (Sept. 19, 2011).

[19]Plaintiffs' Response to Stehle's Response to Amended and Supplemental Settlement Agreement, Docket No. 155 (Sept. 26, 2011).

[20]Fourth Amended Complaint, ¶ 3.

[21]These statements appeared on the front of the Krispies cereal boxes.  (Fourth Amended Complaint, ¶¶ 4(a), 26(a); see, e.g. Complaint, Exh. 1 (picture of front of Cocoa Krispies cereal box, stating "Now Help's Support Your Child's Immunity").)

family needs to help them stay healthy;" and "Enjoy this wholesome breakfast and help keep your family healthy"[22] (collectively the "immunity claims"). As part of Kellogg's marketing campaign, similar claims appeared on the internet.[23] Plaintiffs maintain that "[d]efendants' advertising of the Krispies cereals . . . conveys a single, consistent false and misleading message to consumers: that Defendants' Krispies cereals will boost a family's immune systems . . . and keep a family healthy."[24] They suggest that defendants purposefully employed this advertising campaign in the wake of the H1N1 flu epidemic and peoples' "ever-increasing health concerns."[25]

Plaintiffs contend that the immunity claims are false, deceptive, and misleading because they are unsupported by competent and reliable scientific evidence.[26] They assert, for example, that Kellogg has not conducted clinical trials or studies that support the claims.[27] Plaintiffs contend that Kellogg's false representations induced class members collectively to spend millions of dollars in reliance on the claims, believing that consumption of the Krispies cereals would have the tangible benefit of supporting immune systems.[28] They claim that "[d]efendants have sold hundreds of thousands of units or more of Cocoa Krispies and Rice Krispies based upon [d]efendant's false promises."[29]

On December 17, 2009, the Oregon Attorney General announced an agreement with Kellogg to "stop shipping cereal boxes with immunity language by January 15, [to] destroy more

---

[22]These statements appeared on the back of the Krispies cereal boxes. (Fourth Amended Complaint, ¶¶ 4(b), 26(b); see, e.g., Complaint, Exh. 2 (picture of back of Cocoa Krispies cereal box, stating "Helping to Support Your Family's Immunity").)

[23]Fourth Amended Complaint, ¶¶ 4(c), 26(c).

[24]*Id.*, ¶ 9.

[25]*Id.*, ¶¶ 9, 24-25.

[26]*Id.*, ¶ 23.

[27]*Id.*, ¶¶ 27-28.

[28]*Id.*, ¶ 32.

[29]*Id.*

than 2 million units of packaging with the immunity claims, and [to] cease making such health claims unless [Kellogg] provide[d] the Oregon Department of Justice with advance notice and competent reliable scientific evidence."[30]   Additionally, on June 3, 2010, the Federal Trade Commission ordered Kellogg to stop making unsubstantiated or misleading claims about the health benefits of any food it produces, markets or sells in response to "dubious health claims made by Kellogg regarding the ability of Rice Krispies cereal to boost children's immunity."[31]

### B.   The Parties' Negotiations Regarding Settlement, Attorneys' Fees, Costs, and Incentive Awards

Prior to participating in mediation, plaintiffs served requests for production of documents and receive thousands of pages of documents including, for example, sales information.[32]   Kellogg served interrogatories, document production requests, and deposed plaintiffs Weeks and Sandoval on October 8 and 14, 2010, respectively.[33]   Plaintiffs deposed Kellogg's persons most knowledgeable on June 2 and 3, 2010.[34]

On July 28, 2010, while the parties were still conducting discovery and plaintiffs were drafting a motion for class certification, the parties engaged in a day-long mediation before the Honorable Edward A. Panelli in San Francisco, California.[35]   Although a settlement was not

---

[30]Mathers Objection, Exh. A (press release describing the agreement; letter from the Kellogg Company to the Oregon Attorney General confirming the agreement).   As part of its agreement with the Oregon Attorney General, Kellogg agreed to donate 108,000 boxes of cereal to the Oregon Food Bank and 372,000 boxes to Feeding America.   (*Id.*)

[31]*Id.*, Exh. B (concurring statement of Commissioner Julie Brill and Chairman Jon Liebowitz concerning *In the Matter of Kellogg Company*, FTC Docket No. C-4262).

[32]Declaration of Sara D. Avila in Support of Plaintiffs' Application for Attorneys' Fees, Expenses, and Plaintiffs' Service Awards ("Avila Attorneys' Fees Decl."), Docket No. 135 (July 18, 2011), ¶ 8.

[33]*Id.*, ¶ 9; Whatley Decl., ¶ 9.

[34]Avila Attorneys' Fees Decl., ¶ 11.

[35]Whatley Decl., ¶ 10.

reached, it led to what plaintiffs describe as extensive "hard-fought" settlement negotiations over the next six months.[36]   Ultimately, the parties were able to agree on the terms of a settlement agreement, a release, class notice, and a claims submission program.[37]   They filed a Stipulation of Settlement on January 10, 2010.[38]   After the court's hearing, the parties filed an Amended Stipulation that altered certain of the original stipulation's terms.[39]

The parties state that they purposefully did not negotiate attorneys' fees and reimbursement of expenses until after agreement was reached on the substantive terms of the settlement.[40]

### C.    The Terms of the Settlement

The proposed settlement class includes "all persons or entities in the United States who purchased the Product[41] during the Settlement Class Period.   Excluded from the Class are Kellogg's employees, officers, directors, agents and representatives and those who purchased the Product for the purpose of resale."[42]   The Settlement Class Period is defined as "the period from June 1, 2009[,] to March 1, 2010, the dates between which packaging for Rice Krispies and Cocoa Krispies . . . contained the immunity statements appeared on store shelves."[43]

Under the terms of the settlement, Kellogg will establish an interest-bearing cash

---

[36]*Id.*

[37]*Id.*

[38]*Id.*, ¶ 10.

[39]Amended Stipulation, I.C.   The document provides that "[a]ny terms in the Joint Stipulation of Settlement not expressly amended or modified by this Amended and Supplemental Stipulation of Settlement remain in full effect."   (*Id.*)   The court therefore refers to both the original and the amended Stipulation in its discussion.

[40]Avila Attorneys' Fees Decl., ¶ 18.

[41]"Product" is defined as "the Rice Krispies© and Cocoa Krispies© branded cereals that are the subject of the Litigation."   (Original Stipulation, II.A., ¶ 20.)

[42]*Id.*, II.A., ¶ 4.

[43]*Id.*, II.A., ¶ 24.

"Settlement Fund" of $2.5 million to reimburse class members $5 per box of Krispies cereals purchased during the class period, up to a maximum of $15 per class member.[44] If payment to all eligible claimants exceeds the Settlement Fund, each claimant's award will be proportionately reduced. On the other hand, if payment to all eligible claimants leaves a remaining balance in the Settlement Fund, that balance will be distributed to Feeding America, a national hunger charity.[45]

The settlement also requires that Kellogg make a charitable donation of Kellogg branded cereals and other food products with a retail value of $2.5 million to Feeding America ("Cy Pres Fund").[46] Finally, Kellogg agrees that it will permanently cease making immunity claims on its products' labeling, packaging, marketing, and advertising unless, at the time the claims are made, it possesses competent and reliable scientific evidence that supports the claims.[47]

Pursuant to the agreement, Kellogg will pay all costs associated with administration of the class settlement, including the cost of providing notice to class members and processing claims. These amounts will not be paid from the settlement fund.[48] The agreement permits plaintiffs' counsel to apply for an award of attorneys' fees and costs to be paid from the settlement fund.[49] Counsel applied for fee award of $1,147,715.50, as well as a lodestar multiplier, resulting in total

---

[44]Settlement Approval Motion at 6; Stipulation, IV.A., ¶¶ 1-2. Claim forms will be attached to the Publication Notice, and will be available at Class Counsel's websites and the Settlement Website. Class members can also obtain a claim form by calling a toll-free number or writing the class action administrator. (Stipulation, IV.A., ¶ 5.)

[45]Amended Stipulation, IV.A.3.b. The original stipulation provided that the remaining funds would be distributed equally to "the Food Safety, Health, and Nutrition Project of Public Justice, the Westside Food Bank, and the food safety program at the University of Georgia." (*Id.*, IV.A., ¶ 3).

[46]Amended Stipulation, IV.B.2. The original stipulation provided that *cy pres* funds would be distributed to Feeding America and the Westside Food Bank. (Stipulation, IV.B., ¶ 22.) The stipulation did not specify the percentage of the donation each charity was to receive.

[47]*Id.*, IV.B., ¶ 1.

[48]*Id.* at V.C.; Settlement Approval Motion at 8.

[49]Original Stipulation, VIII.A.

1  fees of $1,323,143.64.[50]  They also sought costs of $23,143.64.  Kellogg agreed not to oppose

2  incentive awards of $5,000 for each named plaintiff, also to be paid from the settlement fund.[51]

3  The Amended Stipulation states that class counsel will "agree to apply for and to accept an award

4  of attorneys' fees in the total amount of $879,237 and expenses in the total amount of $19,418.64,

5  to be paid from the Settlement Fund."[52]

6        **D.**    **Notice to the Class of the Proposed Settlement**

7       Because Kellogg does not have the mailing addresses of all persons who purchased the

8  cereals during the class period, a "Publication Notice" was placed in periodicals and on internet

9  sites.[53]  The Publication Notice summarizes the terms of the settlement, explains how class

10  members can submit the attached claim form, notifies class members of their ability to opt-out of

11  the settlement class or object to the settlement, and contains details regarding the fairness

12  hearing.[54]

13       The Garden City Group ("GCG"), which serves as the settlement administrator, published

14  a banner on various websites, including www.Parenting.com, www.Parents.com, and the websites

15  of various newspaper and television stations, between June 8 and July 8, 2011, respectively.[55]

16  The banner has a red background with black and white lettering that reads: "Legal Notice: If you

17  purchased Kellogg's Rice Krispies or Cocoa Krispies cereals you may be entitled to a cash refund

18  from a class action settlement.  For More Information Click Here."[56]  If a consumer clicks, the

19

20  ────────────

21     [50]Attorneys' Fees Motion at 1.

22     [51]Original Stipulation, VIII.B.

23     [52]Amended Stipulation, VIII.A.

24     [53]*Id.*, V.B.; Settlement Approval Motion at 8.

25     [54]Original Stipulation, Exh. D.

26     [55]Declaration of Lance P. Blair Regarding Notice and Settlement Administration ("Blair

27  Decl."), Docket No. 136 (July 18, 2011), ¶ 3.

28     [56]*Id.*, Exh. A.

banner redirects him or her to the settlement website.[57]

GCG also issued a media release, which included essentially the same information as the Publication Notice, to 782 parenting and consumer affairs blogs and to PR Newswire for submission to various news websites.[58]  Additionally, it established a toll-free number beginning June 8, 2011, that class members could call Monday through Friday from 8:30 a.m. to 5:00 p.m. Pacific Standard Time to inquire about the settlement.[59]  As of July 15, 2011, the toll-free line had received 120 calls.[60]  Finally, GCG created a settlement website – www.CerealAdvertisingSettlement.com – where class members can submit claims forms and download the Publication Notice and a more detailed Class Notice, as well as other documents concerning this action.[61]

As of July 15, 2011, GCG had received two requests for exclusion from the class.[62]  As of June 30, 2011, the total costs of notice and settlement administration were $270,791.44.  GCG anticipates that its future costs will be in the $160,000 to $170,000 range.[63]

## II.  DISCUSSION

### A.    Certification of the Proposed Settlement Class

"In order to approve a class action settlement, a district court must first make a finding that a class can be certified." *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 485-86 (E.D. Cal. 2010) (citing *Molski v. Gleich*, 318 F.3d 937, 943, 946-50 (9th Cir. 2003)); see also *Ortiz*

---

[57]*Id.*, ¶ 5.

[58]*Id.*, Exh. B-E.

[59]*Id.*, ¶ 4.

[60]*Id.*

[61]*Id.*, ¶ 5.

[62]*Id.*, ¶ 6.

[63]*Id.*, ¶ 8.

1   *v. Fiberboard Corp.*, 527 U.S. 815, 848-49 (1999) ("When a district court, as here, certifies for

2   class action settlement only, the moment of certification requires heightened attention to the

3   justifications for binding the class members" (citation omitted)); *Staton v. Boeing Co.*, 327 F.3d

4   938, 952-53 (9th Cir. 2003) ("Especially in the context of a case in which the parties reach a

5   settlement agreement prior to class certification, courts must peruse the proposed compromise to

6   ratify both the propriety of the certification and the fairness of the settlement.  First, the district

7   court must assess whether a class exists; '[s]uch attention is of vital importance, for a court asked

8   to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust

9   the class, informed by the proceedings as they unfold.'  Second, the district court must carefully

10  consider 'whether a proposed settlement is fundamentally fair, adequate, and reasonable,'

11  recognizing that '[i]t is the settlement taken as a whole, rather than the individual component parts,

12  that must be examined for overall fairness . . . ,'" quoting *Amchem Prods. Inc. v. Windsor*, 521

13  U.S. 591, 620 (1997), and *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

14       Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which

15  provides that a district court may certify a class only if "(1) the class is so numerous that joinder

16  of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the

17  claims or defenses of the representative parties are typical of the claims or defenses of the class;

18  and (4) the representative parties will fairly and adequately protect the interests of the class."

19  FED. R. CIV. PROC. 23(a).

20       Parties seeking to maintain a suit as a class action must make a prima facie showing that

21  each of these four requirements is met, and must demonstrate that appropriate grounds for

22  pursuing a class recovery exist.  See *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975).  The

23  burden of proving that maintenance of the suit as a class action is appropriate rests on the

24  proponent of the class.  *In re Northern Dist. of California Dalkon Shield IUD Prods. Liab. Litig.*,

25  693 F.2d 847, 854 (9th Cir. 1982).  Failure to satisfy any one of the Rule 23 requirements

26  precludes certification of the class.  *Rutledge v. Electric Hose & Rubber Co.*, 511 F.2d 668, 673

27  (9th Cir. 1975).

28       In addition to satisfying the prerequisites to certification under Rule 23, plaintiffs must also

show that the class is sufficiently "definite" that class members are "ascertainable." See, e.g., *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977); *Lukovsky v. San Francisco*, No. C 05-00389 WHA, 2006 WL 140574, *2 (N.D. Cal. Jan. 17, 2006) ("'Although there is no explicit requirement concerning the class definition in FRCP 23, courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed,'" quoting *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 679-80 (S.D. Cal. 1999)).   The representative plaintiff "must be a member of the class which he or she seeks to represent at the time the class action is certified by the district court." *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *Bailey v. Patterson*, 369 U.S. 31, 32-33 (1962); *Black Faculty Ass'n. of Mesa College v. San Diego Community College District*, 664 F.2d 1153, 1157 (9th Cir. 1981).

The parties seek to have the court certify a settlement class of all persons in the United States who purchased Rice Krispies or Cocoa Krispies between June 1, 2009, and March 1, 2010.[64]   Excluded from the class are Kellogg's employees, officers, directors, agents and representatives and those who purchased the cereals for the purpose of resale.[65]

The court has discretion to modify class definitions where appropriate. See *Armstrong v. Davis*, 275 F.3d 849, 871 n. 28 (9th Cir. 2001) ("Where appropriate, the district court may redefine the class," citing *Penk v. Oregon State Bd. of Higher Educ.*, 816 F.2d 458, 467 (9th Cir. 1987)); *Guevarra v. Progressive Financial Services, Inc.*, No. C-05-3466-VRW,  2006 WL 36123742, *3 (N.D. Cal. Nov. 30, 2006) (denying class certification and finding that "[f]or plaintiff to continue her action as a class action, she must redefine her class"); *Legge v. Nextel Communications, Inc.*, No. CV 02-8676DSF(VNKx), 2004 WL 5235587, *17 (C.D. Cal. June 25, 2004) ("While the Court recognizes that it has the authority to redefine the putative classes, or create subclasses, it declines to do so on this record"); *Poulos v. Caesars World, Inc.*, No. CV-S-94-1126-RLH-RJJ, 2002 WL 1991180, *3 (D. Nev. June 25, 2002) ("Even if the district

[64]Original Stipulation, II.A., ¶ 4 (definition of "Class"), ¶ 20 (definition of "Product"), ¶ 24 (definition of "Settlement Class Period") .

[65]*Id.*, II.A., ¶ 4.

court decides that certification is proper, it is not bound by the plaintiff's description of the class"). In this case, the court does not believe that redefinition is necessary as the class proposed by the parties is sufficiently definite and ascertainable. The court therefore turns to the requirements of Rule 23.

### 1. Numerosity

Under the Federal Rules of Civil Procedure, before a class can be certified, the court must determine that the class is "so numerous that joinder of all members is impracticable." See FED. R. CIV. PROC. 23(a)(1). "Impracticability does not mean impossibility, [however,] . . . only . . . difficulty or inconvenience in joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) (internal quotations omitted). There is no set numerical cutoff used to determine whether a class is sufficiently numerous; courts must examine the specific facts of each case in evaluating whether the requirement has been satisfied. See *General Telephone Co. v. EEOC*, 446 U.S. 318, 329-30 (1980). "As a general rule, [however,] classes of 20 are too small, classes of 20-40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough." *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1988) (citing 3B J. Moore & J. Kennedy, MOORE'S FEDERAL PRACTICE ¶ 23-05[1] (2d ed. 1987)).

Plaintiffs have reviewed Kellogg's sales information,[66] and assert that Kellogg sold hundreds of thousands of units of Cocoa Krispies and Rice Krispies during the class period.[67] Defendants, moreover, are leading manufacturers of breakfast cereals sold throughout the country.[68] Common sense dictates, therefore, that the numerosity requirement is met. See *Perez-Olano v. Gonzalez,* 248 F.R.D. 248, 255 (C.D. Cal. 2008) ("'[W]here . . . general knowledge and common sense indicate that [the class] is large, the numerosity requirement is satisfied,'" quoting *Orantes-Hernandez v. Smith*, 541 F.Supp. 351, 371 (C.D. Cal. 1982)). There is a strong

---

[66]Avila Attorneys' Fees Decl., ¶ 8.

[67]Fourth Amended Complaint, ¶ 32; Settlement Approval Motion at 17.

[68]Fourth Amended Complaint, ¶¶ 17-19.

1    likelihood that thousands of customers purchased the cereals during the class period.  The court

2    therefore finds that the numerosity requirement of Rule 23(a) is satisfied.

3                    **2.    Commonality**

4           The commonality requirement "seek[s] to assure that the action can be practically and

5    efficiently maintained [as a class action]."  *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).

6    "A class has sufficient commonality 'if there are questions of fact and law which are common to

7    the class.'"  *Hanlon*, 150 F.3d at 1019 (quoting FED.R.CIV.PROC. 23(a)(2)).  "[I]f material

8    variations exist as to the law or facts involved with individual class member injuries, then the

9    commonality requirement [cannot] be met."  *LaDuke v. Nelson*, 762 F.2d 1318, 1332 (9th Cir.

10   1985), as amended, 796 F.2d 309 (9th Cir. 1986).  The commonality requirement of Rule 23(a)(2)

11   is less rigorous than the companion requirements of Rule 23(b)(3), and "ha[s] been construed

12   permissively."  *Hanlon*, 150 F.3d at 1019.

13          The Fourth Amended Complaint alleges several questions of fact and law common to all

14   class members' claims – e.g., whether defendants' immunity claims were false and misleading,

15   and whether they were likely to deceive a reasonable consumer.[69]  The court thus finds that the

16   commonality requirement is satisfied.  See *True v. American Honda Motor Co.*, 749 F.Supp.2d

17   1052, 1064 (C.D. Cal. 2010) ("Here, the FAC alleges several common questions of fact and law:

18   (1) whether Defendant's advertising was false and misleading; (2) whether Defendant's claims

19   about fuel economy were material to class members' decision to purchase HCH vehicles;

20   (3) whether the class members suffered damages as a result of Defendant's conduct; (4) whether

21

22          [69]*Id.*, ¶ 40 (stating "Common questions of law include . . . the following: . . . d. Whether

23   Defendants possess competent and reliable scientific evidence to support their label and advertising

24   claims made regarding the Products; e. Whether made false and misleading representations in their
     advertising and labeling of the Products; f. Whether Defendants failed to disclose that the Products

25   may not actually boost consumers' immunity; g. Whether Defendants knew or should have known
     that the representations and omissions were false; h. Whether Defendants representations and

26   omissions were likely to deceive a reasonable consumer; i. Whether Defendants represented that
     the Products were of a particular standard, quality, or grade when they are of another; and j.

27   Whether Defendants represented that the Products have characteristics, benefits, uses, or quantities

28   which it does not have").

Defendant knew or should have known its advertising was false or misleading; (5) whether Defendant knew or should have known the class members would experience significantly less fuel economy than advertised; and (6) whether Defendant concealed or failed to tell class members about material facts regarding fuel economy.  Due to these common questions, the class satisfies the commonality requirement"); *Western States Wholesale, Inc. v. Synthetic Industries, Inc.*, 206 F.R.D. 271, 274 (C.D. Cal. 2002) ("Western States meets the commonality requirement because there are questions of law and fact common to all class members, such as whether SI's advertisements are false and misleading and whether any misrepresentations are material"); *Wiener v. Dannon Co., Inc.*, 255 F.R.D. 658, 664-65 (C.D. Cal. 2009) ("The proposed class members clearly share common legal issues regarding Dannon's alleged deception and misrepresentations in its advertising and promotion of the Products.  Despite the existence of 'divergent factual predicates' surrounding the individual class members' purchases, the overriding 'shared legal issues' are sufficient to satisfy the Ninth Circuit's 'permissive' view of Rule 23(a)(2).  Accordingly, the Court finds that the commonality requirement of Rule 23(a)(2) is satisfied," citing *Hanlon*, 150 F.3d at 1019).

### 3.   Typicality

Typicality requires a determination as to whether the named plaintiff's claims are typical of those of the class members she seeks to represent.   See FED.R.CIV.PROC. 23(a)(3).  "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical."  *Hanlon*, 150 F.3d at 1020; see also *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985) ("A plaintiff's claim meets this requirement if it arises from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory").

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon*, 976 F.2d at 508 (citation and internal quotations omitted).  Typicality, like commonality, is a "permissive standard[ ]."  *Hanlon*, 150 F.3d at 1020.  Indeed, in practice, "[t]he commonality and typicality requirements

of Rule 23(a) tend to merge." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n. 13 (1982).  Typicality may be found lacking, however, "if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Hanon*, 976 F.2d at 508 (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)); see also *J.H. Cohn & Co. v. Am. Appraisal Assoc., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980) ("[E]ven an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation").

Here, the named plaintiffs, like all class members, contend they were injured by defendants' false and misleading immunity claims.  Consequently, the typicality requirement is met.  See *True*, 749 F.Supp.2d at1064 ("The representative plaintiffs' claims are typical of the settlement class members in that they arise from the same alleged course of events: (1) AHM's misrepresentations regarding the fuel economy of the HCH; (2) customers' reliance on these misrepresentations when purchasing or leasing HCHs; and (3) the HCH's failure to achieve the advertised fuel economy").

### 4.    Adequacy of Class Representation

The final prerequisite to certification under Rule 23(a) is that the named plaintiff be able "fairly and adequately to protect the interests" of all members of the class.  FED.R.CIV.PROC. 23(a)(4).  The Ninth Circuit has held that representation is "adequate" when class counsel is qualified and competent, the representative's interests are not antagonistic to the interests of absent class members, and it is unlikely that the action is collusive.  *Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d at 855.  In addition, the class representative must have a sufficient interest in the outcome of the case to ensure vigorous advocacy.  See *Riordan v. Smith Barney*, 113 F.R.D. 60, 64 (N.D. Ill. 1986).  Thus, whether this requirement has been met turns on two questions: "(a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *In re Mego Financial Corp. Securities Litigation*, 213 F.3d 454, 462 (9th Cir. 2000).

Here, the named plaintiffs' interests are consistent with those of the absent class members.

1   When the court is asked to certify a settlement class, however, issues of possible collusion merit

2   special consideration.  Often, there is a concern that a lead plaintiff will structure a settlement that

3   favors her interests by maximizing current payments and minimizing the funds available to future

4   claimants.  The Supreme Court addressed this issue in *Amchem Products*, 521 U.S. 591, which

5   involved a proposed global resolution of suits against asbestos manufacturers.  The interests of

6   class members who were currently injured as a result of asbestos exposure, and who sought

7   generous immediate payments, conflicted with the interests of exposure only-plaintiffs in ensuring

8   an ample, inflation-protected fund for the future.  *Id.* at 591.  Unlike *Amchem*, members of the

9   proposed settlement class here "are not divided into conflicting discrete categories," and there is

10  no similar "allocation dilemma."  *Hanlon*, 150 F.3d at 1020-21.  Nor is there any evidence

11  suggesting that the settlement is collusive.  See *Wiener*, 255 F.R.D. at 667 ("As to the first prong

12  of the Ninth Circuit test for the Rule 23(a)(4) adequacy of representation requirement, the Court

13  is not aware of any conflict of interest between Wiener and the proposed class members, as

14  Wiener's interests in proving Dannon's alleged false advertising certainly align with those of other

15  class members. . . .  '[Wiener] understands [her] duties and is currently willing and able to

16  perform them.  [Rule 23(a)(4)] does not require more,'" quoting *Local Joint Exec. Bd. of*

17  *Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001)).

18      The court also finds that class counsel, Milstein Adelman, LLP, Whatley Drake & Kallas,

19  LLC, the Law Offices of Howard Weil Rubinstein; Kirtland & Packard, LLP, Becker, Paulson,

20  Hoerner & Thompson, P.C., and Freed & Weiss, LLC, are qualified to handle this type of

21  litigation, and able to prosecute the action vigorously on behalf of the class.  See *Gomez v. Illinois*

22  *State Bd. of Educ.*, 117 F.R.D. 394, 401 (N.D. Ill. 1987) ("Factors involved in an examination

23  of the adequacy of counsel include . . . counsel's experience in handling the type of litigation

24  involved"); see also *Esler v. Northrop Corp.*, 86 F.R.D. 20, 37 (W.D. Mo. 1979) ("The central

25  inquiry is whether counsel is experienced with the type of class litigation involved in the case, and

26  generally able to conduct the proposed litigation"); *Carpenter v. Hall*, 311 F.Supp. 1099, 1114

27  (S.D. Tex. 1970) ("By the Plaintiff's attorneys being experienced is meant that he or they are

28  experienced in the type of litigation involved in this cause").

Class counsel have proffered evidence that they have extensive experience in consumer litigation and class actions.[70]  The court therefore finds that class counsel are able adequately to protect the interests of all members of the class.  See *Wiener*, 255 F.R.D. at 667-68 ("As to the second prong of the adequacy of representation test, Wiener has retained counsel with significant experience litigating consumer fraud class actions in federal and state courts across the country.  As such, 'Plaintiffs are represented by qualified and competent counsel,' satisfying the second prong of the adequacy of representation requirement" quoting *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1185 (9th Cir. 2007)); *True*, 749 F.Supp.2d at 1066 ("In connection with their motion for preliminary approval, Plaintiffs submitted substantial evidence of class counsel's experience with class action, complex, and other large-scale litigation, including substantial trial experience. . . . Based on the evidence submitted in connection with the motion for preliminary approval, and its own observation of their work throughout the case, the Court concludes Plaintiffs' counsel have made an adequate showing of their qualifications," citing FED.R.CIV.PROC. 23(g)).

### 5.    Conclusion

For the foregoing reasons, the court finds that plaintiffs have satisfied each of the Rule 23(a) requirements for certification of a class.

### B.    Rule 23(b)(3) Requirements

Once the prerequisites of Rule 23(a) are satisfied, one of the criteria set forth in Rule 23(b) must also be met before a class can be certified.  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("In order for a class action to be certified, the plaintiffs must establish the four prerequisites of Fed.R.Civ.P. 23(a) and at least one of the alternative requirements of Fed.R.Civ.P. 23(b)").  Here, the action satisfies Rule 23(b)(3).  That rule provides, in pertinent part:

> "A class action may be maintained if Rule 23(a) is satisfied and if: . . . (3) the court finds that the questions of law or fact common to class members predominate over

---

[70]Declaration of Sara D. Avila in Support of Motion for Preliminary Approval of Class Action Settlement ("Avila Preliminary Approval Decl."), Exhs. 5-9.

1    any questions affecting only individual members, and that a class action is superior

2    to other available methods for the fair and efficient adjudication of the controversy.

3    The matters pertinent to the findings include: (A) the class members' interests in

4    individually controlling the prosecution or defense of separate actions; (B) the

5    extent and nature of any litigation concerning the controversy already commenced

6    by or against members of the class; (C) the desirability or undesirability of

7    concentrating the litigation of the claims in the particular forum; (D) the likely

8    difficulties in managing a class action." FED.R.CIV.PROC. 23(b)(3).

9                    **1.     Predominance of Common Questions**

10       The predominance requirement is "far more demanding" than the commonality requirement

11   of Rule 23(a). *Amchem Products*, 521 U.S. at 623-24. If common questions "present a

12   significant aspect of the case and they can be resolved for all members of the class in a single

13   adjudication," then "there is clear justification for handling the dispute on a representative rather

14   than on an individual basis," and the predominance test is satisfied. *Hanlon*, 150 F.3d at 1022.

15   "'[I]f the main issues in a case require the separate adjudication of each class member's individual

16   claim or defense, [however,] a Rule 23(b)(3) action would be inappropriate.'" *Zinser v. Accufix*

17   *Research Institute, Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (quoting 7A Charles Alan Wright,

18   Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1778, at

19   535-39 (1986)). This is because, *inter alia*, "the economy and efficiency of class action treatment

20   are lost and the need for judicial supervision and the risk of confusion are magnified." *Id.*

21       Here, it is clear that common questions of fact and law predominate over issues individual

22   to class members. This is so because the test is not each consumer's individual reliance on

23   defendants' representations. Rather, the pertinent inquiry is whether a reasonable consumer would

24   likely have been deceived by the representations. Thus, the court concludes that the predominance

25   requirement is satisfied. See *True*, 749 F.Supp.2d at 1066 ("Plaintiffs satisfy the requirements

26   of Rule 23(b). Common questions of fact predominate [and] common questions of law

27   predominate. . . . [T]his action concerns claims based on nationwide advertising created and

28   distributed on behalf of a single company regarding a single product; all class members allegedly

1   wrongly paid a 'hybrid premium,' or additional cost to obtain a hybrid rather than conventional

2   vehicle"); *Mazza v. American Honda Motor Co.*, 254 F.R.D. 610, 627 (C.D. Cal. 2008) ("Here,

3   Plaintiffs allege that Honda engaged in unfair, deceptive, untrue or misleading advertising when

4   it failed to disclose that the CMBS System would not reliably function, in contrast to the express

5   and implied messages in Honda's advertising and promotional materials . . . Accordingly, the

6   Court finds that Plaintiffs have established that common issues of fact and law predominate").

7               **2.   Superiority**

8               "Under Rule 23(b)(3), the court must evaluate whether a class action is superior by

9   examining four factors: (1) the interest of each class member in individually controlling the

10  prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning

11  the controversy already commenced by or against the class; (3) the desirability of concentrating

12  the litigation of the claims in a particular forum; and (4) the difficulties likely to be encountered

13  in the management of a class action." *Edwards v. City of Long Beach*, 467 F.Supp.2d 986, 992

14  (C.D. Cal. 2006) (quoting *Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462, 469 (N.D. Cal.

15  2004)).

16              Given the limited damages that each class member might recover if he or she sued

17  independently, class members' interest in controlling their own cases is minimal.  See *True*, 749

18  F.Supp.2d at 1066 ("Plaintiffs also have shown that a class action is a superior method of

19  resolving this controversy, as each class member has a relatively small and uniform injury, and

20  the costs of litigation would make individual cases impracticable"); *Wiener*, 255 F.R.D. at 672

21  ("'[A] comparative examination of alternatives underscores the wisdom of a class action in this

22  instance.' '[T]he alternative methods of resolution are individual claims for a small amount of . . .

23  damages. . . .' Thus, '[i]f plaintiffs cannot proceed as a class, . . . most will be unable to proceed

24  as individuals because of the disparity between their litigation costs and what they hope to

25  recover.' Thus, there is no realistic alternative to a class action in this case, making a class action

26  undoubtedly the superior method of adjudication,'" quoting *Hanlon*, 150 F.3d at 1023, and *Local*

27  *Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163

28  (9th Cir. 2001), and citing *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir.

1996)).

The only actions concerning defendants' cereals of which the court is aware have been consolidated with this case. The court, moreover, can discern no reason why it would be undesirable to concentrate the litigation in this forum. While there are undoubtedly a large number of class members, given defendants' sales information, it does not appear that the class would be especially difficult to manage. For these reasons, the court concludes that the proposed settlement class satisfies the superiority requirement.

### 3.   Conclusion

Because the requirements of both Rule 23(a) and 23(b)(3) are met, the court certifies the settlement class proposed by the parties.

### C.   Final Approval of the Proposed Class Action Settlement

Rule 23(e)(1)(A) of the Federal Rules of Civil Procedure requires that the court "approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class." Approval under Rule 23(e) involves a two-step process "in which the [c]ourt first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted." *National Rural Telecommunications Cooperative v. DIRECTV, Inc. ("NRTC")*, 221 F.R.D. 523, 525 (C.D. Cal. 2004) (citing MANUAL FOR COMPLEX LITIGATION, THIRD, § 30.14, at 236-37 (1995)). The Ninth Circuit has noted that, in considering whether to give final approval to a class settlement, "there is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Synocor ERISA Litigation*, 516 F.3d 1095, 1101 (9th Cir. 2008); see *id.* ("This policy is also evident in the Federal Rules of Civil Procedure and the Local Rules of the United States District Court, Central District of California, which encourage facilitating the settlement of cases"); *Officers for Justice v. Civil Service Commission*, 688 F.2d 615, 625 (9th Cir. 1982), cert. denied, 459 U.S. 1217 (1983) ("[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation").

### 1.   Notice Requirements

Rule 23(e) requires that "notice of the proposed dismissal or compromise [of a class action] shall be given to all members of the class in such manner as the court directs." FED.R.CIV.PROC. 23(e).  The notice given must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); see also *Mandujano v. Basic Vegetable Products, Inc.*, 541 F.2d 832, 835 (9th Cir. 1976) ("To comply with the spirit of [Rule 23(e)], it is necessary that the notice be given in a form and manner that does not systematically leave an identifiable group without notice").

Notice to class members in this case was not accomplished through direct mailings because Kellogg does not have the mailing addresses of the consumers who purchased its products through third party retailers.[71]  Instead, notice was published in online versions of newspapers, websites sponsored by television stations, parenting websites, and 782 parenting and consumer affairs blogs; by the creation of a website specifically addressing the settlement; and by the establishment of a toll-free number that 120 class members had called as of July 15, 2011 to obtain information regarding the settlement.[72]

With a national  class such as this that consists of persons with unknown addresses, notice by publication is reasonable. See *Dennis v. Kellogg Co.*, No. 09-CV-1786-IEG (WMc), 2010 WL 4285011, *5-6  (S.D. Cal. Oct. 14, 2010) ("The proposed method of notice is reasonable. Defendant will provide notice to the class after preliminary approval of the proposed settlement. Because Defendant does not sell directly to consumers, there is no way to identify class members directly.  Therefore, Defendant will publish a Publication Notice in targeted sources based on market research about consumers who purchased the products.  The Publication Notice will appear in Parents Magazine and in on-line versions of local newspapers and television stations on 375 websites.  The Publication Notice incorporates the Claim Form, which class members can directly

---

[71]Settlement Approval Motion at 8.

[72]Blair Decl., ¶¶ 3-5.

fill out and return.  In addition, a more detailed Notice of Class Action, along with the Claim Form, will be available on the Settlement Website.  Class members can also request these documents via a toll-free number established for the settlement"); *In re Valdez*, 289 Fed. Appx. 204, 205-06 (9th Cir. Aug. 11, 2008) (Unpub. Disp.) ("[I]nstead of requiring individual notice to all class members who can be identified through reasonable effort, [R]ule 23(d)(2) provides only that notice be given 'in a manner as the court may direct.'  The sufficiency of such notice is measured 'against the broader standards of due process.' . . .  Newby has not shown that the district court's order, which required publication of the claims filing deadline in local newspapers for three consecutive weeks, violated due process," citing *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1126-27 (9th Cir. 1977)); *In re MetLife Demutualization Litigation*, 689 F.Supp.2d 297, 345 (E.D.N.Y. 2010) ("Notice of the Settlement was appropriate and adequate. . . .  Class members were notified by publication over a two-week period, four times in each of four widely read newspapers.  The form of notice and the Stipulation of Settlement were made available on the 'Notices' page of the Eastern District of New York's website, which is reachable by a link from the court's home page, and the address of which was included in the published notice. . . . Notice by publication is appropriate where individual notice would be burdensome or expensive. . . .  In the present case, [i]n view of the millions of members of the class, notice to class members by individual postal mail, email or radio or television advertisements, is neither necessary nor appropriate.  The publication notice ordered is appropriate and sufficient in the circumstances," citing *Handschu v. Special Services Div.*, 787 F.2d 828, 832-33 (2d Cir. 1986); *W. Va. v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1090 (2d Cir. 1971)).  The court therefore concludes that the notice requirements of Rule 23(e) have been satisfied.

### 2.   Fairness of the Proposed Settlement

"The role of a court . . . reviewing the proposed settlement of a class action under Fed.R.Civ.P. 23(e) is to assure that the procedures followed meet the requirements of the rule and comport with due process and to examine the settlement for fairness and adequacy."  *Vaughns v. Board of Education of Prince George's County*, 18 F.Supp.2d 569, 578 (D. Md. 1998).  The district court's role, in reviewing "what is otherwise a private consensual agreement negotiated

between the parties to a lawsuit, must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625.

The parties contend that the settlement is presumptively fair because it is the result of good faith, arms-length negotiations.[73]  See *NRTC*, 221 F.R.D. at 528 ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair," citing *City Partnership Co. v. Atlantic Acquisition Ltd, P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996)).  They note that (1) they engaged in protracted discovery, which included deposing two named plaintiffs and Kellogg's persons most knowledgeable; (2) they participated in a voluntary mediation conducted by Justice Panelli; and (3) they reached a negotiated agreement after six months of further discussions.[74]  The court agrees that the agreement was reached in good faith after a well-informed arms-length negotiation and is entitled to a presumption of fairness.  Nonetheless, it must examine the terms of the settlement and consider relevant factors to determine whether the settlement is indeed fair.

In making this assessment, the court balances:

"(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement." *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) (citing *Hanlon*, 150 F.3d at 1026).

This list of factors is not exclusive, "and different factors may predominate in different factual contexts." *Torrisi v. Tuscon Electric Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).  See also

---

[73]Settlement Approval Motion at 11-12.

[74]*Id.*

1   *Churchill Village*, 361 F.3d at 576 n. 7 ("Because the settlement evaluation factors are

2   non-exclusive, discussion of those factors not relevant to this case has been omitted"); *Young v.*

3   *Polo Retail, LLC*, No. C-02-4546 VRW, 2007 WL 951821, *3 (N.D. Cal. Mar. 28, 2007)

4   (adding as relevant factors "(9) the procedure by which the settlements were arrived at, see

5   MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.6 (2004), and (10) the role taken by the

6   plaintiff in that process").

7           Recently, the Ninth Circuit clarified that "[p]rior to formal class certification, there is an

8   even greater potential for a breach of fiduciary duty owed the class during settlement.

9   Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of

10  collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing

11  the court's approval as fair." *In re: Bluetooth Headset Products Liability Litig.*, _ F.3d _, 2011

12  WL 3632604, *9 (9th Cir. Aug. 19, 2011).   Since "[c]ollusion may not always be evident on the

13  face of a settlement . . . courts therefore must be particularly vigilant not only for explicit

14  collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-

15  interests and that of certain class members to infect the negotiations." *Id.*, 11116. The *Bluetooth*

16  court identified a number of potential "red flags" that should give a district court pause before

17  approving a class settlement.  These factors are also addressed below.

18          The court's discussion below sets forth its reasons for approving certain portions of the

19  parties' original stipulation of settlement and for declining to approve the *cy pres* provisions.  It

20  also addresses the parties' amended stipulation.

21                          a.      **Strength of Plaintiffs' Case**

22          The parties acknowledge that plaintiffs faced substantial obstacles in proving their claims.

23  They note that "[t]he question of whether Kellogg's claims were deceptive is disputed by the

24  parties and would [have] require[d] analysis by experts. . . ."[75]  The fact that this issue, which is

25  at the heart of plaintiffs' case, would have been the subject of competing expert testimony suggests

26  that plaintiffs' ability to prove liability was somewhat unclear; this favors a finding that the

27  _____

28          [75]*Id*. at 14.

                                        25

settlement is fair.  See *In re Portal Software, Inc. Securities Litigation*, No. C-03-5138 VRW, 2007 WL 4171201, *3 (N.D. Cal. Nov. 26, 2007) ("Factor (1), the strength of plaintiffs' case, somewhat favors settlement because plaintiffs' remaining claims are tenuous.  Plaintiffs assert that establishing liability and damages at trial would be difficult because of the uncertainties associated with proving its claims, which are 'exacerbated by the unpredictability of a lengthy and complex jury trial'").  The court therefore concludes that this factor weighs in favor of final approval of the settlement.

### b.      The Risk, Expense, Complexity, and Likely Duration of Further Litigation

The parties argue that this factor also weighs in favor of approval of the settlement because they would have incurred significant expenses preparing for and trying the case.  In particular, they contend "th[e] action is complex," and absent settlement, "litigation would likely [have] continue[d] for years before Plaintiffs or the Class would [have] see[n] any recovery."[76]  These observations appear reasonable, given the fact that the law governing food and beverage consumer fraud litigation is still developing, and given the vigorous motion practice in which the parties engaged, both regarding the validity of the claims and certification of a class.  In addition to trial and probable appeal, there would undoubtedly have been significant pretrial motion practice and discovery to complete.

The court thus concludes that this factor weighs in favor of approving the settlement.  See *Officers for Justice*, 688 F.2d at 626; *Milstein v. Huck*, 600 F.Supp. 254, 267 (E.D.N.Y. 1984) ("The expense and possible duration of the litigation are major factors to be considered in evaluating the reasonableness of this settlement"); *Sandoval v. Tharaldson Employee Management*, No. EDCV 08-00482-VAP (OPx), 2009 WL 3877203, *6 (C.D. Cal. Nov. 17, 2009) ("Settling the case, Plaintiff reasons, would 'avoid many more documents being requested, reviewed and analyzed with more expense in having [Plaintiff's] expert analyze the documents[,] … obtain[ing] the contact information of the absent class members, contact[ing] them and obtain[ing] numerous

---

[76]*Id.*

1  declarations[,] … [and] send[ing] out questionnaires to absent members at great expense.'  For

2  the foregoing reasons, the Court finds this factor weighs in favor of preliminary approval").

3          **c.**    **The Risk of Maintaining Class Action Status Throughout Trial**

4        Whether or not the action would have been tried as a class action is also relevant in

5  assessing the fairness of the settlement.  Defendants filed strong opposition to plaintiffs' motion

6  for class certification, which raised various arguments against class certification, including that

7  plaintiffs had failed to demonstrate that all proposed class members purchased boxes of the

8  Krispies cereals that were labeled with the immunity claims, and that they had not shown that all

9  proposed class members did so in reliance on those claims.[77]  Defendants also asserted that the

10  representations at issue were not material, because the Krispies cereals were "iconic brands" that

11  consumers had purchased for more than fifty years for "many and varied reasons, including the

12  taste, quality, nutrition, and pleasurable eating experience."[78]

13        Thus, plaintiffs faced significant risks both in initially certifying a class and in maintaining

14  the class throughout the litigation.  See *In re Omnivision Technologies, Inc.*, No. C-04-2297 SC,

15  2007 WL 4293467, *4 (N.D. Cal. Dec. 6, 2007) ("Although Plaintiffs' case has survived two

16  motions to dismiss it still faces numerous hurdles.  For example, when the parties entered serious

17  settlement discussions, Plaintiffs' Motion for Class Certification was still pending before the

18  Court, and has been taken off calendar because of the Settlement.  Defendants opposed class

19  certification.  That motion may be outcome-determinative in itself.  If the Court were to refuse

20  certification, the unrepresented potential plaintiffs would likely lose their chance at recovery

21  entirely.  Even if the Court were to certify the class, there is no guarantee the certification would

22  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

23     [77]Although defendants tacitly conceded that plaintiffs do not usually need to prove

24  individual reliance by class members under *In re Tobacco II Cases*, 46 Cal.4th 298 (2009), they
argued that such a showing would be required in this case because plaintiffs had defined the class

25  in such a way that it included all purchasers of Krispies cereals during the class period and many
boxes of cereal that were sold during that period did not include the immunity claims.  Defendants

26  thus argued that individualized inquiries would have to be made to determine which class members

27  received the representations.  (Opposition to Motion for Class Certification at 16-18.)

28     [78]*Id.* at 20.

survive through trial, as Defendants might have sought decertification or modification of the class. . . . As Defendants agree to the class certification for the purposes of the Settlement, there is much less risk of anyone who may have actually been injured going away empty-handed. This factor therefore favors approval of the Settlement"). Therefore, this factor weighs in favor of approving the proposed settlement.

### d.    The Amount Offered in Settlement

As the Ninth Circuit has noted, "it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is [thus] not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators." *Officers for Justice*, 688 F.2d at 625 (emphasis original). Rather, "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Id.* at 624 (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 5th Cir. 1977)). "'The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.'" *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1242 (9th Cir. 1998) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 & n. 2 (2d Cir. 1974)). Estimates of what constitutes a fair settlement figure are tempered by factors such as the risk of losing at trial, the expense of litigating the case, and the expected delay in recovery (often measured in years).

As noted, the proposed settlement establishes an interest-bearing cash fund of $2.5 million from which individual class members submitted claims will be paid.[79] The settlement entitles class members to recover up to $15 per household, or the equivalent of the price of three boxes of cereal.[80] In addition, the settlement provides for a *cy pres* donation with a retail value of $2.5

---

[79]Original Stipulation, IV.A., ¶ 2.

[80]*Id.*, IV.A., ¶ 1.

million.[81]  Defendants have also undertaken to pay the costs associated with claims administration and providing notice to class members, which the claims administrator estimates will be roughly $430,791.44.[82]  The parties therefore estimate that "[a]ll told, the Settlement has a value in excess of $5.4 million."[83]

Class members will have compensation mailed to them no later than thirty days after the close of the claim period,[84] rather than potentially waiting years until the litigation concludes.  The amount of compensation each class member will receive, while small, represents a compromise of disputed claims reached following extensive arms-length negotiations.  Given the relatively low cost of a box of cereal, moreover, and the likelihood that few, if any, class members possess documentation verifying the number of boxes of Krispies cereals they bought during the class period, the compensation does not appear disproportionately small.  For these reasons, the court finds that the settlement amount is fair and adequate, and will provide immediate monetary relief to the class.  See *In re Mego Financial Corp. Securities Litigation*, 213 F.3d 454, 459 (9th Cir. 2000) (given the difficulties inherent in complex securities litigation, one-sixth of the potential recovery was fair and adequate);[85] *Officers for Justice*, 688 F.2d at 628 ("It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not *per se* render the settlement inadequate or unfair"); *Jaffe v. Morgan Stanley & Co.*, No. C 06-3903 TEH, 2008 WL 346417, *9 (N.D. Cal. Feb. 7, 2008) ("The settlement amount could undoubtedly be greater, but it is not obviously deficient, and a sizeable discount is to be expected in exchange for avoiding the uncertainties, risks, and costs that come with litigating a case to trial").

---

[81]Stipulation at 22-23.

[82]Blair Decl., ¶ 8.

[83]Settlement Approval Motion at 1.

[84]Stipulation, IV.A., ¶ 4.

[85]If one assumes that each purchaser of Krispies cereals during the class period purchased one box per week during the eight month class period, he or she paid $180 for all of the cereal purchased.  The $15 settlement amount is approximately 10 percent of this total damages figure.

1        **e.**  **The Stage of the Proceedings and Extent of Discovery Completed**

2   "'The extent of discovery may be relevant in determining the adequacy of the parties'

3 knowledge of the case.'" *NRTC*, 221 F.R.D. at 527 (quoting MANUAL FOR COMPLEX

4 LITIGATION, THIRD, § 30.42 (1995)). "'A court is more likely to approve a settlement if most of

5 the discovery is completed because it suggests that the parties arrived at a compromise based on

6 a full understanding of the legal and factual issues surrounding the case.'" *Id.* (quoting 5 W.

7 Moore, MOORE'S FEDERAL PRACTICE, § 23.85[2][e] (Matthew Bender 3d ed.)). The greater the

8 amount of discovery that has been completed, the more likely it is that the parties have "'a clear

9 view of the strengths and weaknesses of their cases.'" *Young*, 2007 WL 951821 at *4 (quoting

10 *In re Warner Communications Securities Litigation*, 618 F.Supp. 735, 745 (S.D.N.Y. 1985)).

11   The parties engaged in settlement negotiations early in the litigation. Plaintiffs' counsel

12 report, however, that they expended significant time reviewing thousands of documents produced

13 by defendants, preparing for and attending the depositions of plaintiffs Weeks and Sandoval, and

14 deposing Kelloggs' persons most knowledgeable.[86]

15   While the parties did not take many depositions or conduct expert discovery, "[i]n the

16 context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining

17 table' whe[n] the parties have sufficient information to make an informed decision about

18 settlement." *In re Mego Financial Corp. Sec. Litig.*, 213 F.3d at 459 (quoting *Linney*, 151 F.3d

19 at 1239). The court concludes that counsel had sufficient information to make an informed

20 decision regarding the adequacy of the settlement. Consequently, this factor also weighs in favor

21 of approval of the parties' agreement.

22        **f.**  **The Presence of a Governmental Participant**

23   This factor does not apply because no government entities participated in this case.

24        **g.**  **The Experience and Views of Counsel**

25   "The recommendations of plaintiffs' counsel should be given a presumption of

26 reasonableness." *Boyd v. Bechtel Corp.*, 485 F.Supp. 610, 622 (N.D. Cal. 1979) (citations

27 

28   [86]Avila Attorneys' Fees Decl., ¶ 8.

omitted).   "Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pacific Enterprises Securities Litigation*, 47 F.3d 373, 378 (9th Cir. 1995).

Class counsel have significant experience litigating consumer class action claims, including claims against auto industry defendants.[87]   In toto, they have litigated at least seventeen class actions.[88]   Class counsel recommend the settlement, asserting that it is fair, reasonable, and adequate.[89]   While this recommendation weighs in favor of approval, see *In re Omnivision Techs.*, 559 F.Supp.2d at 1043, it must be evaluated in light of "their obvious pecuniary interest in seeing the settlement approved," *Young*, 2007 WL 951821 at *5.   Consequently, the court accords this factor little weight.[90]

### h.     Class Members' Reaction to the Proposed Settlement

In order to gauge the reaction of class members, the court evaluates the number of opt-out requests as well as the number of objections to the settlement.   See *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 812 (3rd Cir. 1995) ("In an effort to measure the class's own reaction to the settlement's terms directly, courts look to the number and vociferousness of the objectors"); *Pallas v. Pacific Bell*, No. C-89-2373 DLJ, 1999 WL 1209495, *6 (N.D. Cal. July 13, 1999) ("The greater the number of objectors, the heavier the burden on the proponents of settlement to prove fairness").   The administrator received 120 calls for information regarding the settlement; the settlement website has been visited more than

---

[87]Whatley Decl., ¶ 13; Avila Attorneys' Fees Decl., ¶ 23.

[88]Avila Attorneys' Fees Decl., ¶ 23.

[89]Whately Decl., ¶ 17.

[90]The court does not find class counsel's recommendation "superfluous." (Stehle Objection at 6.)   It simply concludes that the recommendation must be discounted given counsel's interest in having the settlement approved.   See *Fernandez v. Victoria Secret Stories*, No. CV 06-04149 MMM (SHx), 2008 WL 8150856, *7 n.32 (C.D. Cal. Jul. 21, 2008) ("While the court agrees that this factor must be discounted to some degree in recognition of the personal interest of class counsel in having the settlement approved, it declines to discount the well-considered views of counsel entirely.").

129,000 times as of July 15, 2011.[91]  By that same date, only two class members had opted out of the proposed settlement,[92] and only two had objected to the terms of the settlement.[93]  By August 15, 2011, only one additional class member had opted out of the settlement.[94]

While the parties do not indicate how many claim forms have been submitted thus far, the relatively low number of opt-outs and objectors indicates that generally, class members favor the proposed settlement and find it fair.  Cf. *Garner v. State Farm Mut. Auto. Ins.,* No. CV 08 1365 CW (EMC), 2010 WL 1687832, *15 (N.D. Cal. Apr. 22, 2010) (finding that an opt-out rate of 0.4 percent supported "the fairness of the Settlement"); *Mangone v. First USA Bank*, 206 F.R.D. 222, 227 (S.D. Ill. 2001) (finding that an opt-out rate of 0.10614 percent and an objection rate of 0.0052 percent represented "overwhelming support" for the settlement by class members and "strong circumstantial evidence supporting the fairness of the Settlement"); see also *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) ("The court had discretion to find a favorable reaction to the settlement among class members given that, of 376,301 putative class members to whom notice of the settlement had been sent, 52,000 submitted claims forms and only fifty-four submitted objections [0.014 percent]"); *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming approval of a class action settlement where 90,000 class members received notice, and 45 objections were received); *In re Austrian and German Bank Holocaust Litig.*, 80 F.Supp.2d 164, 175 (S.D.N.Y. 2000) (finding a small number of objectors "indicative of the adequacy of the settlement").

### i.    Other Factors

As noted, the *Young* court considered two additional factors: the process by which

[91]Blair Decl., ¶¶ 4-5.

[92]*Id.*, ¶ 6.

[93]Mathers Objection; Stehle Objection.

[94]Kellogg's Reply in Support of Motion for Final Approval of Class Action Settlement ("Kellogg Response"), Docket No. 147 (Aug. 15, 2011) at 2 (noting that there are "three opt oust from the Class").

settlement was reached and the involvement of the named plaintiffs in the process. The parties here reached agreement after intensive arms-length negotiations over a period of months, including a mediated conference with a retired Justice of the California Supreme Court.[95] It does not appear, however, that class representatives were substantively involved in the process. Accordingly, these factors are neutral.

> **j.    Class Members' Objections to the Original Proposed Settlement**

As noted, two class members objected to the original proposed settlement. Although the number of objections is minimal, and therefore weighs in favor of finding the settlement fair, the objectors raised several concerns. Both plaintiffs[96] and defendants[97] responded to the objections, and the court heard oral argument from the parties and the objectors at the August 29, 2011, fairness hearing. The court addresses below both the objections and the parties' responses to them.

When considering class members' objections, the district court must evaluate whether they raise serious challenges to the fairness of the proposed settlement. See *Bennett v. Behring Corp.*, 737 F.2d 982, 988 (11th Cir. 1984) (affirming approval of a class settlement despite significant objections by class members because "the reasons for that opposition [were] thoroughly considered and ultimately rejected by the district court"); *Californians for Disability Rights, Inc. v. Cal. DOT*, No. C 06-5125 SBA, 2010 WL 2228531, *2 (N.D. Cal. June 2, 2010) ("If objections are filed, the district court is to evaluate whether they suggest serious reasons why the settlement proposal might be unfair"); *Boyle v. Arnold-Williams*, No. C01-5687JKA, 2006 U.S. DIST. LEXIS 91920, *10–11 (W.D. Wash. Dec. 20, 2006) ("T]he fact that there is opposition does not necessitate disapproval of the settlement. Instead, the court must independently evaluate

---

[95]Whatley Decl., ¶ 10.

[96]Plaintiffs' Response to Objections to Settlement Agreement and Motion for Attorneys Fees ("Plaintiffs' Resp."), Docket No. 148 (Aug. 15, 2011).

[97]Response in Support of Motion for Settlement Approval ("Def.'s Resp."), Docket No. 147 (Aug. 15, 2011).

1    whether the objections being raised suggest serious reasons why the proposal might be unfair").

2    The objectors raised five concerns regarding the proposed settlement: (1) that diverting *cy*

3    *pres* funds to the Westside Food Bank, one of the organizations identified in the Stipulation of

4    Settlement, does not serve the class; (2) that the distribution of monies remaining in the Settlement

5    Fund to certain charitable organizations after class claimants are paid is inappropriate, (3) that the

6    value of defendants' *cy pres* donations should be the wholesale value of the donated food, not its

7    retail value; (4) that plaintiff Weeks's involvement in the action was so minimal that she should

8    be disqualified as a class representative; and (5) that the court's deadline for filing objections

9    provided inadequate time to address counsel's application for attorneys' fees, costs, and incentive

10   awards.[98]   The court considers these objections in turn.

11                    **i.        Distribution of *Cy Pres* Funds to the Westside Food Bank**

12   The parties' original settlement provided for distribution of cereals and other food products

13   with a retail value of $2.5 million to two charitable organizations, Feeding America and the

14   Westside Food Bank.  Both objectors challenged the distribution of food to the Westside Food

15   Bank, asserting that the organization provides food only to local neighborhoods in Los Angeles

16   and that due to its local focus, donations to it would not provide relief to a national class.

17   The objectors did not challenge the creation of the Cy Pres Fund, or dispute that such a

18   fund was an appropriate means of providing relief to the class.  Rather, they challenged the

19   selection of the Westside Food Bank as one of the entities to receive a food donation.  When a

20   national class is involved, donations to charities whose work is focused on a discrete locale are

21   generally disfavored.  See *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301,

22   1303 -1309 (9th Cir. 1990) ("The class consists of 1349 undocumented Mexican workers who

23   were employed by ACG during the 1976-77 picking season. . . .  The court's order states that all

24   unclaimed funds over $50,000 are to be given to the Inter-American Foundation [('IAF')] for

25   distribution in Mexico. . . .  The district court's proposal benefits a group far too remote from the

27        [98]The objectors also challenged the attorneys' fees application.  The court addresses these

28   issues *infra*.

1   plaintiff class.   Even where cy pres is considered, it will be rejected when the proposed

2   distribution fails to provide the 'next best' distribution.   The district court's plan permits

3   distribution to areas where the class members may live, but there is no reasonable certainty that

4   any member will be benefitted.   The tool for distribution, the IAF, is not an organization with a

5   substantial record of service nor is it limited in its choice of projects. . . .   The plan does not

6   adequately target the plaintiff class and fails to provide adequate supervision over distribution.

7   We therefore set aside the court's cy pres application as an abuse of discretion," citing *City of*

8   *Philadelphia v. American Oil Co.*, 53 F.R.D. 45, 72 (D.N.J. 1971)); *Schwartz v. Dallas Cowboys*

9   *Football Club, Ltd.*, 362 F.Supp.2d 574, 577 (E.D. Pa. 2005) ("To begin, the plaintiffs' proposed

10   distribution must be rejected. . . .   [W]hile the class and the geographic scope of the law suit is

11   nationwide, the relief proposed by plaintiffs would be limited to organizations based in the

12   Philadelphia area. . . .   On the other hand, the defendants' proposal is far from a perfect fit under

13   cy pres principles.   Clearly, distribution to the NFL YET Centers would not further the goals of

14   the antitrust laws.   Yet, at least the defendants' proposed donee has some involvement in the same

15   area of commerce as the subject matter of the law suit (football or sports-related activities), and

16   the ultimate beneficiaries, unlike the ultimate beneficiaries of the plaintiffs' proposed distribution,

17   are located throughout the country.   Under the circumstances and given the alternatives presented

18   to the Court, the Court concludes that the NFL YET Centers best satisfy cy pres principles"); *In*

19   *re Compact Disc Minimum Advertised Price Antitrust Litig.*, No. 2:00-MD-1361-P-H, 2005 WL

20   1923446 , *2 (D. Me. Aug. 9, 2005) ("Two [proposed recipients of the *cy pres* fund], Music for

21   Youth and Jazz at Lincoln Center, devote their activities primarily to the New York City area.

22   Given the scope of the music club membership, the plaintiff class in this lawsuit, I conclude that

23   a program with a more national scope is preferable").

24        As the objectors noted, the Westside Food Bank distributes food primarily in the Los

25   Angeles area.   Indeed, the organization focuses specifically on the westside of Los Angeles,

26   rendering its geographic reach even more limited.[99]   Given that the settlement proposes to resolve

27   ─────────────────

28        [99]Mathers Objection, Exh. C.

the claims of a nationwide class, the local focus of the Westside Food Bank raised serious questions about the parties' selection of it as a recipient of food donations.  In contrast, Feeding America, the other organization designated, is an organization with a national scope.  The objectors noted that Feeding America donates significant funds to the Los Angeles Food Bank, raising questions as to why additional foodstuffs should be directed to a primarily local organization.[100]

In support of the donation to the Westside Food Bank, plaintiffs and defendants argued that the settlement did not specify the percentage of the food distribution that would go to each of Feeding America and Westside Food Bank.   The parties argued that the objectors incorrectly assumed the two charities would receive an equal distribution of food, and intimated that they and the court could have determine an appropriate apportionment at a later date.[101]  Even had Feeding America received the lion's share of the food donated under the original terms of the settlement, however, that would not have changed the fact that the Westside Food Bank serves a primarily local community and that directing *any* funds to the organization would have been inappropriate. See *In re Wells Fargo Securities Litigation*, 991 F.Supp. 1193, 1198 (N.D. Cal. 1998) (concluding that a local bar association was an inappropriate recipient of *cy pres* funds); *In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 2005 WL 1923446 at *1; see also *In re Relafen Antitrust Litig.*, 231 F.R.D 52, 82 (D. Mass. 2005) (approving a *cy pres* distribution where the "applicant will locate non-profit organizations in Group II states to act as program partners, with a focus on organizations serving populations that include Relafen class members. This applicant

---

[100]Stehle Objection at 10-11.  Objector Mathers also objected that Feeding America has an "existing relationship" with Kellogg, which is listed as a "Leadership Partner" on the organization's website.  (Mathers Objection at 5-6, Exh. D.)  It is likely, however, that an organization that combats hunger on a national scale will have prior relationships with large corporations in the food industry.  Indeed, Feeding America's website lists an array of major food companies, including ConAgra, General Mills, Kraft, Nestlé, and Pepsico as "Leadership Partners."  Moreover, Mathers did not propose an alternate national hunger organization that has no association with Kellogg.

[101]Plaintiffs' Resp. at 9; Defendants' Resp. at 3.

will also create a sub-grant program for non-profit organizations in Group II states to carry out consumer education campaigns using the materials developed").[102]

Given the Westside Food Bank's primarily local focus, as well as its preexisting relationship with certain of plaintiffs' counsel, the court concluded that the organization was an inappropriate recipient of donations from the $2.5 million Cy Pres Fund, or of monies remaining in the Settlement Fund following distributions to claimants. The parties' Amended Settlement eliminates the Westside Food Bank as a recipient of any *cy pres* funds, designating Feeding America as the sole recipient of both the remaining monies in the Settlement Fund and the distribution of the Cy Pres Fund.[103] The court approves this amendment.[104]

---

[102]In addition, Mathers asserted that Milstein Adelman, LLP, one of the firms representing plaintiffs, has an ongoing relationship with the Westside Food Bank, in that all of the firm's attorneys volunteer annually at the charity. (Mathers Objection at 5-6, Exh. C. ) Mathers proffered a printout of the website of the Westside Food Bank that lists Milstein Adelman as among the "organizations that have continually offered their support." (*Id.*, Exh. C.) Courts are wary of distributing *cy pres* funds to organizations that have a close relationship with class counsel given the appearance of a conflict of interest. See *Schwartz*, 362 F.Supp.2d at 577 n. 2 ("In connection with the University of Pennsylvania, the Court is sensitive to the appearance of conflict in selecting as the beneficiary of the fund an institution with long-established ties to the Eastern District Bench"); American Law Institute, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.07 ("A cy pres remedy should not be ordered if the court or any party has any significant prior affiliation with the intended recipient that would raise substantial questions about whether the selection of the recipient was made on the merits").

For his part, Stehle's objected that parties to a settlement must disclose all potential conflicts of interest to the court. (See Stehle Objection at 13 ("All of the parties involved . . . should be required to produce a plain and concise statement for the record attesting that they have no significant affiliation with any of the four projected *cy pres* recipients or those organizations' principals. . ."). Stehle cited no authority for this proposition, and the court need not address it, since Milstein Adelman's relationship with the Westside Food Bank is clear on the record.

[103]Amended Stipulation, IV.A-B.

[104]Stehle asserts that the settlement permits Kellogg to donate "junk food" to the charities, rather than food that has nutritional value. (Stehle Obj. at 11-12.) Given Kellogg's representations to the contrary (see Defendants' Resp. at 5-6), and the fact that Stehle's concern is speculative, the court finds this objection unconvincing.

ii.      **Distribution of Funds to Public Justice and the Food Safety Program of the University of Georgia**

The objectors also challenged the valuation of the settlement, which plaintiffs claim totals more than $5.4 million.[105]  This number is comprised of the $2.5 million in the Settlement Fund, the $2.5 million retail value of the Cy Pres Fund, and the $400,000 defendants will pay for the costs of notice and claims administration.[106]  One objection concerned the proposed distribution of any money remaining in the Settlement Fund after all claimants are paid.  The original settlement provided that the remaining funds would be distributed in equal shares to three organizations: the Westside Food Bank, the Food, Safety, Health and Nutrition Project of Public Justice, and "the food safety program at the University of Georgia."[107]  The concerns the court expressed above regarding distributions to the Westside Food Bank are equally applicable to the proposed distribution to that entity of unclaimed monies in the Settlement Fund.  Stehle also objected to any distribution to Public Justice, noting that the organization is a nonprofit law firm that supports trial lawyers, and thus that the award would "appear[ ] to benefit trial lawyers twice" by giving them a portion of the Settlement Fund while at the same time increasing the total settlement value used to calculate attorneys' fees.[108]  This argument treats all organizations and firms that litigate on behalf of plaintiffs as indistinguishable.  Public Justice is separate from class counsel, and Stehle adduced no evidence that there is a relationship or affiliation of any kind between the two.  Nor does the fact that the organization generally tends to represent plaintiffs, as opposed to defendants, mean that plaintiffs' counsel will derive a benefit from the donation.  So long as the organization's work benefits consumers of food products on a national scale, the fact that it litigates to achieve its objectives, and litigates generally on behalf of plaintiffs, does not

---

[105]Settlement Approval Motion at 6.

[106]*Id.*

[107]Original Stipulation, IV.A., ¶ 4.

[108]Stehle Objection at 12.

render it an inappropriate beneficiary of a *cy pres* award.  Because the predicate for Stehle's objection was not adequately proved, the court declined to consider it.  See also *In Re Publication Paper Antitrust Litig.*, No. 3:04 MD 1631SRU, 2009 WL 2351724, *2 (D. Conn. 2009) (approving $28,000 cy pres award to Public Justice's Class Action Project).

The court found Stehle's objection that the goals of the Food, Safety, Health and Nutrition Project of Public Justice were not fully defined more persuasive.[109]  Public Justice's website does not list the project among its programs.  Although the organization is national in scope and participates in a broad range of "consumer's rights" litigation, the mission of its Food, Safety, Health and Nutrition Project is unclear.[110]  In addition, while neither objector specifically raised the issue, the proposed donation to the "food safety program at the University of Georgia" raises similar questions.  The parties have provided no information regarding the program's goals and activities, or regarding the population the program serves.  Indeed, the fact that the organization is affiliated with the University of Georgia may raise the same geographic concerns the court discussed earlier regarding the Westside Food Bank.  See *Six Mexican Workers*, 904 F.2d at 1308 ("Although we do not generally disapprove of cy pres, we cannot affirm the district court's application in this case.  The district court's proposal benefits a group far too remote from the plaintiff class").

Given these issues, the court concluded that it could not approve any distribution of monies remaining in the Settlement Fund to organizations or projects whose relationship to members of the class and counsel was unclear.  See *id.* ("The district court's plan permits distribution to where the class members may live, but there is no reasonable certainty that any member will be benefitted").  The court directed the parties to submit additional information regarding the nature and activities of Public Justice's Food, Safety, Health and Nutrition Project and the University of

---

[109]*Id.*

[110]Public Justice - What We Do, http://www.publicjustice.net/What-We-Do.aspx.

Georgia's food safety program.[111]   In their amended stipulation, the parties responded by eliminating those entities as recipients of monies from the Cy Pres Fund, instead designating that the entire distribution from that fund go to Feeding America, a national hunger charity.[112]   The court approves this revision.

### iii.    The Valuation of the *Cy Pres* Fund

Another objection addressed the value of the Cy Pres Fund, noting that the settlement provides for the donation of food products with a *retail* value of $2.5 million.   Both Mathers and Stehle noted that the retail value of a product represents a substantial markup from its wholesale cost, in that it includes not only costs but expected profits for the manufacturer and the retailer.[113] Stehle argued that it was more appropriate to use Kellogg's costs as the value of the donation; he estimated that if such a figure were used, the Cy Pres Fund would have a value of $1.8 million.[114] Mathers asserted that the donation should be valued on a "cost of manufacturing" basis; adopting this approach, he believed that the food donation had a value of $1.01 million.[115]

In response to the objectors' arguments, the parties stated that Kellogg's charitable donation will be valued not at the retail price of the food products to consumers, but at the price Kellogg sells the food products to its wholesale customers.[116]   This approach was accepted by the court

---

[111]In their reply to the objections, plaintiffs submitted additional information addressing Public Justice's programs and activities, and its prior receipt of *cy pres* funds from other settlements.  (Declaration of Sara D. Avila in Support of Plaintiffs' Reply to Objections ("Avila Objections Decl."), Docket No. 148 (Aug. 15, 2011), Exh. 2.)  While this information is helpful, it does not fully address the court's questions regarding the ways in which Public Justice would use money distributed to it.  Nor does it define the functions of the Food, Safety, and Nutrition Program.

[112]Amended Stipulation, IV.B.2.

[113]Mathers Objection at 8-9; Stehle Objection at 18-19.

[114]Stehle Objection at 19.

[115]Mathers Objection at 9.

[116]Plaintiffs' Resp. at 15; Defendants' Resp. at 5.

1   in *Dennis v. Kellogg*, CV No. 09-01786 IEG (WMCx) (S.D. Cal. Apr. 5, 2011), and the court

2   concludes that it is an acceptable approach to use here.  Use of this price will result in the donation

3   of more food than if the retail price were used, and will more closely approximate the actual

4   expense to Kellogg of the donation.[117]

5   ### iv.   Plaintiff Weeks's Involvement in the Action

6       Mathers next objected to lead plaintiff Michelle Weeks's involvement as a class

7   representative, arguing that she has an "existing and apparently beneficial relationship" with one

8   of plaintiffs' lawyers, who has represented her in other class actions.[118]   Citing a class

9   representative's fiduciary duty to members of the class, Mathers asserted that there is "no

10  evidence in the record" that Weeks properly fulfilled her role.[119]

11      Class counsel responded that all class representatives "reviewed relevant pleadings" and

12  maintained regular communication with them throughout the litigation.[120]   Weeks also testified at

13  a deposition.[121]   This level of engagement is sufficient to validate her standing as a class

14  representative.  See *In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Marketing Litig.*, 270

15  F.R.D. 521, 531 (N.D. Cal. 2010) ("The fact that [plaintiffs] are familiar with the basis for the

16  suit and their responsibilities as lead plaintiffs is sufficient to establish their adequacy");  *In re

17  First American Corp. ERISA Litig.*, 258 F.R.D. 610, 619-20 (C.D. Cal. 2009) ("Notwithstanding

18  the fact that a named plaintiff does not need to have special knowledge of the case or possess a

19

20  [117]The objections to valuation of the *cy pres* fund concern valuation of the settlement
21  generally, and thus whether it is a fair and adequate resolution of the class claims.  Other valuation
    objections, which concern the cost of giving notice and administering claims, are more directly
22  concerned with calculating the value of the settlement fund for purposes of awarding attorneys'
23  fees on a percentage of the fund basis.  These objections are therefore addressed in Part II.D,
    *infra*.
24
25  [118]Mathers Objection at 6.

26  [119]*Id.*

27  [120]Whatley Decl., ¶ 25.

28  [121]Plaintiffs' Resp. at 17-18.

1   detailed understanding of the legal or factual basis on which a class action is maintained, there is

2   at least some evidence that the Plan Participants are knowledgeable about and prepared to

3   prosecute this action" (internal citations omitted)).   Moreover, the fact that class counsel has

4   represented Weeks in other cases is not an independent reason to question the validity of the

5   settlement.  See *Lemire v. Wolpoff & Abramson, LLP,* 256 F.R.D. 321, 327 (D. Conn. 2009)

6   (deeming "insignificant" defendants' characterization of plaintiff as "professional plaintiff" despite

7   the fact that both she and her spouse were named plaintiff in other lawsuits).   As a consequence,

8   the court concludes that this objection does not undermine the fairness of the settlement.

9   **v.   Insufficient Time for Class Members to Object**

10   Stehle objected that the deadline for filing objections to the class settlement and counsel's

11   fee application did not provide adequate opportunity for class members to object.[122]   The deadline

12   for filing of objections was July 25, 2011, while the deadline for class counsel to file a motion for

13   approval of the settlement and an application for attorneys' fees, costs, and incentive awards was

14   July 18, 2011.[123]   Citing *In re Mercury Interactive Corp. Securities Litigation*, 618 F.3d 988 (9th

15   Cir. 2010), Stehle argued that this schedule provided insufficient time to prepare objections.

16   *In re Mercury*, however, is inapposite.   There, the Ninth Circuit confronted the widespread

17   practice of district courts setting the deadline for objections *before* the deadline for the filing of

18   class counsel's fee motion.   *In re Mercury*, 618 F.3d at 993 ("We have not yet had occasion to

19   construe Rule 23(h), and the schedule set by the district court in this case, requiring objections to

20   be filed before the filing of the fee motion itself and its supporting papers, appears to be

21   commonly employed by district courts throughout the Ninth Circuit and elsewhere in the

22   country").   The Ninth Circuit deemed this practice improper, since it forced objectors to make

23   only "generalized" objections to the fee application, without having any information regarding the

24   basis and justification for the application.   *Id.* at 993-94 ("We hold that the district court abused

25   its discretion when it erred as a matter of law by misapplying Rule 23(h) in setting the objection

26

27   [122]Stehle Objection at 14.

28   [123]Prelim. Order, ¶¶ 11, 14.

deadline for class members *on a date before* the deadline for lead counsel to file their fee motion (emphasis added)).

Here, objectors had a week to review the fee application and motion for settlement approval and file objections. As respects the terms of the settlement, moreover, the court's preliminary approval order directed that class members receive notice of the settlement by June 8, 2011; this afforded ample opportunity for them to consider and lodge objections to the settlement terms.[124]

Other courts have set schedules similar to the one issued by this court. See *In re AT & T Mobility Wireless Data Services Sales Tax Litigation*, No. MDL 2147, No. 10 C 2278, 2011 WL 2204584, *31 (N.D. Ill. June 2, 2011) ("Travis Cox and Margaret Johnson have objected that 'Class Counsel will not file an attorney fee application prior to the objection deadline on March 10, 2011.' Citing *In re Mercury Interactive Corp. Secs. Litig.* they argue that 'rule 23(h) and due process require the fee motion to precede the objection deadline.' Paige Nash similarly objects that, '[a]s the case is now scheduled, the fee petition will be filed after the objection deadline. This sequence of events violates due process, the express terms of Fed.R.Civ.P. 23(h) and the decision in' *In re Mercury*. These objections are misplaced. *The Court required Class Members to file objections by February 2, 2011, and Class Counsel to file its application for Class Representatives' fees, attorneys' fees, costs, and expenses by January 26, 2011*. Here, Class Counsel in fact filed its motion for approval of attorneys' fees, costs, and expenses, and for approval of incentive awards on January 26, 2011. Objectors are therefore incorrect that Class Counsel did not file an attorney-fee application prior to the objection deadline" (emphasis added)).

Indeed, the only clear requirement *In re Mercury* imposes is that class counsel file their application for attorneys' fees, costs, and incentive awards before the deadline for filing objections. See *In re Mercury*, 618 F.3d at 994 ("We do not adopt a bright-line rule of a time period that would meet Rule 23(h)'s requirement that the class have an adequate opportunity to oppose class counsel's fee motion"). As plaintiffs note, the fact that the objectors were able to

---

[124]Prelim. Order, ¶ 8.

review the fee application and prepare rather lengthy objections to both the settlement and the fee request indicates that they had sufficient time to respond. Indeed, under the Local Rules of this court, parties typically have one week to file opposition to a motion filed by their opponent. See CA CD L.R. 7-9; see also *id.*, 7-10. This objection is therefore unpersuasive.[125]

### k.    Signs of Collusion

The Ninth Circuit recently explained that, in addition to evaluating the fairness of the settlement terms, the district court should be watchful for "subtle signs" that class counsel and the class representatives have permitted self-interest to outweigh their obligation to ensure a fair settlement for the class as a whole. *In re Bluetooth*, 2011 WL 3632604 at *9. The Ninth Circuit identified three possible signs of such collusion:

> (1) when the settlement terms result in class counsel receiving a disproportionate share of the settlement, or when the class receives no monetary compensation but counsel receive an ample award of attorneys' fees;
>
> (2) the presence of a "clear sailing" agreement that "carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for . . . accepting an unfair settlement," *Lobatz v. U.S. West Cellular of California, Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2000); and
>
> 3) when the parties arrange for fees not awarded to revert to defendants, rather than being paid into the class fund. *Id.*

The court noted that this list was not exclusive, but offered some guidance to lower courts regarding the type of provisions that require "greater scrutiny than ordinarily demanded" as to the overall fairness of the settlement. *Id.* at *9, 12. At least one of the suspect type of provisions noted by the *Bluetooth* court is not present here. The parties' settlement does not provide that any attorneys' fees not awarded by the court will revert to defendants instead of being distributed to members of the class. Indeed, the parties did not agree on the amount of fees that counsel could

---

[125]At the fairness hearing, Stehle's counsel reiterated that the court's timeline "may" violate *In re Mercury*. When pressed, however, Stehle did not argue that any such violation warranted disapproval of the settlement.

seek without objection.  In addition, this is not a situation where the class is not receiving any monetary compensation - $2.5 million has been set aside to compensate individual class claimants and pay class counsel's attorneys' fees.

As the *In re Bluetooth* court noted, the existence of a clear sailing agreement may raise an inference of collusion.  Here, while defendants generally agreed that "Class Counsel [could] apply for an award of attorneys' fees and reasonable, actual out-of-pocket expenses from the Settlement Fund,"[126] the settlement agreement does not contain the typical markers of a clear sailing agreement.  Generally, such agreements indicate that "the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling."  *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 520 n. 1 (1st Cir. 1991).  The term has been applied, however, both to contract provisions that specify a particular maximum fee amount, see *BTZ, Inc. v. Great Northern Nekoosa Corp.*, 47 F.3d 463, 465 (1st Cir. 1995) ("GPC-Great Northern, in turn, [agreed to] 'pay the plaintiffs' attorneys' fees and expenses [up to $2 million]"), and to more general provisions that obligate defendants not to contest counsel's fee application, see *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1292-93 (11th Cir. 1999) ("Finally, the stipulation included a 'clear-sailing' agreement which provided that 'Defendants will not directly or indirectly oppose Plaintiff's Class Counsel of Record's application for fees and expenses and compensation of the Representative Plaintiffs'").

The attorneys' fee provision in the parties' original settlement agreement clearly stated plaintiffs' counsel's right to apply for fees, but did not state that defendants would not oppose the fee application if it sought fees below a certain amount.[127]  Neither the parties nor the objectors argue that the agreement contains a clear sailing provision.  Thus, the concerns raised by such a

---

[126]Original Stipulation, VIII.A.

[127]Original Stipulation, VIII.A. ("The parties agree that Class Counsel may apply for an award of attorneys' fees and reasonable, actual out-of-pocket expenses from the Settlement Fund based upon the value of the Settlement").

provision are not clearly at issue here.[128]

### l.      Balancing the Factors

"Ultimately, the district court's determination [regarding the fairness and adequacy of a proposed settlement] is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Officers for Justice*, 688 F.2d at 625 (citation omitted). "[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation." *Id.*

---

[128]Even if the court were to construe the fee provision as a clear sailing provision, it would conclude that the term does not raise the inference of collusion that troubled the *In re Bluetooth* court. There, the fee provision permitted plaintiffs' counsel to seek a fee award that was *eight times* the value of the *cy pres* relief obtained by the class. *In re Bluetooth*, 2011 WL 3632604 at *10. Additionally, the Ninth Circuit noted that including both a clear sailing and a reversion provision meant that if the court did not approve any portion of the negotiated amount of attorneys' fees, those funds would revert to defendants. *Id.* at *12 ("For this same reason, a kicker arrangement reverting unpaid attorneys' fees to the defendant rather than to the class amplifies the danger of collusion already suggested by a clear sailing provision. . . . The clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees").

Here, the attorneys' fees provision in the original settlement stipulation did not set a ceiling on the fees counsel could seek without objection by defendants. There is thus no indication that the parties colluded to negotiate a fee amount that was disproportionate to the class recovery. The absence of a "kicker provision" also reduces the likelihood that plaintiffs and defendants colluded to confer benefits on each other at the expense of class members. While clear sailing agreements must be scrutinized to ensure that they do not result in unfair awards of attorneys' fees, see *Weinberger*, 925 F.2d at 523 ("[T]he approval function has routinely been extended to embrace fees, whether or not pre-negotiated, in those cases where the plaintiffs' attorneys are to be paid out of a common fund (and where, consequently, there is an inherent tension between the interests of the class and the interests of the lawyers"), the court concludes that even if the attorneys' fees provision were construed as a clear sailing agreement, its presence does not raise an inference of collusion that warrants invalidation of the class settlement as a whole.

Rather, the court considers the attorneys' fees provision in its analysis of the reasonableness of the fee award sought, so as to ensure that class members are afforded some relief, and that the fees their lawyers receive are proportionate to the value of their recovery.

The amended stipulation contains a provision stating that class counsel will apply for and accept an attorneys' fees award of $879,237, and an award of $19,418.64 in expenses. (Amended Stipulation, VIII.A.) Because these are the figures the court tentatively indicated it was prepared to approve, as discussed Part G, *infra*, the court does not deem this provision to be a clear sailing agreement.

1    Having considered the relevant factors, as well as the parties' modification of the original

2    Stipulation of Settlement, the court concludes that the settlement as amended is fair to the class

3    members.

4    **D.      Legal Standard Governing Awards of Attorneys' Fees and Litigation Costs**

5    The court now turns to class counsel's fee application.  The procedure for requesting

6    attorneys' fees is set forth in Rule 54(d)(2) of the Federal Rules of Civil Procedure.  While the

7    rule specifies that requests shall be made by motion "unless the substantive law governing the

8    action provides for the recovery of . . . fees as an element of damages to be proved at trial," the

9    rule does not itself authorize the awarding of fees.  "Rather, [Rule 54(d)(2)] and the accompanying

10   advisory committee comment recognize that there must be another source of authority for such

11   an award . . . [in order to] give[ ] effect to the 'American Rule' that each party must bear its own

12   attorneys' fees in the absence of a rule, statute or contract authorizing such an award."  *MRO*

13   *Communications, Inc. v. AT&T*, 197 F.3d 1276, 1281 (9th Cir. 1999).

14   In class actions, statutory provisions and the common fund exception to the "American

15   Rule" provide authority for awarding attorneys' fees.[129]  See Alba Conte and Herbert B. Newberg,

16   Newberg on Class Actions, § 14.1 (4th ed. 2005) ("Two significant exceptions [to the

17   "American Rule"] are statutory fee-shifting provisions and the equitable common-fund doctrine").

18   Valid contractual provisions providing for the payment of attorneys' fees also provide a basis for

19   awarding fees.  *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 257 (1975)

20   ("[A]bsent statute or enforceable contract, litigants pay their own attorneys' fees"); *Kyocera Corp*

21   *v. Prudential-Bache Trade Serv., Inc.*, 299 F.3d 769, 793 (9th Cir. 2002) ("Absent statute or

22   enforceable contract, litigants pay their own attorneys' fees"); *MRO Communications*, 197 F.3d

23   at 1281 ("[E]ach party must bear its own attorneys' fees in the absence of a rule, statute or

24   contract authorizing such an award").  Under normal circumstances, once it is established that a

25   party is entitled to attorneys' fees, "[i]t remains for the district court to determine what fee is

26

27   [129]The common fund exception recognizes that attorneys' fees can be collected from a fund
     preserved, protected, collected or realized by attorneys' efforts on behalf of the class of persons
28   benefitted by or entitled to the fund.  See 38 A.L.R.3d 1384, §4(a) & (b).

1  'reasonable.'"  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).[130]

2      In "common-fund" cases such as this one, "where the settlement or award creates a large

3  fund for distribution to the class, the district court has discretion to use either a percentage or

---

[130]As noted, the court does not construe the attorneys' fees provision in the original settlement agreement as a "clear sailing" agreement.  Should any doubt remain concerning that issue, however, the court recognizes that the inclusion of a clear sailing provision requires it to "scrutinize [the agreement] to ensure that the fees awarded are fair and reasonable."  *Weinberger*, 925 F.2d at 520; see also *Nienaber v. Citibank (South Dakota) N.A.*, CV-04-4054, 2007 WL 2003761, *2 (D.S.D. July 5, 2007) ("A district court must determine the reasonableness of attorney fee requests notwithstanding the fact that such fees are subject to a clear sailing fee agreement and notwithstanding the fact that the source of payment for the attorney fees does not directly impair the class recovery").

Although "such agreements are sometimes included in class actions settlements so that defendants have a more definite idea of their total exposure," *Waters*, 190 F.3d at 1293 n. 3 (citing *Weinberger*), courts have explained that "[c]lear sailing clauses can breed circumstances ripe for conflicts of interest between the members of the plaintiff class and counsel for the plaintiffs," since "[t]here is the possibility that the plaintiffs' 'lawyers might urge a class settlement at a low figure or on less-than-optimal basis in exchange for red carpet treatment on fees.'"  *Stokes v. Saga Int'l Holidays, Ltd.*, 376 F.Supp.2d 86, 90 (D. Mass. 2005) (quoting *Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F.Supp. 375, 377 (D. Mass. 1997), in turn citing *Weinberger*, 925 F.2d at 524).

In addition to concerns regarding potential conflicts of interest, close judicial scrutiny of clear sailing fee agreements is appropriate given "the 'precedential value' set by the award for future class action settlements."  *Stokes*, 376 F.Supp.2d at 90 (citing *Duhaime*, 989 F.Supp. at 379 and *Weinberger*, 925 F.2d at 526).  "When . . . a court is compelled by the nature of the case or statutory mandate to award attorney fees to a party, the determination of such award is not only a matter of public record, it becomes part of the great body of our law.  A court would be shirking its responsibility to render a principled decision were it to accept without scrutiny and close examination the fees agreed upon by client and counsel."  *Id.* (quoting *Codex Corp. v. Milgo Elec. Corp.*, 717 F.2d 622, 632 (1st Cir. 1983), cert. denied *sub nom Milgo Elec. Corp. v. Codex Corp.*, 466 U.S. 931 (1984)).

Finally, "[c]lear sailing agreements can . . . engender 'potential public misunderstandings' with regard to the class counsel."  *Stokes*, 376 F. Supp.2d at 91 (citing *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 216, 225 (2d Cir. 1987), cert. denied *sub nom Newton B. Schwartz, P.C. v. Dean*, 484 U.S. 926 (1987), and *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 820 (3d Cir. 1995), cert. denied *sub nom General Motors Corp. v. French*, 516 U.S. 824 (1995)).  As is evident from the fact that the fees and costs the court tentatively indicated it was prepared to approve differed materially from the amounts class counsel sought, the court believes the record is clear that it carefully scrutinized the request to ensure that the fees awarded were fair and reasonable.

lodestar method." *Hanlon*, 150 F.3d at 1029 (citing *In re Washington Public Power Supply System Securities Litigation ("WPPS")*, 19 F.3d 1291, 1295 (9th Cir. 1994)). "Though courts have discretion to choose which calculation method they use, their discretion must be exercised so as to achieve a reasonable result." *In re Bluetooth*, 2011 WL 3632604 at *5 (citing *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997). As respects selection of the lodestar or percentage-of-the-fund method, the Ninth Circuit has observed:

> "Despite the recent ground swell of support for mandating a percentage-of-the-fund approach in common fund cases, . . . we require only that fee awards in common fund cases be reasonable under the circumstances. Accordingly, either the lodestar or the percentage-of-the-fund approach 'may, depending upon the circumstances, have its place in determining what would be reasonable compensation for creating a common fund.'" *State of Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990) (quoting *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989)).

In cases where courts apply the percentage method to calculate fees, they should use a rough calculation of the lodestar as a cross-check to assess the reasonableness of the percentage award. See *In re Bluetooth*, 2011 WL 3632604 at *6 (encouraging "comparison between the lodestar amount and a reasonable percentage award"); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award").[131] By

---

[131]Judge Walker explored the utility of the lodestar method as a cross-check in percentage cases in some detail in *Young*. Citing an article he had co-authored, Judge Walker noted the weaknesses inherent in comparing the percentage award requested to the 25% benchmark established in the Ninth Circuit. See *Young*, 2007 WL 951821 at *5 ("the court has serious reservations about the adequacy of such a comparison to test the reasonableness of a fee award"). Instead, he opined that using the lodestar as a cross-check was the preferable way to proceed:

> "Indeed, the court's independent research into fee award practice in other courts convinces it that the best practice is to assess a percentage fee award not only by using the usual litany of factors bearing on the reasonableness of a fee [citing

the same token, "a court applying the lodestar method to determine attorney's fees may use the percentage-of-the-fund analysis as a cross-check." *Grays Harbor Adventist Christian School v. Carrier Corp.*, No. 05-05437 RBL, 2008 WL 1901988, *5 (W.D. Wash. Apr. 24, 2008) (citing *Wing v. Asarco Inc.*, 114 F.3d 986, 988-90 (9th Cir. 1994)).

### 1.     Whether Counsel's Fee Request is Reasonable Under the Percentage-of-the-Fund Method

The Ninth Circuit has established 25% of the common fund as a benchmark for attorneys' fees awards calculated according to the percentage-of-the-fund method. See *Fischel v. Equitable Life Assurance Society of the United States*, 307 F.3d 997, 1006 (9th Cir. 2002); *Six Mexican Workers*, 904 F.2d at 1311 ("The benchmark percentage should be adjusted, or replaced by a lodestar calculation, [however,] when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors"). In evaluating the reasonableness of the fee award, the court must take into account all the circumstances of the case. *Vizcaino*, 290 F.3d at 1048.

Plaintiffs' counsel contend that their requested fees of $1,323,143.64 represent only 24% of the total settlement value, which they contend is more than $5.4 million.[132] The $5.4 million figure includes the $2.5 million Settlement Fund, the *cy pres* donation, valued at $2.5 million, and claims administration and notice costs, estimated to be more than $400,000.[133] Counsel argue that their request thus complies with the Ninth Circuit's 25% benchmark. The objectors raise challenges to counsel's method of calculating the total value of the settlement, which are addressed

---

*Vizcaino*], but also by cross-checking the percentage fee award against a rough fee computation under the lodestar method. See, e.g., *In re GMC Pick-Up Tuck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 820-21 & n. 40 (3d Cir. 1995) (Becker, J). See also *Vizcaino*, 290 F.3d at 1050-51 (approving district court's use of a lodestar cross-check); *In re HPL Tech., Inc., Sec. Litig.*, 366 F.Supp.2d 912 (N.D. Cal. 2005)." *Id.*

[132]Attorneys' Fees Motion at 4.

[133]*Id.*

50

below.

### a.   Including the Value of the *Cy Pres* Donation in the Total Value of the Settlement

Plaintiffs' counsel states that their fee request represents 24% of the total value of the settlement. The settlement agreement, however, provides that counsel's fees and costs will be paid entirely from the $2.5 million Settlement Fund, which is the only money available to pay class members submitting claims.[134] Given the way in which the settlement was structured, counsel's original fee request for $1,323,143.64 in fees constituted 52.9% of the only money available to pay claimants.

As support for their inclusion of the *cy pres* donation in the value of the settlement, counsel cite *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437-38 (2d Cir. 2007), for the proposition that "the efforts of class counsel established the entire settlement, including nonmonetary benefits, for the benefit of the entire class."[135] *Masters* concerned calculation of the total value of a common fund under a settlement providing that *cy pres* donations would be made with common fund monies not claimed by class members. The court addressed whether the percentage-of-the-fund calculation should be based on the *entire* common fund, which represented monies actually available to pay class members submitting valid claims. See *Masters*, 473 F.3d at 437-38 ("In this case, the District Court calculated the percentage of the Fund on the basis of the claims made against the Fund, rather than on the entire Fund created by the efforts of counsel. We hold that this was error . . . An allocation of fees by percentage should . . . be awarded on the basis of *the total funds made available*, whether claimed or not . . .*[T]he entire fund created by the efforts of counsel presumably is 'paid to the class,'* even if some of the funds are distributed under the Cy Pres Doctrine" (emphasis added; citing, *inter alia*, 7B Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 1803.1 (2d ed. 2004) and *Williams v. MGM-Pathe Comm'ns Co.*, 129 F.3d 1026, 1027 (9th Cir.1997) ("The class' attorneys contend

---

[134]Original Stipulation, VIII.A.

[135]Attorneys' Fees Motion at 4.

that the district court should have calculated their fee as one-third of the entire $4.5 million settlement fund, for a fee of about $1.5 million, rather than calculating it as one-third of the class members' claims against that fund, for a fee of only $3,300.  We conclude that the district court abused its discretion by basing the fee on the class members' claims against the fund rather than on a percentage of the entire fund or on the lodestar")).

Here, in contrast, the $2.5 million Cy Pres Fund will not be made available to pay class members; only the $2.5 million Settlement Fund can be used for that purpose.  See *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004)  ("In the class action context the reason for appealing to *cy pres* is to prevent the defendant from walking away from the litigation scot-free because of the infeasibility of distributing the proceeds of the settlement (or the judgment, in the rare case in which a class action goes to trial) to the class members.  *There is no indirect benefit to the class from the defendant's giving the money to someone else*.  In such a case the '*cy pres*' remedy (badly misnamed, but the alternative term – 'fluid recovery' – is no less misleading) is purely punitive" (emphasis added)).  Although courts regularly approve settlements involving *cy pres* distributions, those distributions typically provide for all class members to obtain relief first, rather than designating an entire portion of the settlement that will go *directly* to charitable organizations and bypass class members entirely.  See *In re Pharmaceutical Industry Average Wholesale Price Litig.*, 588 F.3d 24, 34-35 (1st Cir. 2009) ("The settlement permits all plaintiffs to claim and be paid their damages – indeed treble their damages – *before* any money is paid to charity through *cy pres*.  This process is like *other, routinely approved* cy pres *distributions*" (emphasis added)); *In re Matzo Food Products Litig.*, 156 F.R.D. 600, 605 (D.N.J. 1994) ("*Cy pres* principles have most commonly been used where unclaimed funds remain following distribution of the class fund to individual class members").  The parties' agreement here, by contrast, provides that defendants will make substantial donations to groups that are not part of the class.  In addition, it provides that counsel's fees will be deducted from the only portion of the settlement set aside to pay class members.

In their response to their objectors, plaintiffs cite two cases in which courts have approved settlements providing for significant charitable donations because the identification of individual

1   claimants was likely to prove prohibitively costly or impractical.[136]   A closer examination of the

2   fee arrangements in those cases is highly instructive, however.  In *In re Toys R Us Antitrust Litig.*,

3   191 F.R.D. 347 (E.D.N.Y. 2000), the court approved a settlement that provided for almost $57

4   million in cash donations and toy distributions, in lieu of payments to individual class members.

5   *Id.* at 349-50.  The cash donations amounted to $20.3 million and the toy distributions were valued

6   at $36.6 million.  Counsel requested attorneys' fees equivalent to 9.54% of the settlement's total

7   value and 26.69% of the cash donation defendant agreed to make.  *Id.* at 357.  Additionally, since

8   no individual class member received monetary compensation in that case, the attorneys' fees

9   award did not reduce any class member's potential recovery.  In marked contrast, counsel's

10  request here amounts to 24% of the entire settlement's value and almost 53% of the funds actually

11  available for distribution to individual class members.

12       The other case plaintiffs cite, *HealthPlan, Inc. V. Warner Holdings Co.*, 246 F.R.D. 349

13  (D.D.C. 2007), involved a settlement providing for $3 million in donations to primary care

14  physicians, university health centers or clinics, and charitable organizations in the health care

15  field.  *Id.* at 355.  Class counsel requested $1.1 million in compensation, which comprised over

16  a quarter of the court's valuation of the total settlement.  Those fees, however, were to be drawn

17  out of a separate "fees fund," rather than taken from any distribution that was alleged to be of

18  benefit to the class members themselves.  *Id.* at 363-64 ("[B]ecause the attorneys' fees are borne

19  by defendants and not plaintiffs, they represent a valuable part of the settlement.").  Here,

20  plaintiffs' have not taken similar steps to ensure that their fees will not detract from the total

21  compensation to the class members.  Instead, the fee request will be taken directly out of the

22  money available as relief to the claimants.

23       Although the value of the settlement may be $5.4 million from defendants' perspective, this

24  does not mean that it is appropriate to utilize that number in determining reasonable attorneys'

25  fees.  Therefore, the court concludes that it is appropriate to discount the Cy Pres Fund when

26  determining the settlement value on which reasonable attorneys' fees should be calculated.  See

27  ──────────────

28       [136]Plaintiffs' Resp. at 8.

1   *Perry v. FleetBoston Financial Corp.*, 229 F.R.D. 105, 123 n. 9 (E.D. Pa. 2005) ("To remain

2   on the conservative side, the Court will not consider the $50,000.00 *cy pres* donation or the

3   noneconomic benefits obtained for the class in valuing the settlement 'fund'"); cf. *Staton v. Boeing*

4   *Co.*, 327 F.3d at 974 ("Precisely because the value of injunctive relief is difficult to quantify, its

5   value is also easily manipulable by overreaching lawyers seeking to increase the value assigned

6   to a common fund.  We hold, therefore, that only in the unusual instance where the value to

7   individual class members of benefits deriving from injunctive relief can be accurately ascertained

8   may courts include such relief as part of the value of a common fund for purposes of applying the

9   percentage method of determining.  When this is not the case, courts should consider the value

10  of the injunctive relief obtained as a 'relevant circumstance' in determining what percentage of the

11  common fund class counsel should receive as attorneys' fees, rather than as part of the fund

12  itself").

13       Given the terms of the settlement agreement, which provide that defendants will donate

14  $2.5 million in food to a charitable organization – value that will never be available to members

15  of the class – the court concludes that this case presents "unusual circumstances" weighing in

16  favor of adjusting the percentage.  See *Williams*, 129 F.3d at 1027 ("In *Six (6) Mexican Workers*

17  *v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir.1990), we held likewise, and indicated

18  that our benchmark for an attorneys' fee award in a successful class action is twenty-five percent

19  of the entire common fund. *Of course, the percentage may be adjusted to account for any unusual*

20  *circumstances*," citing *Paul, Johnson, Alston, & Hunt v. Graulty*, 886 F.2d 268, 272 (9th

21  Cir.1989) (emphasis added)); *Six Mexican Workers*, 904 F.2d at 1311 ("The benchmark

22  percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances

23  indicate that the percentage recovery would be either too small or too large in light of the hours

24  devoted to the case or other relevant factors").

25                    **b.    Including Notice and Administration Costs in the Total**

26                          **Value of the Settlement**

27       While the court can consider notice and administration costs "a benefit to the class" that

28  is properly taken into account in assessing the reasonableness of a fee request, it is not required

to do so.  *Staton*, 327 F.3d at 974-75 ("The district court also did not abuse its discretion by including the cost of providing notice to the class of the proposed consent decree as part of its putative fund valuation. . . .  The post-settlement cost of providing notice to the class can reasonably be considered a benefit to the class. . . .  We conclude that where the defendant pays the justifiable cost of notice to the class – but not, as here, an excessive cost – it is reasonable (although certainly not required) to include that cost in a putative common fund benefit[t]ing the plaintiffs for all purposes, including the calculation of attorneys' fees").[137]

Stehle objects strenuously to the inclusion of notice and administration costs in the total value of the settlement, arguing that those costs should be considered a benefit to defendants rather than plaintiffs.[138]  He contends, as a result, that class counsel seek an unjust "commission" on the notice and administration costs.[139]  The fact that the notice and claims administration process assists defendants does not mean that class members derive no benefit from it.  As plaintiffs note, notice and administration costs are typically borne by plaintiffs in class action suits.  See *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 356 (1978) ("The general rule must be that the representative plaintiff should perform [notice and administration] tasks, for it is he who seeks to maintain the suit as a class action and to represent other members of his class. . . . [Prior case law] strongly suggests that the representative plaintiff should bear this expense because it is he who seeks to maintain the suit as a class action").

Plaintiffs successfully negotiated a provision that required defendants to bear the cost of notice and settlement administration.  In doing so, they prevented these costs from being paid in

---

[137]Stehle observes that this aspect of *Staton* may have been "legislatively superseded" by 28 U.S.C. § 1713.  (See Stehle Objection at 17 n.6.)  Because that statute only applies when a class member is "obligated to pay sums to class counsel that would result in a net loss to the class member," it has no applicability here.  Because notice and administration costs are not being deducted from either the Settlement Fund or the Cy Pres Fund, the hypothetical Stehle poses is inapposite. (*Id.* at 16.)

[138]*Id.* at 16.

[139]*Id.*

1   a manner that reduced the Settlement Fund, and thus ensured that more money would be available

2   to pay claimants.  This conferred a concrete benefit on the class.  The court thus concludes that

3   it is proper to include them in the value of the class action settlement.  Cf. *In re Bluetooth*, 2011

4   WL 3632604 at *7 (considering possibility of including notice and settlement costs in

5   "constructive fund"); *In re Brokerage Antitrust Litig.*, 579 F.3d 241, 283 (3d Cir. 2009)

6   (approving a fee award based on a total settlement value that included, *inter alia*, attorneys' fees

7   to be paid independent of the common fund); *Vizcaino*, 290 F.3d at 1049 ("Incidental or

8   non-monetary benefits conferred by the litigation are a relevant circumstance").

9           **c.   Conclusion Regarding Percentage-of-the-Fund Calculation**

10         Class counsel seek fees of $1,323,143.64, which is more than 50% of the only fund

11   actually available to pay claimants.  In addition, they seek incentive awards of $5,000 for each of

12   three named plaintiffs, which are also to be paid from the $2.5 million Settlement Fund.  If the

13   court were to make these awards, there would be only $1,161,856.36 in cash to pay class

14   members who submit a claim.  This would be sufficient to pay $15 to only 77,457 of the

15   potentially hundreds of thousands of claimants the parties speculate exist.[140]  In the event that

16   submitted claims combined seek more than the available cash in the Settlement Fund, each

17   claimant's recovery will be proportionately reduced.[141]  Although the parties have not stated the

18   number of claims that have been submitted, extrapolating from plaintiffs' estimate of the number

19   of units sold during the class period, claimants may well receive less than $15 per household if

20   counsel's fee request is granted.

21         Under these circumstances, the court finds that an attorneys' fees award of $879,237 is

22   reasonable.  This figure represents 30% of the $2.5 million in cash that is available to pay class

23   members submitting valid claims, plus the $431,791 in notice and administration costs to be paid

24       ————————————————

25        [140]See Fourth Amended Complaint, ¶ 32; Settlement Approval Motion at 17.  Given that

26   the class period extends from June 1, 2009, to March 1, 2010 – a period of nine months – it is
    likely, moreover, that payment for three boxes of Krispies cereal is a mere fraction of the total

27   amount expended by many class members.

28        [141]Original Stipulation at 18.

by defendants.  The 30 percent figure is reasonable in light of awards in other common fund cases.  In *Vizcaino*, 290 F.3d 1043, the Ninth Circuit surveyed fee awards in 34 common fund cases where settlements of $50-$200 million were approved between 1996 and 2001, and noted that most awards (27 of 34, or 79%) fell within the 10-30% range.  A majority (19 of 34, or 56%) were clustered in the 20-30% range.  *Id*. at 1050 n. 4.  Although *Vizcaino* involved settlements much larger than that being approved in this case, the same range has been found to be reasonable in cases involving smaller settlements as well.  See, e.g., *Chatelain v. Prudential-Bache Securities, Inc.*, 805 F.Supp. 209, 216 (S.D.N.Y. 1992) (awarding fees of $529,666.76 or 28% of settlement fund); *Ressler v. Jacobson*, 149 F.R.D. 651, 657 (M.D. Fla. 1992) (awarding "30% of the gross Settlement Fund, or $232,500, as attorneys' fees"); *In re Activision Securities Litigation*, 723 F.Supp. 1373, 1378 (N.D. Cal. 1989) (concluding that attorneys' fees should equal 30% of the total recovery "absent extraordinary circumstances"); see also *Vasquez v. Coast Valley Roofing*, Inc., 266 F.R.D. 482, 491-92 (E.D. Cal. 2010) (approving counsel's request for 33.3% of the recovery obtained and noting five recent wage and hour class actions where federal district courts approved attorneys' fee awards of 30 to 33%); *Singer v. Becton Dickinson and Co.*, No. 08-CV-821-IEG (BLM), 2010 WL 2196104, *8 (S.D. Cal. June 1, 2010) (approving an attorneys' fees award of 33.33% of a common fund, and noting "the request for attorneys' fees in the amount of 33.33% of the common fund falls within the typical range of 20% to 50% awarded in similar cases").

The figure also represents 16.2% of the $5.431 million valuation that the parties placed on the settlement.  The court deems this an appropriate discount in light of the fact that almost half of the settlement's value is guaranteed not to directly benefit individual class members.[142]  Given

---

[142]Although plaintiffs and the objectors dispute the value of the "injunctive relief" portion of the settlement, counsel did not include this aspect of the settlement in their calculation of the total value of the settlement. (Plaintiffs' Resp. at 19.)  The court does not construe defendants' agreement not to make immunity claims in the future unless they can support the claims with appropriate studies as "injunctive relief."  Rather, it appears merely to be a contractual undertaking.  Moreover, under *Staton*, when the value of injunctive relief to the class members is difficult to quantify, a district court should not consider it in calculating fees. *Staton*, 327 F.3d

the nature of the recovery achieved for the class, the court concludes this fee is reasonable.  See *Powers v. Eichen*, 229 F.3d 1249, 1258 (9th Cir. 2000) ("We note that the choice of whether to base an attorneys' fee award on either net or gross recovery should not make a difference so long as the end result is reasonable.  Our case law teaches that the reasonableness of attorneys' fees is not measured by the choice of the denominator").[143]

---

at 974 .

[143]After the parties filed their amended stipulation, Stehle filed a response in which he requested permission to seek attorneys' fees to compensate him for the benefit he conferred upon class members by filing objections.  The court, in its discretion, can award attorneys' fees to objectors' counsel if they increase the fund or otherwise provide a substantial benefit to class members.  See *Vizcaino*, 290 F.3d at 1051 ("Objectors contend that the district court abused its discretion in rejecting their request for attorneys' fees, arguing that they caused the district court to require class counsel to submit time records and that they brought about minor procedural changes in the settlement agreement.  Because objectors did not increase the fund or otherwise substantially benefit the class members, they were not entitled to fees"); see also *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 963 (9th Cir. 2009) ("[W]e remand for the district court to reconsider the extent to which Objectors added value that increased the fund or substantially benefitted the class members, and to award attorney's fees accordingly"); *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 288 (7th Cir.2002) (noting that "lawyers who contribute materially to the proceedings" may obtain a fee, but "objectors [must] produce an improvement in the settlement worth more than the fee they are seeking; otherwise they have rendered no benefit to the class").

Stehle asserts that his objections led the parties to amend the original settlement terms to ensure a greater level of recovery for individual class members.  Based on these alleged contributions, Stehle stated his intention to apply for an attorneys' fees award of approximately $34,000, to be drawn from the fee award the court has authorized above.  Stehle also indicated that he would seek a $700 incentive award as an objector.  Thereafter, plaintiffs notified the court that they had stipulated that Stehle's counsel may be awarded $21,000 in fees, and Stehle may receive a $700 incentive payment.  These funds will be drawn from the attorneys' fees award of $879,237, leaving other aspects of the settlement undisturbed.

The court questions whether it can, as a matter of law, approve an *incentive award* for an objector.  See *UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp.*, 352 Fed. Appx. 232, 236 (10th Cir. Sept. 11, 2009) (Unpub. Disp.) ("We need not decide if a *pro se* objector can *ever* be entitled to an incentive award under appropriate circumstances because we affirm the district court's order denying Mr. Schonbrun an incentive award on the ground that his efforts did not benefit the class" (emphasis added)).  In this case, however, it concludes that it is merely entering an order on a stipulation of parties before it.  Since the total amount of fees and incentive awards will not change, and since the court has determined that sum adequately protects the class, it is prepared to include an order approving the parties' stipulation.

### 2.    The Lodestar Cross-Check

When a court exercises its discretion to use a percentage-of-the-fund calculation to determine the reasonableness of attorneys' fees, checking that figure against the lodestar calculation is appropriate.  See *Vizcaino*, 290 F.3d at 1050; *Young*, 2007 WL 951821 at *5 ("[T]he best practice is to assess a percentage fee award not only by using the usual litany of factors bearing on the reasonableness of a fee, but also by cross-checking the percentage fee award against a rough fee computation under the lodestar method" (internal citations omitted)).  The lodestar figure is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  *Hensley*, 461 U.S. at 433.  The lodestar "presumptively provides an accurate measure of reasonable attorney's fees."  See *Harris v. Marhoefer*, 24 F.3d 16, 18 (9th Cir. 1994); *Clark v. City of Los Angeles*, 803 F.2d 987, 990 (9th Cir. 1986).  A court may increase or decrease the lodestar amount in rare or exceptional cases.  See *Blum v. Stenson*, 465 U.S. 886, 898-901 (1984); *Harris*, 24 F.3d at 18; *Clark*, 803 F.2d at 990-91.

A court employing the lodestar method to determine the amount of an attorneys' fee award does not directly consider the multi-factor test developed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), and *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69-70 (9th Cir. 1975).[144]   Rather, as a first step, it determines the lodestar amount, which subsumes some of the *Johnson/Kerr* factors, i.e., the novelty and complexity of the issues, the

_____

By approving the stipulation, the court expresses no opinion concerning the entitlement of Stehle and his counsel to fees and an incentive award or to the amounts of the awards to which the parties have agreed.

[144]Under the *Johnson/Kerr* test, the factors to consider in determining the amount of attorney's fees awarded include: "(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases."  *Kerr*, 526 F.2d at 70; see also *Johnson*, 488 F.2d at 717-19.

1   special skill and experience of counsel, the quality of the representation, and the results obtained.

2   See *Blum*, 465 U.S. at 898-900; *Cunningham v. County of Los Angeles*, 879 F.2d 481, 484 (9th

3   Cir. 1988); *Clark*, 803 F.2d at 990-91 and n. 3. Next, the court looks to the *Johnson/Kerr* factors

4   that have not been subsumed in the lodestar calculation to determine whether to increase or reduce

5   the presumptively reasonable lodestar fee. See *Clark*, 803 F.2d at 991.

6         Class counsel argued in their fee application that the lodestar method confirms the fees they

7   request are properly awarded.[145] Based on the number of hours billed and their hourly rates,

8   counsel calculate an initial lodestar of $1,147,715.50.[146] They assert that a multiplier of 1.2

9   should be applied to this amount, generating a final fee amount of $1,323,143.64.[147] Counsel also

10   seek reimbursement of $23,143.64 in out-of-pocket expenses,[148] resulting in total fees and costs

11   of $1,346,287.28. Counsel maintain that they will spend additional time working with class

12   members to ensure adequate resolution of their claims, which will further reduce the hourly value

13   of their fee.[149]

14            **a.**      **Reasonableness of Counsel's Hourly Rates**

15         To assist the court in calculating the lodestar, a plaintiff must submit "satisfactory evidence

16   . . . that the requested rates are in line with those prevailing in the community for similar services

17   by lawyers of reasonably comparable skill, experience, and reputation." *Blum*, 465 U.S. at

18   895-96 n. 11. The relevant community is that in which the district court sits. See *Schwartz v.*

19   *Sec'y of Health and Human Serv.*, 73 F.3d 895, 906 (9th Cir. 1995). Declarations regarding the

20   prevailing market rate in the relevant community suffice to establish a reasonable hourly rate. See

21   *Widrig v. Apfel*, 140 F.3d 1207, 1209 (9th Cir. 1998); *Guam Soc'y of Obstetricians &*

22

23

24   [145]Attorneys' Fees Motion at 6-7.

25   [146]*Id*. at 6.

26   [147]*Id*.

27   [148]*Id*. at 1.

28   [149]*Id*. at 10-11.

1  *Gynecologists v. Ada*, 100 F.3d 691, 696 (9th Cir. 1996) (noting that declarations from attorneys

2  in the community can provide adequate proof of the reasonableness of counsel's rates). See also

3  *Earthquake Sound Corp. v. Bumper Industries*, 352 F.3d 1210, 1215 (9th Cir. 2003) (discussing

4  the affidavit of "an attorney practicing in the same region as Earthquake's attorneys," which

5  opined that "Earthquake's attorney rates were reasonable and customary"). Courts can also use

6  survey data to evaluate the reasonableness of attorneys' rates. See *Fish v. St. Cloud State Univ.*,

7  295 F.3d 849, 852 (8th Cir. 2002) ("The parties presented two surveys of hourly rates, one

8  reporting fees received by seven Twin Cities class action firms and the other reporting fees

9  received by sixty-two firms doing a variety of work around the state. The court set individual

10 hourly rates at the median of the class action survey and near the upper limit of the statewide

11 survey, also taking into account the number of years an attorney had been admitted to practice");

12 *American Petroleum Inst. v. United States EPA*, 72 F.3d 907, 912 (D.C. Cir. 1996) ("Petitioners

13 have provided support for the reasonableness of their rates through affidavits and a survey of rates

14 and we hold that these rates are reasonable"); *Martin v. University of South Alabama*, 911 F.2d

15 604, 607 (11th Cir. 1990) ("Based on the testimony and survey produced by plaintiffs the

16 reasonable non-contingent hourly rate for civil rights lawyers in the relevant market (Alabama)

17 was found to be $135 to $150 per hour for senior counsel and $105 to $115 per hour for junior

18 counsel").

19        In calculating the lodestar, courts typically exclude time spent on clerical or ministerial

20 tasks because such tasks are properly considered part of an attorney's overhead and are reflected

21 in his or her hourly rate. See *Missouri v. Jenkins*, 491 U.S. 274, 288 n. 10 (1989) ("[P]urely

22 clerical or secretarial tasks should not be billed at a paralegal [or lawyer's] rate, regardless of who

23 performs them"). Where support staff do substantive case-related work, however, fees for such

24 work are recoverable. *Id.* at 285 ("Clearly, a 'reasonable attorney's fee' cannot have been meant

25 to compensate only work performed personally by members of the bar. Rather, the term must

26 refer to a reasonable fee for the work product of an attorney. Thus, the fee must take into account

27 the work not only of attorneys, but also of secretaries, messengers, librarians, janitors, and others

28 whose labor contributes to the work product for which an attorney bills her client"); *Earthquake*

*Sound Corp.*, 352 F.3d at 1214-15 (affirming a lodestar-based fee award that included work performed by attorneys, paralegals, and clerks); *Grays Harbor Adventist Christian Sch. v. Carrier Corp.*, No. 05-05437 RBL, 2008 WL 1901988, *5 (W.D. Wash. Apr. 24, 2008) (accepting class counsel's lodestar calculation, which included fees for support staff, and noting that "if [the] recoverable lodestar were limited to attorney time, law firms would be inclined to assign low-level work to attorneys rather than legal support staff.  The Ninth Circuit discourages such an inefficient result by recognizing the contributions of attorneys and non-attorneys").

Class counsel report that they have spent 2,685 hours litigating this matter thus far.[150]  They represent that their time charges would have generated a lodestar of $1,147,715.50 prior to application of any multiplier.[151]  Counsel's fee application provided little or no information supporting these numbers, however.  They proffered six declarations that include summary charts showing total amounts of fees.  The charts do not distinguish between attorneys, paralegals, and support staff; they list only names and hourly rates.[152]  The declarations do not include billing records showing the specific tasks performed by specific individuals, and are thus of little help in assessing the reasonableness of the fees.  Nor did counsel proffer the declarations of local attorneys who perform similar work, or hourly rate surveys relevant to this community or counsel's field of expertise.  In the absence of this type of support, the court cannot say that a fee of more than $1.3 million, including times charges of more than $1.1 million, are reasonable.

### b.    Reasonableness of the Hours Expended

A court may award attorneys' fees only for the number of hours it concludes were reasonably expended on the litigation.  *Hensley*, 461 U.S. at 434 ("[Counsel] should make a good faith effort to exclude . . . hours that are excessive, redundant, or otherwise unnecessary").

---

[150]*Id*. at 6.

[151]*Id*.

[152]See, e.g., Whatley Decl. at 7 (listing the names of six individuals with varying hourly rates without distinguishing between the levels of experience of those individuals or their status within the firm).

1  "[T]he fee applicant bears the burden of documenting the appropriate hours expended in the

2  litigation and must submit evidence in support of th[e] hours worked. . . .'" *Gates v.*

3  *Rowland*, 39 F.3d 1439, 1449 (9th Cir. 1994) (quoting *Gates v. Deukmejian*, 987 F.2d 1392,

4  1397-98 (9th Cir. 1992)); *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986)

5  ("[C]ounsel bears the burden of submitting detailed time records justifying the hours claimed to

6  have been expended"); *Pac. W. Cable Co. v. City of Sacramento*, 693 F.Supp. 865, 870 (E.D.

7  Cal. 1988) ("The cases do not indicate that every minute of an attorneys' time must be

8  documented; they do, however, require that there be adequate description of how the time was

9  spent, whether it be on research or some other aspect of the litigation. . .").

10       Here, with the exception of the declaration of Paul Weiss,[153] the tables submitted indicate

11  only the total number of hours expended on the litigation by an individual professional; they

12  provide no detail as to how many hours were spent on particular tasks.[154]  As a consequence, the

13  court cannot determine whether the hours were reasonably expended on the litigation.  Courts

14  have reduced attorneys' fee awards on a percentage basis when counsel have failed to supply such

15  detail.  See *In re Samuel R. Pierce, Jr.*, 190 F.3d 586, 593-94 (D.C. Cir. 1999) ("To establish

16  that he is entitled to reimbursement for particular items of attorneys' fees . . . the fee petitioner

17  must provide the court with the attorney[ ] billing records that describe the work performed in

18  sufficient detail to establish that the work [was] reasonably related [to the litigation]. . . .

19  [I]nadequate documentation 'makes it impossible for the court to verify the reasonableness of the

20  billings, either as to the necessity of the particular service or the amount of time expended on a

21  given task"); see also *H.J. Inc. v. Flygt Corp.*, 925 F.2d 257, 260 (8th Cir. 1991) ("Incomplete

22  or imprecise billing records preclude any meaningful review by the district court of the fee

23  application for 'excessive, redundant, or otherwise unnecessary' hours and may make it

24  _____

25      [153]Declaration of Paul M. Weiss in Support of Plaintiffs' Application for Attorneys' Fees,

26  Expenses, and Plaintiff Service Awards ("Weiss Decl."), Docket No. 135 (July 18, 2011), Exh. 2.

27      [154]See, e.g., Whatley Decl. at 7 (listing the hours worked by six individuals, but failing to

28  detail the tasks these individuals performed during the hours recorded).

impossible to attribute a particular attorney's specific time to a distinct issue or claim.  Here, counsel's billing records included numerous entries such as 'legal research' or 'trial prep' or 'met w/client.'  Some entries were so vague that the district court could not determine with certainty whether they were related to this litigation, much less the claims upon which H.J. ultimately prevailed.  In the future the district court might consider directing the plaintiff to submit additional records before deciding to reduce the lodestar for inadequate documentation.  Nonetheless, we cannot say that the district court abused its discretion in the present case by reducing the lodestar by 20% for inadequate documentation," quoting *Hensley*, 461 U.S. at 437 n. 12; *Ohio–Sealy Mattress Manufacturing Co. v. Sealy, Inc.*, 776 F.2d 646, 653 (7th Cir. 1985); and *International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255, 1275 (1980)); *Gratz v. Bollinger*, 353 F.Supp.2d 929, 939 (E.D. Mich. 2005) ("Defendants also seek a reduction in the number of hours expended by Plaintiffs' attorneys due to the vagueness of the attorneys' billing records. Defendants argue that vague and general entries such as, 'telephone conference,' 'office conference,' 'research,' and 'review article' make it impossible for the Court to evaluate the reasonableness of the hours expended on the litigation.  This Court agrees with respect to the billing entries submitted by the Maslon attorneys").

Plaintiffs' counsel argue that they "need only submit summaries of the[ ] hours" expended, and that "submission of billing records" is not necessary.[155]  Although summaries may be adequate, see *Lobatz*, 222 F.3d at 1148-49, the submissions in this case cannot be characterized as "summaries."  They are better described as conclusory statements regarding the number of hours expended, as they provide no description whatsoever of the tasks performed, the hours spent on various types of task, or the relation of those tasks to the litigation.  Plaintiffs cite *Lytle v. Carl*, 382 F.3d 978, 989 (9th Cir. 2004) for the proposition that "minimal" time descriptions are sufficient to establish that attorneys spent time litigating a particular case.  See also *Hensley*, 461 U.S. at 437 n. 12 (counsel need only "identify the general subject matter of [their] time expenditures").  Here, however, the declarations plaintiffs have submitted frequently contain little

---

[155]Attorneys' Fees Motion at 7-8 n. 3; Plaintiffs' Resp. at 22-23.

more than the name of an attorney, a single figure representing the total hours the attorney worked, and the attorney's hourly rate.[156]  Although detailed billing reports are not required, the court must have some information regarding what a particular attorney was doing during the hours billed to evaluate the reasonableness of the fees charged.  See, e.g., *Schultz v. Ichimoto*, CV No. 00526 (OWW) (SMS), 2010 WL 3504781, *11 (E.D. Cal. Sept. 7, 2010) ("Included with Jamison and Klassen's declarations are detailed billing statements outlining the tasks performed"); *Allen v. Ghoulish Gallery*, CV No. 06-00371 (NLS) 2008 WL 802980, *3 (S.D. Cal. Mar. 24, 2008) (noting that counsel provided invoices reflecting billings, and approving attorneys' fees as a result); *EEOC v. Harris Farms, Inc.*, CV No. 02-06199 (AWI) (LJO), 2006 WL 1028755, *5 (E.D. Cal. Mar. 1, 2006) ("Mr. Smith has submitted approximately 45 pages that consist of a date, hours spent on a task divided in tenths of an hour, and a description of the task performed. The descriptions are not always overly detailed and as particular as possible, but they mostly identify the general subject matter of the time expenditure and are thus, sufficiently detailed for purposes of a fee award").  Because the declarations submitted by plaintiffs' counsel lack detail, some reduction of the lodestar amount is appropriate.  See *Trustees of Directors Guild of America-Producer Pension Benefits Plans v. Tise*, 234 F.3d 415, 427 (9th Cir. 2000) ("Where the documentation is inadequate, the district court is free to reduce an applicant's fee award accordingly"); see also *S.E.C. v. Goren*, 272 F.Supp.2d 202, 211 (E.D.N.Y. 2003) ("The burden is on counsel to "keep and present records from which the court may determine the nature of the work done, the need for it, and the amount of time reasonably required; where adequate contemporaneous records have not been kept, the court should not award the full amount requested,'" quoting *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1265 (2d Cir. 1987)).

### c.     Conclusion Regarding Lodestar Cross-Check

Given the summary nature of the materials submitted in support of the attorneys' fees

---

[156]See, e.g., Declaration of Michael Kelly in Support of Plaintiffs' Application for Attorneys' Fees [and] Expenses ("Kelly Decl."), ¶ 5; Declaration of Kevin T. Hoerner in Support of Plaintiffs' Application for Attorneys' Fees, Expenses ("Hoerner Decl.), ¶ 5.

request, the court is unable to conduct a true lodestar cross-check to ensure the reasonableness of the percentage-of-the-fund fee. See *Blum*, 465 U.S. at 896 n. 11, 898 ("To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation. . . . The burden of proving that [an upward adjustment to the fee award] is necessary to the determination of a reasonable fee is on the fee applicant").[157]

---

[157]Given the difficulty of accurately calculating the lodestar, the court need not address counsel's contention that they are entitled to a lodestar enhancement. It notes, however, that the argument is based on a questionable premise.

Counsel assert it is appropriate to apply a multiplier to the lodestar given (1) the "exceptional results" they achieved; (2) the contingent nature of their fee agreement and their ongoing work; (3) the skill displayed and the promptness of the settlement; and (4) the benefit to the public. As an initial matter, the Supreme Court recently held that "the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee," and that an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation." *Perdue v. Kenny A. ex. rel. Winn*, 130 S.Ct. 1662, 1673 (2010) (quoting *Pennsylvania v. Delaware Valley Citizens' Council*, 478 U.S. 546, 566 (1986) ["*Delaware Valley*"]). The first three factors counsel identify are subsumed within the lodestar calculation under the *Johnson-Kerr* test. See *Perdue*, 130 S.Ct. at 1673 ("We have thus held that the novelty and complexity of a case generally may not be used as a ground for an enhancement because these factors 'presumably [are] fully reflected in the number of billable hours recorded by counsel.' We have also held that the quality of an attorney's performance generally should not be used to adjust the lodestar '[b]ecause considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate,'" quoting *Blum*, 465 U.S. at 898, and *Delaware Valley*, 478 U.S. at 566). As a consequence, they do not warrant application of a multiplier. See *Kerr*, 526 F.2d at 70 (noting that "the novelty and difficulty of the questions involved . . . the skill requisite to perform the legal service properly . . . the customary fee . . . whether the fee is fixed or contingent . . . the amount involved and the results obtained . . . [and] the experience, reputation, and ability of the attorneys" are considered when making lodestar calculations).

As the Ninth Circuit has noted, moreover, the contingent nature of the fee is no longer a basis for modifying the lodestar. See *In re Bluetooth*, 2011 WL 3632604 at *4 n. 7 ("At least one factor is no longer valid – whether the fee was fixed or contingent," citing *Davis v. City and Cnty. of San Francisco*, 976 F.2d 1536, 1546 (9th Cir. 1992)); see also *City of Burlington v. Dague*, 505 U.S. 557, 563 (1992) ("The risk of loss in a particular case (and, therefore, the attorney's contingent risk) is the product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits. The second factor, however, is ordinarily reflected in the lodestar – either in the higher number of hours expended to overcome

the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so. Taking account of it again through lodestar enhancement amounts to double counting" (internal citations omitted)).

Moreover, the results in this case, while positive, are not extraordinary. Given the allegedly hundreds of thousands of purchases of Krispies cereals during the class period, a settlement of $5 million – only half of which directly benefits the class – represents an acceptable, but hardly noteworthy, achievement. See *In re Bluetooth*, 2011 WL 3632604 at *6 (encouraging "comparison between the settlement's attorneys' fees award and the benefit to the class or degree of success in the litigation"). The court also notes Mathers's objection that the settlement here should be evaluated in light of settlements into which Kellogg has entered in other cases. Although the court agrees with plaintiffs that the suits Mathers cites do not constitute a baseline, they provide at least some evidence that the settlement reached in this case is typical. For example, Kellogg's settlement with the state of Oregon provided that it would donate 500,000 boxes of cereal with a wholesale value of $1.5 million to the Oregon Food Bank and Feeding America. The settlement counsel negotiated is quite similar, at least as respects the distribution of food products via the Cy Pres Fund. Although the Oregon settlement was for a lower amount, the action sought to protect the rights of Oregon citizens. Here, by contrast, the class is national in scope, and it is reasonable to expect a higher settlement amount in light of that fact. In the *Dennis* lawsuit, the court preliminarily approved the settlement of an action alleging that Kellogg had made false claims regarding its Mini-Wheats cereal. *Dennis*, 2010 WL 4285011 at *1. That settlement contemplated a fund of $2.75 million against which class members could make claims, and a *cy pres* distribution of $5.5 million. Although the *Dennis* lawsuit addressed a different product and different health-related claims, the plaintiffs there asserted false advertising claims paralleling the claims at issue here. *Id.* The structure of the settlement, moreover, was similar, in that it contemplated separate funds for payments to charitable organizations and for payments to individual claimants. *Id.* The value of the settlement was substantially greater than the one here, moreover, providing further proof that counsel has not achieved an unusual or atypical degree of success in this case.

Plaintiffs cite two California cases for the proposition that "benefit to the public" should be taken into account in determining whether a lodestar enhancement is appropriate. Although these cases acknowledge the relevance of that factor, they do not stand for the proposition that litigation carried out for the public's benefit always merits application of a multiplier. See *California v. Meyer*, 174 Cal.App.3d 1061, 1073 (1985) (noting that a "public service element" and "motivation to represent consumers and enforce laws" may be considered in deciding whether to apply lodestar enhancement, but not applying the factors); *Lealao v. Beneficial California*, 82 Cal.App.4th 19, 41 (2000) (observing that California courts had held that "there is 'no mechanical formula [that] dictate[s] how the [trial] court should evaluate all these factors. Instead, it ha[s] wide latitude in assessing the value of the attorney's services,'" citing *Flannery v. California Highway Patrol*, 61 Cal.App.4th 639 (1998) (brackets original)).

The court thus sees little basis for application of a multiplier in this case. See *Cruz ex rel. Cruz v. Alhambra School Dist.*, 601 F.Supp.2d 1183, 1196 (C.D. Cal. 2009) ("[A] 'strong presumption' exists that the lodestar figure represents a 'reasonable fee' and should be enhanced

1

2      This lack of information weighs heavily in favor of relying on the percentage-of-the-fund

3 calculation and determining that fees of $879,237 are reasonable. See *Vizcaino*, 290 F.3d at 1048

4 ("Selection of the benchmark or any other rate must be supported by findings that take into

5 account all the circumstances of the case"); *Hughes v. Furniture on Consignment, Inc.*, No.

6 4:04CV3368, 2005 WL 3132345, *1 (D. Neb. Nov. 22, 2005) ("Note that when calculating the

7 lodestar, various things are subsumed within it; that is, reductions for insufficient documentation

8 are included in the lodestar calculation. . ."); see also *In re Rite Aid Corp. Securities Litig.*, 396

9 F.3d 294, 306-07 (3d Cir. 2005) ("The lodestar cross-check calculation need entail neither

10 mathematical precision nor bean-counting. The district courts may rely on summaries submitted

11 by the attorneys and need not review actual billing records. . . . But the lodestar cross-check does

12 not trump the primary reliance on the percentage of common fund method"); *In re Quantum*

13 *Health Resources, Inc.*, 962 F.Supp. 1254, 1256-57 (C.D. Cal. 1997) ("Courts and commentators

14 have been wary of the lodestar method since its introduction by the Third Circuit in *Lindy Brothers*

15 *Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161

16 (3d Cir.1973). . . . As critics have noted, the lodestar method needlessly increases judicial

17 workload, creates disincentive for early settlement, and causes unpredictable results").

18     **E.**    **Legal Standard Governing Incentive Award**s

19      An individual who joins his claims with those of a class "disclaim[s] any right to a

20 preferred position in the settlement [of those claims]." *In re Oracle Securities Litigation*, No.

21 C-90-0931-VRW, 1994 WL 502054, *1 (N.D. Cal. June 18, 1994) (quoting *Officers for Justice*,

22 688 F.2d at 632). Nonetheless, it is well established that the court may grant a modest incentive

23 award to a class representative, both as an inducement for his having agreed to bring the action

24 and as compensation for time spent in litigation activities. See *In re Mego Financial Corp.*, 213

25 F.3d at 463 (district court did not abuse its discretion in authorizing an incentive award to class

26 ——————————————

27 only in 'rare and exceptional cases,'" citing *Delaware Valley*, 478 U.S. at 565). In any case, any

    discussion of a potential lodestar enhancement is irrelevant where, as here, plaintiffs have

28 provided little or no information concerning the basis for their lodestar calculation.

1   representatives); *Matter of Continental Illinois Securities Litigation*, 962 F.2d 566, 571 (7th Cir.

2   1992) (stating that an incentive award in such amount "as may be necessary to induce [the class

3   representative] to participate in the suit" was appropriate).

4        The parties' settlement agreement provides for payment of $5,000 to each of three class

5   representatives as an incentive award.  See, e.g., *In re Mego Financial Corp.*, 213 F.3d at 463

6   (approving a $5,000 incentive award to each class representative); *Faigman v. AT & T Mobility*

7   *LLC*, No. C06-04622 MHP, 2011 WL 672648, *5 (N.D. Cal. Feb. 16, 2011) (approving an

8   incentive payment of $3,333.33 for each of three class representatives, and noting that "[i]n [the

9   Northern] [D]istrict, incentive payments of $5,000 are presumptively reasonable"); *Clesceri v.*

10  *Beach City Investigations & Protective Services, Inc.*, No. CV-10-3873-JST (RZx), 2011 WL

11  320998, *2 (C.D. Cal. Jan. 27, 2011) (preliminarily approving an award of $3,000 to two named

12  plaintiffs); *Hartless v. Clorox Co.*, __ F.R.D. __, 2011 WL 197542, *15 (S.D. Cal. Jan. 20,

13  2011) (approving an award of $4,000 to one named plaintiff and $2,000 to another); *Dennis v.*

14  *Kellogg Co.*, No. 09-CV-1786-IEG(WMc), 2010 WL 4285011, *3 (S.D. Cal. Oct. 14, 2010)

15  (preliminarily approving an incentive award of $5,000); *Rausch v. Hartford Financial Servs.*

16  *Group*, No. 01-CV-1529-BR, 2007 WL 671334, *3 (D. Or. Feb. 26, 2007) ("the Court finds

17  Reynolds is entitled to $10,000 as a reasonable incentive award, particularly in light of his

18  perseverance in pursuing this matter to a successful outcome in the Ninth Circuit"); *Razilov v.*

19  *Nationwide Mut. Ins. Co.*, No. 01-CV-1466-BR, 2006 WL 3312024, *1 (D. Or. Nov. 13, 2006)

20  ("The Court also awards . . . incentive awards in the amounts of $10,000 to class representative

21  Ruslan Razilov and a total of $10,000 to class representatives Sara and Derek Lapham"); *Aguayo*

22  *v. Oldenkamp Trucking*, No. F04-6279 AWI LJO, 2006 WL 3020943, *10 (E.D. Cal. Oct. 17,

23  2006) (preliminarily approving a settlement agreement, which provided that class counsel would

24  apply for an incentive award of no more than $5,000 for the named plaintiff).  The only cases in

25  which an incentive payment greater than that requested in this case has been approved involved

26  much larger settlement funds.  See, e.g., *Van Vranken v. Atlantic Richfield Co.*, 901 F.Supp. 294,

27  299 (N.D. Cal. 1995) (awarding $50,000 to a named plaintiff where the total settlement amount

28  was $76,723,213.26).

1    Whether to authorize an incentive payment to a class representative is a matter within the

2    court's discretion.   The criteria that courts consider in determining whether to approve an

3    incentive award include: "1) the risk to the class representative in commencing suit, both financial

4    and otherwise; 2) the notoriety and personal difficulties encountered by the class representative;

5    3) the amount of time and effort spent by the class representative; 4) the duration of the

6    litigation[;] and[ ] 5) the personal benefit (or lack thereof) enjoyed by the class representative as

7    a result of the litigation."   *Van Vranken*, 901 F.Supp. at 299.

8                          **1.      The Risk to the Class Representative in Commencing Suit**

9    When a class representative shoulders some degree of personal risk in joining the litigation,

10   such as workplace retaliation, awarding an incentive is especially important. See *Staton*, 327 F.3d

11   at 977 (noting that fear of workplace retaliation is a relevant factor in evaluating the propriety of

12   an incentive award). Here, plaintiffs proffered no evidence that the class representatives' decision

13   to sue subjected them to any form of risk.  The court therefore finds this factor neutral.

14                         **2.      The Notoriety and Personal Difficulties Encountered by the Class**

15                                  **Representative**

16   An incentive award is particularly appropriate where class representatives have attracted

17   significant media attention and notoriety as a result of the litigation, and experienced personal

18   difficulties as a result. See, e.g., *Wilson v. Airborne, Inc.*, No. EDCV 07-770-VAP (OPx), 2008

19   WL 3854963, *13 (C.D. Cal. Aug. 13, 2008) (finding that the media attention class

20   representatives attracted supported incentive awards).  The fact that there was no such media

21   attention, however, does not preclude the approval of an incentive payment.  See *Razilov*, 2006

22   WL 331204 at *4 (approving an incentive award of $10,000 despite a lack of notoriety or

23   demonstration of personal difficulties).  The parties did not identify any significant media attention

24   regarding this case.  This factor, therefore, is neutral.

25                         **3.      The Amount of Time and Effort Expended by the Class Representative**

26   An incentive award is appropriate where the "class representative[ ] remain[s] fully

27   involved and expended considerable time and energy during the course of the litigation." *Razilov*,

28   2006 WL 331204 at *4.  The class representatives in this case committed time to the litigation by

reviewing pleadings, communicating with class counsel during the prosecution of this case and sitting for deposition. Their involvement, however, appears to have been relatively minimal and not particularly burdensome. Compare *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW (EMC), 2010 WL 1687832, *17 (Apr. 22, 2010) (approving a $20,000 award where plaintiff "made herself available for deposition on two separate occasions, wherein she was subjected to questioning regarding her personal financial affairs and other sensitive subjects; met with Class Counsel on six separate occasions; attended the full-day Court-ordered appraisal hearing; spoke with Class Counsel and their staff on many occasions; reviewed all major pleadings; and repeatedly responded to interrogatories and document requests.) Thus, while this factor favors approval of an incentive award, the court accords it minimal weight.

### 4. The Duration of the Litigation

When litigation has been particularly protracted, an incentive award is especially appropriate. See *Van Vranken*, 901 F.Supp. at 299 (finding that a class representative's participation through "years of litigation" supported an incentive award). This litigation has been pending for almost two years, which is a substantial, but not particularly unusual, period of time. This factor, therefore, weighs only slightly in favor of approving the incentive award.

### 5. The Personal Benefit Enjoyed by the Class Representative as a Result of the Litigation

An incentive award may be appropriate when a class representative will not gain any benefit beyond that she would receive as an ordinary class member. See *Razilov*, 2006 WL 331204 at *4 (approving the payment of an incentive award where the only benefit a class representative was going to receive from a settlement was the same statutory damages award that other class members would receive); *Van Vranken*, 901 F.Supp at 299 (where class representative's claim made up "only a tiny fraction of the common fund," a substantial incentive award was appropriate). There is no evidence here that any class representative has received any unusual or extraordinary benefit. This factor, therefore, favors approval of an incentive award.

### 6. Weighing the Factors

Although none of the factors weighs strongly in favor of granting an incentive award, a

1    sufficient number support an award that the court concludes such an award would be reasonable.

2    Therefore, the court concludes that an incentive award of $5,000 for each class representative is

3    "just and reasonable under the circumstances." *Van Vranken*, 901 F.Supp at 299.  An incentive

4    award of $5,000 per class representative is in line with other awards approved in this circuit.  The

5    court therefore approves a $5,000 incentive award for each named plaintiff, to be paid out of the

6    Settlement Fund, conditional upon final approval of the settlement.[158]

7    ### F.    Whether Counsel's Request for Litigation Costs is Reasonable

8            The district court has discretion to determine an appropriate award of costs and expenses.

9    See *Trans Container Services v. Security Forwarders, Inc.*, 752 F.2d 483, 488 (9th Cir. 1985).

10   One court has noted that, in evaluating the reasonableness of costs, "the judge has to step in and

11   play surrogate client."  See *In re Continental Illinois Securities Litigation*, 962 F.2d at 572.  In

12   keeping with this role, the court must examine prevailing rates and practices in the legal

13   marketplace to assess the reasonableness of the costs sought.  *Jenkins*, 491 U.S. at 286-87; *Blum*,

14   465 U.S. at 895.

15           Plaintiffs' counsel seek $23,143.64 in expenses.[159]  The court has reviewed the accounting

16   submitted and finds that almost all of the expenses were reasonably and necessarily incurred in

17   the course of the litigation.  One line item is questionable, however.  Attorney Howard Rubinstein

18   seeks reimbursement for approximately $7,150 in meal, hotel, and transportation costs.[160]

19   Rubenstein's declaration provides no information concerning these costs or why he was required

20   to travel to this extent.  None of the other attorneys representing plaintiffs claims similar amounts

---

23   [158]Memorandum of Understanding at 17 ("To the extent that the Court approves less than
     the amount of the Plaintiff's awards that Class Counsel requests, the difference between the
24   requested and awarded amounts will be proportionately redistributed among the participating Class
     Members").

25

26   [159]Attorneys' Fees Motion at 1.

27   [160]Declaration of Howard Rubinstein in Support of Plaintiffs' Application for Attorneys'
     Fees, Expenses, and Plaintiff Service Awards ("Rubinstein Decl."), Docket No. 135, Attachment
28   3 (Jul. 18, 2011), ¶ 6.

1  for hotel, meal, and transportation costs.[161]

2     Without further explanation, the court cannot find that these expenditures are reasonable.

3  Consequently, it concludes that the costs Rubinstein seeks should be reduced by 50% for a total

4  award of $3,725.  The court will award total expenses to all plaintiffs' counsel of $19,418.64.

5  **G.     Further Notice to the Settlement Class**

6     Finally, the court must also consider whether further notice to the settlement class is

7  warranted.  Courts do not generally require that additional notice be provided to the class where

8  modification of a settlement increases benefits to the class.  See *In re Prudential Ins. Co. of Am.*

9  *Sales Practices Litig.*, 962 F.Supp. 450, 473 (D.N.J. 1997) ("Class members have already

10  received adequate notice both of the pendency of this class action and of the Proposed Settlement.

11  Class members need not be informed of the Final Enhancements to the settlement because the

12  Proposed Settlement is only more valuable with these changes"); *In re Remeron End-Payor*

13  *Antitrust Litigation*, No. Civ. 02-2007 FSH, Civ. 04-5126 FSH, 2005 WL 2230314, *19 (D.N.J.

14  Sept. 13, 2005) ("[T]he boilerplate provision that allows for modification of the settlement without

15  notice to class is satisfactory and necessary.  The class is protected from adverse modifications

16  by Rule 23 and the requirements of due process, regardless of what the provision says, and the

17  Court is charged with enforcing these protections.  Minor modifications may be necessary to a

18  settlement agreement (indeed may be favorable to the class), and additional class notice is not

19  always required because, e.g., of the cost of notice that would take recovered money from the

20  class").  Here, the court concludes that giving additional notice to all class members and a further

21  period for objections is not required.  Any modifications will help ensure that the national scope

22  of the class settlement being reached is recognized.  No modification will reduce the fund available

23  to compensate class members who purchased the Krispies cereals during the class period.

24     Courts have generally required, however, that class members who previously opted out be

25  given notice of a modification and time to decide whether they wish to rejoin the class.  See *In re*

26  *Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. at 473 ("Plainly, class members

27  ───────────

28     [161]Rubinstein Decl., ¶ 5.

who declined to opt out earlier, would not choose to do so now.  Moreover, class members who opted out may now desire to participate in the Proposed Settlement, given the added value of the Final Enhancements.  For this reason, the Court will order that a special notice be sent to the opt-outs to permit them to reevaluate their choices"); *In re Remeron End-Payor Antitrust Litigation*, 2005 WL 2230314 at *19  (approving a settlement where "the adjustment that was made to the settlement that favored the class, after notice went out, was followed by additional notice and by opportunity for any opt-outs to return to the class in order to partake in the additional recovery").

In this case, it is unlikely that the modifications effected by the amended stipulation would change the minds of those who have opted out, since the revisions primarily concern the distribution of the Cy Pres Fund, and the allocation of monies remaining in the Settlement Fund after class members are paid.  Nonetheless, in response to the concerns regarding additional notice expressed in the court's August 29, 2011, tentative order, the parties agreed in the amended stipulation to provide notice by U.S. mail to all class members who previously opted out of the settlement, informing them of the modified terms and providing them with an opportunity to rejoin the class within thirty days of the amended stipulation's filing.[162]  The court thus deems any additional notice requirements to have been satisfied.

### III.     CONCLUSION

For the foregoing reasons, the court grants the parties' joint motion for final approval of their class action settlement.  The court also awards class counsel attorneys' fees of $879,237, and costs of $19,418.64, for a total of $898,655.64.  It approves incentive awards of $5,000 to each of the three named class representatives.  The court also approves the parties' stipulation that

---

[162]Amended Stipulation, V.D.

21,700 of the fees award be paid to objector Stehle and his counsel; this will result in class counsel recovering $857,537 in attorneys' fees.

DATED: November 23, 2011

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

75